UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

19 CV 7137

Senior Health Insurance Company of
Pennsylvania,

Plaintiff,

v.

Lincoln International LLC, Lincoln Partners
Advisors LLC,

Defendants.

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
JUL 3 1 2019
U.S.D.C. S.D. N.Y.
CASHIERS

# Table of Contents

NATURE OF THE ACTION .................................................................................................. 3

PARTIES ............................................................................................................................... 7

RELEVANT NONPARTIES ................................................................................................. 8

JURISDICTION AND VENUE .......................................................................................... 12

FACTUAL BACKGROUND .............................................................................................. 12

    A.   SHIP and How It Became Involved with Beechwood ...................................... 12

    B.   The Platinum-Beechwood Scheme To Secure Funds From Insurers Like SHIP Under False Pretenses To Keep the Platinum Ponzi Scheme Afloat ................................. 14

    C.   Beechwood's Misrepresentations to Induce SHIP to Enter Into the IMAs ............... 18

    D.   The Investment Management Agreements .......................................................... 21

        i.    *The BBIL and Beechwood Re IMAs* ...................................................... 21

        ii.   *The BAM IMA and Side Letter* ........................................................... 26

    E.   Lincoln's Central Role In the Fraud ................................................................ 28

        i.    *Platinum Engages Lincoln to Lend Credibility and Enable the Fraud* ..................... 28

                                              ............................... 34

        iii.  *Lincoln Terminates the Relationship* ............................................... 55

    F.   Beechwood Disregards the IMAs, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ....... 64

        i.    *Beechwood uses SHIP Assets to Engage in Related-party Transactions* ................. 64

        ii.   *Beechwood Overvalues Investments and Collects Performance Fees as a Result* .... 71

        iii.  *Beechwood Takes Performance Fees* .......................................................... 75

    G.   Revelation of the Fraudulent Beechwood-Platinum Scheme and Further Concealment ............................................................................................................. 78

COUNT ONE ...................................................................................................................... 80

COUNT TWO ..................................................................................................................... 81

COUNT THREE .................................................................................................................. 83

COUNT FOUR .................................................................................................................... 85

COUNT FIVE ...................................................................................................................... 87

COUNT SIX ........................................................................................................................ 89

COUNT SEVEN .................................................................................................................. 90

PRAYER FOR RELIEF ...................................................................................................... 91

DEMAND FOR TRIAL BY JURY ..................................................................................... 91

Plaintiff Senior Health Insurance Company of Pennsylvania ("SHIP") by and through their undersigned attorneys, submits this Complaint against Lincoln International LLC and Lincoln Partners Advisors LLC (collectively referred to as "Lincoln"), and alleges as follows:

## NATURE OF THE ACTION

1. This Complaint seeks to hold Lincoln accountable for its material role . Beechwood consisted of reinsurance companies and related investment management and servicing entities that feigned independence from Platinum[3] and falsely purported to invest in safe and highly collateralized assets. In reality, Beechwood was controlled by Platinum and transferred its assets to the benefit of Platinum, which Platinum used to fund its high risk and unsecured investments.[4] Far from yielding the guaranteed returns that were promised to SHIP for its investment of $320 million, instead SHIP's investment in Beechwood resulted in losses that may exceed its original investment. SHIP has sought relief against the Beechwood and Platinum entities in other actions.[5]

---

[1] "Platinum Entities" means Platinum Management (NY) LLC, Beechwood Re Investments, LLC, and N Management LLC.

[2] "Beechwood" means the entire Beechwood enterprise, which includes the Beechwood Advisors, the Beechwood Entities, and the Beechwood Insiders.

[3] "Platinum" means the entire Platinum enterprise, which includes the Platinum Entities and the Platinum Insiders.

[4] This Complaint is a piece of a larger puzzle and focuses on Lincoln's role in the scheme. *See SHIP v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515 (S.D.N.Y. 2018); *Trott, et al. v. Platinum Management (NY), LLC, et al.*, ("PPVA Action") Second Amended Complaint [ECF 226] (March 29, 2019) (the "PPVA Complaint"); *Cyganowski v. Beechwood Re Ltd., et al*, ("PPCO Action") First Amended Complaint [ECF 207] (March 29, 2019) (the "PPCO Complaint"; *SEC v. Platinum Management (NY) LLC, et al.*, 16-cv-6848 (E.D.N.Y .) (the "SEC Complaint"); *U.S. v. Nordlicht, et al.*, 16-cr-640 (E.D.N.Y.) (the "Criminal Indictments").

[5] *Senior Health Insurance Co. of Pa. v. Beechwood Re Ltd., et al.*, 18 Civ. 06658-JSR, Second Amended Complaint [ECF 84], Answer, Crossclaims, and Third-party Claims [ECF 390] (the "SHIP Action").

This Complaint seeks relief specifically against Lincoln, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

2.      Because █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

3.      SHIP signed three Investment Management Agreements (the "IMAs"), providing $270 million in policyholder reserves to Beechwood that required independent valuations before ceding assets or releasing funds, in addition to $50 million outside the IMAs. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, SHIP released its cash reserves, relying on █████████████████████████████████████████████████████████████████████████████████████████████████████████████ Lincoln is liable to SHIP for its conduct in assisting the Platinum Entities and the Beechwood Entities[6] in the fraud as detailed below.

---

[6] "Beechwood Entities" means Beechwood Re, Ltd.; Beechwood Bermuda International, Ltd.; B Asset Manager, L.P.; B Asset Manager II, L.P.; MSD Administrative Services LLC; Beechwood Re Holdings, Inc.; Beechwood Bermuda, Ltd.; BAM Administrative Services LLC; Beechwood Capital Group, LLC; B Asset Manager GP LLC; and B Asset Manager II GP LLC.

4.    As Beechwood pursued this scheme in concert with Platinum over a period of multiple years, it consistently misled SHIP as to the nature, quality, and value of the investments that Beechwood was making on SHIP's behalf and as SHIP's fiduciary.  For example, for each investment made, Beechwood reported and represented the existence, general nature, and asserted value of the investment to SHIP.   As part of this scheme, Beechwood furnished periodic reports from third-party analysts, including Lincoln, offering valuations of SHIP's investments.

5.    ███████████████████████████████████████████

██████████████████████████████████  ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

6.    ███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

████████ as required under the Investment Management Agreements. ████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████

7.   ███████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ None of the Co-conspirators or

Lincoln ever disclosed these facts to SHIP. To the contrary, ███████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

---

[7] The Platinum Founders, the Platinum Insiders, and the Beechwood Insiders are collectively referred to as the "Co-conspirators."

██████████████████████████████████████████

████████████████████████

8. Ultimately, Beechwood and Platinum's Ponzi-like scheme that ███████████ ████████████████████, resulted in hundreds of millions of dollars in economic injury to SHIP. Beechwood, with the knowledge and participation of the Platinum Insiders[8] and the Beechwood Insiders[9], mismanaged and misused more than $270 million in funds that SHIP entrusted to Beechwood for investment under false pretenses through the IMAs, and another $50 million provided outside the IMAs. In addition, as a result of, and in reliance on, Beechwood's repeated misrepresentations regarding the value and performance of the IMA investments to which ████████████ SHIP authorized Beechwood's requests to pay itself over $30,000,000 in unearned performance fees, the last of which was authorized on August 1, 2016. SHIP accordingly brings this action to recover the losses it has sustained as a result of ██████████████ █████████████████████.

## PARTIES

9. SHIP is an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

10. Lincoln International LLC is a valuations company domiciled in Illinois, actively registered to do business in New York, with its principal place of business in New York, New York.

---

[8] Mark Nordlicht, Murray Huberfeld, David Bodner (collectively, the "Platinum Founders"), Estate of Uri Landesman, Naftali Manela, Joseph SanFilippo, Daniel Small, Ezra Beren, David Steinberg, David Ottensoser, Brian Jedwab, Will Slota, Bernard Fuchs, Isaac Barber and Paul Poteat, David Levy are collectively referred to as the "Platinum Insiders."

[9] David Levy, Dhruv Narain, Eliot Feit, Daniel Saks, Hokyong Kim a/k/a Stewart Kim, Samuel Adler, Moti Edelstein, and Rick Hodgdon, Moshe M. Feuer, and Scott Taylor are collectively referred to as the "Beechwood Insiders."

11.    Lincoln Partners Advisors LLC is a valuations company domiciled in Illinois, actively registered to do business in New York, with its principal place of business in New York, New York. Upon information and belief, Lincoln Partners Advisors LLC operates as a subsidiary of Lincoln International LLC.

## RELEVANT NONPARTIES[10]

12.    Beechwood Re Ltd. ("Beechwood Re") is a reinsurance company domiciled in the Cayman Islands, which had offices in New York, New York at all relevant times.

13.    Beechwood Re Investments, LLC ("BRILLC") is a limited liability company domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.

14.    B Asset Manager LP ("BAM I") is a limited partnership domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.

15.    B Asset Manager II LP ("BAM II," and collectively with BAM I, "BAM") is a limited partnership domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.  BAM II, with BAM I served as an investment advisor for the other Beechwood Entities, and enacted Investment Management Agreements with both BBIL and Beechwood Re.  In their capacity as investment managers, BAM signed on behalf of SHIP, and was signatory to most of the deals Beechwood caused SHIP to enter. Through its controllers and ownership structure, BAM had knowledge of all aspects of the Platinum-Beechwood scheme and was used to further the scheme to the detriment of SHIP.

16.    Beechwood Re Holdings, Inc. ("Beechwood Holdings") is a corporation domiciled in Delaware.  Beechwood Holdings holds all of the common stock of Beechwood Re.

---

[10] SHIP is seeking relief from the relevant nonparties in a separate case as discussed above in footnote 5.

17.    Beechwood Bermuda International, Ltd. ("BBIL") is a reinsurance company domiciled in Bermuda, which had offices in New York, New York at all relevant times.

18.    Beechwood Bermuda Ltd. ("BBL") is an entity organized under Bermuda law, with its principal place of business in Bermuda and a place of business in New York. BBL was a reinsurance company that was licensed as an insurer located in Hamilton, Bermuda and regulated by the Bermuda Monetary Authority.  BBL is the parent company of BBIL.

19.    BAM Administrative Services LLC ("BAM Administrative") is a limited liability company domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times. BAM Administrative was a wholly owned subsidiary of BAM I. BAM Administrative served as agent for the Beechwood Trusts and as agent and signatory on behalf of Beechwood Re and BBIL in connection with certain transactions described more fully below. BAM Administrative also took management fees that it did not earn to move assets away from SHIP.

20.    Mark Nordlicht is a resident of New Rochelle, New York.  Nordlicht founded Platinum Partners and played a principal role in the creation of Beechwood.  He was an owner of Beechwood and exercised significant control over the enterprise's affairs, operating the business through the Beechwood Insiders. Nordlicht even maintained an office within Beechwood's offices, unbeknownst to SHIP.  Nordlicht deliberately concealed his ownership in and control over Beechwood in order to perpetuate Platinum's fraudulent scheme.  In particular, he set up Beechwood Trust Nos. 1-6, one for each of his six children, which held Nordlicht's interests in Beechwood Holdings.  He also indirectly owned preferred shares in Beechwood Re Ltd. through several of the BRILLC Series, one of which was owned and controlled by his wife, Dahlia Kalter. Nordlicht was recently convicted in the Eastern District of New York for securities fraud,

conspiracy to commit securities fraud, and conspiracy to commit wire fraud in connection with his role in the scheme described herein.

21. Murray Huberfeld is a resident of Lawrence, New York. Huberfeld is also a founder of Platinum Partners and was instrumental in Beechwood's creation. Huberfeld is currently serving a 30-month sentence for conspiracy to commit fraud in conjunction with his activities at Platinum Partners. Huberfeld was also responsible for the solicitation of the initial funds that seeded Beechwood. Huberfeld was a direct or indirect owner of Beechwood at all relevant times through, among other vehicles, several of the BRILLC Series and Beechwood Trust Nos. 15-19. Each of Huberfeld's five children is named as a beneficiary of one of those trusts.

22. David Bodner is a resident of Monsey, New York, and is also a founder of Platinum Partners. Like Nordlicht and Huberfeld, Bodner played a key role in Beechwood's formation. Bodner was a direct or indirect owner of Beechwood at all relevant times. Bodner maintained ownership interests in Beechwood Holdings through Beechwood Trust Nos. 7-14, each of which named one of Bodner's eight children as the beneficiary. Bodner also indirectly owned preferred shares in Beechwood Re through Beechwood Re Investments, LLC Series C, which in turn was owned and controlled by Monsey Equities, LLC, a vehicle owned and controlled by Bodner's wife, Naomi Bodner.

23. Mark Feuer ("Feuer") is, and at all times material to the allegations in this pleading was, a resident of Lawrence, New York. Feuer is a Beechwood Founder, and together with Scott Taylor, and initially David Levy, presented the public face of the Beechwood Entities. Feuer was part of the Beechwood enterprise and its operations at all times relevant to these allegations. Feuer continuously misrepresented material facts regarding Beechwood's ownership, management, investment strategy, investments, and investment values and returns to SHIP and other clients of

the Beechwood Entities. Feuer was one of the authors of the Platinum-Beechwood scheme, together with Scott Taylor, David Levy, Mark Nordlicht, Murray Huberfeld, and David Bodner. Feuer also was instrumental in carrying out the Platinum-Beechwood scheme, including the defrauding and otherwise harming of SHIP, in concert with the Co-Conspirators. Feuer is a named Defendant in the SHIP Action

24.     Scott A. Taylor ("Taylor") is, and at all times material to the allegations in this pleading was, a resident of New York, New York. Taylor was one of the founders of Beechwood (each, a "Beechwood Founder"), and together with Feuer, and initially David Levy, presented the public face of the Beechwood Entities. Taylor was part of the Beechwood enterprise and its operations at all times relevant to these allegations. Taylor continuously misrepresented material facts regarding Beechwood's ownership, management, and investment strategy, investments, and investment values and returns to SHIP and other clients of the Beechwood Entities. Taylor was one of the authors of the Platinum-Beechwood scheme, together with Feuer, David Levy, Mark Nordlicht, Murray Huberfeld, and David Bodner. Taylor also was instrumental in carrying out the Platinum-Beechwood scheme, including the defrauding and otherwise harming of SHIP, in concert with the Co-Conspirators. Taylor is a named Defendant in the SHIP Action.

25.     David I. Levy ("Levy") is, and at all times material to the allegations in this pleading was, a resident of New York, New York. Levy is the nephew of Murray Huberfeld. Levy was a portfolio manager at Platinum Management and rose through the ranks to become Co-Chief Investment Officer of Platinum Management with Mark Nordlicht. Levy is a Beechwood Founder and, together with Feuer and Taylor, presented the public face of the Beechwood Entities. Levy left Beechwood in late 2014 and returned to Platinum Management, but, as part of the Platinum-Beechwood scheme, surreptitiously continued to exert control over the Beechwood Entities

throughout the relevant period. Levy was integral in every aspect of the Platinum-Beechwood scheme, including developing the scheme, founding Beechwood, selecting investments for SHIP contrary to the guidelines of the IMAs and against SHIP's best interest in consultation with Nordlicht and others, and concealing the true relationship between Platinum and Beechwood. Levy is a named Defendant in the SHIP Action.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction under 28 U.S.C. 1332(a) because the parties are citizens of different states and the amount of controversy exceeds $75,000.00.

27.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because the Defendants are subject to personal jurisdiction in this district and a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this district.

## FACTUAL BACKGROUND

### A.     SHIP and How It Became Involved with Beechwood

28.     After sustaining significant and ongoing underwriting losses, SHIP stopped writing new business in 2003 and began to work with the Pennsylvania Insurance Department to develop a run-off strategy.  In 2008, the ownership of SHIP was transferred from a wholly owned subsidiary of Conseco, Inc. to the Senior Healthcare Trust, which was then merged into the Senior Healthcare Oversight Trust (the "Oversight Trust"), and the company's name was changed to the "Senior Health Insurance Company of Pennsylvania."  The Trustees of the Oversight Trust serve as SHIP's Directors and are primarily former insurance regulators.

29.     SHIP is responsible for funding the covered long-term care expenses of its elderly policyholders.  When all of SHIP's policies and other obligations have been satisfied, proceeds from the liquidation of SHIP, if any, will be disbursed by the Oversight Trust to a common law

trust, which at that time will select an ultimate beneficiary. This ultimate beneficiary must be one or more charities that are focused on senior health issues.

30. Hence, although SHIP is organized as a "for profit" corporation, it is managed solely for the benefit of its policyholders and without a profit motive. As SHIP is no longer managed to earn a return on equity, SHIP's policyholders are the primary beneficiaries of SHIP's statutory surplus (which equals the amount by which its assets exceed its obligations).

31. SHIP was introduced to Beechwood Re in late 2013. On February 1, 2014, SHIP's affiliate, Fuzion ("Fuzion"), entered into a Master Services Agreement with Beechwood Re under which Fuzion agreed to administer the long-term care insurance policies that had been reinsured with Beechwood Re by WNIC and BCLIC with the approval of their respective state regulators.

32. SHIP is an insurer that no longer writes new business, SHIP's access to capital and sources of income are limited to policyholder premiums and investment income. SHIP's recently filed financial statement demonstrates a deficiency in its capital and surplus in excess of $450 million.

33. In 2014 and 2015, SHIP's then-President and CEO, Brian Wegner, and, SHIP's then-CFO, Paul Lorentz, and others met with and otherwise communicated with Feuer, Taylor, and Levy electronically, by telephone, and in person to discuss SHIP's unique status as a run-off insurer and the particular challenges it faced with respect to its surplus. Feuer, Taylor, and Levy advised SHIP that Beechwood Re was unable to enter into a reinsurance agreement with SHIP. But they proposed instead to assist SHIP in improving its capital and surplus status by offering SHIP the opportunity to participate in the same investments in which Beechwood Re invested the reserves associated with the WNIC and BCLIC policies and certificates that were reinsured by Beechwood Re.

34.     Unbeknownst to SHIP, and undisclosed by Beechwood, these investments were primarily investments in or involving Platinum Partners, an entity whose principals owned and controlled Beechwood, a fact that was intentionally hidden from SHIP from the beginning. These investments also would favor the interests of Beechwood and Platinum and their related parties to SHIP's detriment, though SHIP could not have known this at the time, and was never informed of this by the independent valuations provided by Lincoln, described in detail below, that were meant to provide SHIP comfort in investing their funds with Beechwood.

**B.     The Platinum-Beechwood Scheme To Secure Funds From Insurers Like SHIP Under False Pretenses To Keep the Platinum Ponzi Scheme Afloat.**

35.     As has been well-described elsewhere, beginning in at least 2012, Platinum faced recurring liquidity crises that it kept concealed from its investors. Platinum Partners Value Arbitrage Fund L.P. ("PPVA") became increasingly concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded. Many of PPVA's investors, however, demanded their money back every quarter, as PPVA's own operating documents permitted them to do. To satisfy these recurring redemption requests, Platinum Management was required to withdraw cash from more liquid investments, creating a feedback loop whereby PPVA's investment portfolio became increasingly illiquid as time went on.

36.     As a solution to Platinum's liquidity woes, the Platinum Insiders, along with Feuer and Taylor, conceived of Beechwood, which was constructed specifically to seek out pockets of cash from unsuspecting institutional investors such as SHIP to serve the interests of Platinum and the Platinum Insiders.

37.	In early 2013, Nordlicht, Huberfeld, and Bodner, in their individual capacities and on behalf of Platinum, entered into a conspiracy with Feuer and Taylor, in their individual capacities and on behalf of Beechwood Capital Group, a company that they had previously founded. The conspirators agreed to establish a reinsurance company, Beechwood Re, and use it as a vehicle for fraudulently inducing insurers to hand over funds to Beechwood via reinsurance agreements or otherwise, so that Beechwood could use those funds to keep Platinum afloat, thereby enriching the Co-conspirators.

38.	Beechwood Re served as one of the three main vehicles—along with BBIL and BAM (collectively referred to as the "Beechwood Advisors") —through which Nordlicht, Huberfeld, Feuer, Taylor, Levy, Bodner and the rest of the Platinum Insiders and Beechwood Insiders perpetrated a fraudulent conspiracy, over several years, aimed at SHIP and other insurers, with Feuer, Taylor and Levy serving as the front men. The Lincoln valuations were a key component of this fraudulent conspiracy.

39.	Indeed, by February 28, 2013, Beechwood and Platinum were alter egos and had interchangeable management, as demonstrated, inter alia, by an e-mail exchange between Taylor and Feuer from their Beechwood emails and Levy from his Platinum email, discussing the execution of an agreement between Beechwood Capital and Alpha Re Limited, another reinsurance company.

40.	The Co-conspirators agreed that the key to the conspiracy's success was to keep the relationship between Beechwood and Platinum a secret from everyone, especially their targets. The Co-conspirators agreed that Beechwood would misrepresent the persons who owned and controlled Beechwood, making sure never to divulge that Nordlicht, Huberfeld or Bodner controlled Beechwood and had substantial ownership interests in the many Beechwood Entities,

particularly including Beechwood Re. They created a complex and elaborate ownership structure with the sole intent of confusing interested parties.

41.     The Co-conspirators expressly contemplated how to utilize Beechwood's intentionally complex structure to avoid revealing Nordlicht, Huberfeld, Bodner and Levy's control over the investments to SHIP and other clients. In a series of e-mails between Feuer, Taylor, Nordlicht and Levy on May 11 and 12, 2014, Taylor informed the group that ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

Nordlicht responded asking to have primary brokerage accounts set up "quickly" and asked who was internally responsible for getting that done; David Levy replied that he and Sam Adler were. Nordlicht responded: ████████████████████████████████████████

██

42.     At all relevant times, the management teams of the Beechwood Entities worked in concert with and under the direction of the Platinum Entites and the Platinum Insiders, who were in turn controlled by Nordlicht, Huberfeld, Bodner and Levy. In fact, at its founding, Beechwood was initially operated out of Platinum Partners' offices. Furthermore, Nordlicht and other Platinum executives, including Naftali Manela and Daniel Saks, maintained e-mail accounts with both Beechwood and Platinum Partners that they used interchangeably to direct Beechwood's investment activities. Huberfeld was also intimately involved in Beechwood-related transactions, having been included on numerous e-mails concerning those transactions and having provided advice to Beechwood on a number of occasions.

43.     In short, Beechwood was nothing more than an instrumentality of Platinum's fraudulent scheme, with the Beechwood and Platinum Insiders all in on it, and SHIP and other

Beechwood investors serving as their marks. Bodner confirmed as much in a July 29, 2015 e-mail in which he stated that "We weren't exactly honest . . . that beechwood and platinum are really integrated." Bonder recognized that the Beechwood Advisors were merely Platinum's alter egos and that the connections between the entities were deliberately concealed from third parties. Bodner knew that if Beechwood's investors, including SHIP, knew the truth about the improper connections between Beechwood and Platinum and the resultant improper investments, the entire scheme would collapse.

44.　SHIP's confidence in Beechwood was bolstered by its knowledge that, in early 2014, Beechwood Re had entered into regulator-approved reinsurance transactions with BCLIC and WNIC (collectively, and as part of the CNO Financial Group, or "CNO"). CNO also relied on Lincoln valuations to enter these transactions and then authorize performance fees.

45.　SHIP was aware of the BCLIC and WNIC reinsurance arrangements through SHIP's affiliate, Fuzion Analytics, LLC, which acts as a third-party policy and claims administrator for policies of long-term care business issued by various insurers, including SHIP. Beechwood itself lacked internal policy or claim administration infrastructure and capabilities. Hence, in seeking to reinsure the BCLIC and WNIC business, Beechwood engaged Fuzion to continue its role as administrator. In communications with SHIP and Fuzion personnel regarding the CNO reinsurance block that occurred in late 2013 into 2014, Beechwood repeatedly represented that Beechwood's skill was in investments and that Beechwood had access to investments that yielded high returns and thus would enable Beechwood to profit from the reinsurance of the CNO portfolio.

46. On February 1, 2014, Fuzion entered into a Master Services Agreement with Beechwood Re under which Fuzion agreed to administer the WNIC and BCLIC long-term care insurance policies and certificates reinsured by Beechwood Re.

47. Beechwood Re indicated that it was unwilling to enter into a similar regulator-approved reinsurance arrangement with SHIP under which Beechwood would, in essence, take SHIP's reserves and then assume the financial obligation to pay policy claims. Instead Beechwood advised SHIP that it could gain access to the same kinds of allegedly high-quality, high-yield investments that supported the BCLIC and WNIC agreements by entering into investment management agreements with the Beechwood Advisors.

**C.     Beechwood's Misrepresentations to Induce SHIP to Enter Into the IMAs**

48. On April 10, 2014, Taylor, on behalf of Beechwood sent SHIP's CEO Wegner an e-mail, with copies to Levy and Feuer. The e-mail attached documents that provided information concerning Beechwood's purported ███████████████████████████████ and advised that Beechwood's ████████████████████████████████████████ ███████████ Taylor noted in his April 10, 2014 e-mail that those classes of investments were ████████████████████████████████████████████████████████ ██████████████████

49. The April 10, 2014 e-mail included a "Discussion Document" that summarized Beechwood's purported investment strategy and guidelines. The Discussion Document indicates that, in investing assets, Beechwood: ████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████

50.     Prior to entering into each IMA or placing any assets with Beechwood for investment management, SHIP was provided available Beechwood financial statements and other financial reporting that were purportedly provided by Beechwood's independent auditor, KPMG. This information from Beechwood indicated that it possessed a strong balance sheet, providing increased comfort to SHIP while considering Beechwood's business proposals.

51.     In its presentations to SHIP, Beechwood recommended a strategy of investing in assets that were highly collateralized and well protected.  Beechwood represented to SHIP that the investments were over-secured by collateral that Beechwood could seize if a loan or other investment was not repaid, which would enable Beechwood to recover the value of any investment.

52.     Beechwood's April 2014 Discussion Document and their presentations to SHIP also emphasized Beechwood's relationship with Lincoln and promised ███████████████ ██████████ from Lincoln on █████████████████████████ Beechwood's presentations further emphasized Lincoln's purported seven-step valuation methodology for secured credit opportunities, such methodology including monthly "negative assurance" valuations as well as quarterly "positive assurance" valuations.

53.     The monthly negative assurance valuations by Lincoln were promised to include ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

54.     The quarterly positive assurance valuations by Lincoln were promised to include ████████████████████████████████████████████████████████████ ███████████████████

55.     Unbeknownst to SHIP, Beechwood's representations were false, misleading, and material, and Beechwood knew, or they were at least grossly negligent in not knowing, that they

were false, misleading, and material when they made them to SHIP in order to induce SHIP to enter the IMAs and to turn over, in time, more than $270 million for investment.

56.     Beechwood concealed from SHIP in a fraudulent or at least grossly negligent manner that they intended for their promised "independent" valuations to provide inadequate, misleading, or false information when they placed SHIP's assets into investments that were highly speculative, opaque, and not adequately secured.  They also hid the reality that Beechwood intended, in essence, to convert SHIP's assets to the uses of Platinum and the individuals controlling Beechwood and Platinum in a manner fundamentally inconsistent with the safe and conservative portfolio they promised would result in a guaranteed return.

57.     Beechwood concealed from SHIP in a fraudulent or at least grossly negligent manner that they intended to place SHIP's assets in related-party transactions involving one or more of the principals of the Beechwood Advisors or the Platinum Entities and their associates.

58.     As each of the three IMAs was successively executed, Beechwood further concealed their actions by, as set forth herein, providing false and misleading information to SHIP regarding the nature of the investment strategy and the individual investments, including fraudulent valuations.  Beechwood thus created a false impression that the investments made on SHIP's behalf were performing well, which encouraged SHIP to invest additional funds and discouraged SHIP from taking earlier actions to protect its funds that were being manipulated and diminished in value by Beechwood's schemes.

59.     Based upon and in reliance on Beechwood's false and misleading representations and the fraudulent or grossly negligent omission or concealment of material information, SHIP entered into the IMAs to its detriment.

**D.     The Investment Management Agreements**

60.     SHIP entered into three Investment Management Agreements with the Beechwood Advisors.  All three IMAs contain the same basic structure, with a few minor exceptions that do not materially change the nature of Beechwood's breaches or misrepresentations.  The substance of the IMAs is incorporated herein by reference.  The IMAs all were controlled by the Beechwood Insiders and their related parties in essentially the same manner, even though the individual agreements had different contractual counterparties, purportedly because such diversification would further protect SHIP's invested funds.

61.     SHIP also was subject to investment guidelines limiting investment concentration. SHIP further understood from Beechwood prior to executing the IMAs that Beechwood was managing assets that were achieving returns well in excess of the IMA guaranteed returns, which guarantees were considered additional protection for SHIP.  Each of the IMAs granted Beechwood full discretion over the specific investments made and promised independent valuations by Lincoln of investment returns that would allow Beechwood to withdraw performance fees. Specifically, all the IMAs stated that, "Within 15 calendar days subsequent to quarter end, Adviser will provide Client valuation reports from an independent third-party valuation company" (i.e. Lincoln) "on all nonpublic securities, as well as the quarter end investment holding report and Net Asset Value." BBIL IMA, Exhibit E at ¶ 2; Beechwood Re IMA, Exhibit E at ¶ 2; BAM IMA, Exhibit D at ¶ 2. Therefore, Lincoln's role as the "independent" valuation company was a negotiated term in the IMAs that SHIP relied upon to enter the agreements.

### i.     The BBIL and Beechwood Re IMAs

62.     The first IMA between SHIP and BBIL for the provision of investment management and advisory services was executed as of May 22, 2014 (the "BBIL IMA").

63.     The second IMA for the provision of investment management and advisory services was between SHIP and Beechwood Re and was executed as of June 13, 2014 (the "Beechwood Re IMA").

64.     Taylor executed the BBIL IMA and Beechwood RE IMA on behalf of BBIL and Beechwood Re, respectively.

65.     The BBIL and Beechwod Re IMAs were identical in some of the following respects:

a.  They appointed BBIL/Beechwood Re as SHIP's investment adviser and manager to invest and manage the funds on behalf of SHIP and "subject at all times to the fiduciary duties imposed upon it by reason of its appointment to invest and manage the Assets."  BBIL IMA, ¶ 1; Beechwood Re IMA, ¶ 1.

b.  They each contractually guaranteed an annual investment return to SHIP equal to 5.85% (non-compounded) of the net asset value of the assets contributed to the account.  This guaranteed payment would then be automatically reinvested in the custody account to be managed by each of them, which effectively makes the guaranteed annual return "compounded." BBIL IMA, Exhibit B at ¶ 3; Beechwood Re IMA, ¶ 1(b) and Exhibit B at ¶ 3.

c.  In the event that SHIP's investments under the IMAs did not achieve an annual Investment Return of 5.85%, they were obligated to "(i) pay the Client [SHIP] any Investment Return shortfall from its own account and (ii) as necessary, contribute assets to the Account from its own account such that the net asset value of the Account equals the Initial NAV."  BBIL IMA, Exhibit B at ¶ 3; Beechwood Re IMA, Exhibit B at ¶ 3.  This "True-Up Payment" provision effectively required

them to pay the guaranteed investment return and maintain the asset base, whether the investments performed as they represented they would or not.

d.  They were required to "use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers" under the agreement.  BBIL IMA, ¶ 1; Beechwood Re IMA, ¶ 1; The BAM IMA also had this language. BAM IMA, ¶ 1.

e.  Under the terms of each IMA, they promised to make all investment decisions and to manage SHIP's invested funds "consistent with the general investment policy, guidelines and restrictions" as described on Exhibit A.  BBIL IMA, ¶ 3(b) and Exhibit A; Beechwood Re IMA, ¶ 3(b) and Exhibit A. The BAM IMA also had this language. BAM IMA, ¶ 3(b) and Exhibit A.

f.  The referenced Exhibit A to the IMAs contains their "Adviser Investment Policy, Guidelines and Restrictions" and "Guidelines for Senior Secured Credit Opportunities."  The investment document specifies that it must invest in a manner permitted by "SHIP's corporate investment guidelines 'Senior Health Insurance Company of Pennsylvania: Investment Objectives, Policies and Guidelines, Version 1.6'" ("SHIP's Investment Policies"). The BAM IMA referred to Version 1.7, which was materially consistent with the prior version.

g.  SHIP's Investment Policies begin by emphasizing that "[c]ognizant of the fiduciary character of the insurance business, [SHIP] seeks to achieve investment returns commensurate with the protection of invested capital while minimizing the risk of impairment of investment assets to provide financial stability for its policy holders."  SHIP's "general investment objective" was specified to be "to seek

current income consistent with the preservation of capital and prudent investment risk. Long-term growth is an important secondary consideration."

h. The IMAs permitted returns above the 5.85% guaranteed Investment Return to be retained as a Performance Fee. BBIL IMA, Exhibit B at ¶ 1; Beechwood Re IMA, Exhibit B at ¶ 1. Lincoln's valuations played an important role in misrepresenting Beechwood's returns and thereby induced the authorization of unearned performance fees.

i. During performance under the IMAs, Beechwood compounded the damage to SHIP by falsely overstating the value of the assets under management in their IMA account, with the support of Lincoln valuations, to justify its retention of Performance Fees to which it would not otherwise be entitled as well as to extend the duration of the scheme and magnify the losses.

66. Under the BBIL IMA, SHIP ultimately deposited a total of $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

67. From September 2015 to July 2016, BBIL withdrew from the Wilmington Trust account at least $12,343,891 of SHIP's funds in performance fees, according to the records available to SHIP, and the actual amount could be higher. Because these performance fees had not in fact been earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

68. Indeed, on June 23, 2014, Mark Nordlicht sent an e-mail to Nicholas Marzella of Platinum, copying Israel Wallach and David Shirreffs of Beechwood, stating that he ███████ ████████████████████████████████████████████ and requests that they ███ ███████████ The same day, ███████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ On

July 1, 2014, Nordlicht e-mailed the same group, ███████████████████████

████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ As established in the PPVA and Platinum Partners Credit Opportunities Master Fund, LP ("PPCO") complaints, it was well known to Beechwood and Platinum that Black Elk was a distressed asset at the point these investments were made.

69.     On June 29, 2014, just one day after the BBIL IMA was funded, Nordlicht (using a Beechwood e-mail address) recommended certain equity allocations for SHIP's investments to Taylor.  This level of direct involvement by Platinum in the management of SHIP's money by Beechwood, its fiduciary, was not disclosed in relation to any of the three IMAs and conflicted with Beechwood's ongoing representations that it was acting in SHIP's best interests and was solely in control of all decision-making.  To the extent Platinum was identified by Beechwood to SHIP at all, it was in the context of post-acquisition reporting of investment in one or more of PPCO or PPVA.  Neither Beechwood, ████████████████████████████████████

████████████████████ ever disclosed to SHIP any Platinum connection to other assets in which SHIP was invested, that Platinum was directing SHIP's investments, that Platinum and Beechwood Insiders were personally benefiting from fees and charges related to those investments, or the related-party nature of such transactions and the inherent conflicts of interest that such ties reflect. In connection with the Beechwood Re IMA, SHIP ultimately deposited a total of $80 million into a custody account at Wilmington Trust for investment by Beechwood Re on SHIP's behalf.  This amount was in addition to the previously described $80 million invested under the BBIL IMA.

The deposits were made over time and SHIP, based on Beechwood's assurances, relied on Beechwood's false representations as to the nature, quality, value, and performance of the BBIL IMA and the initial investments made under the Beechwood Re IMA in agreeing to increase the amount to be managed by Beechwood Re under the Beechwood Re IMA. Had SHIP known the truth, SHIP would never have authorized these increases.

70. From September 2014 to April 2016, Beechwood Re withdrew from the Beechwood Re Wilmington Trust account at least $11,275,000 of SHIP's funds in performance fees, according to the records available to SHIP, and the actual amount could be higher. Because these performance fees had not in fact been earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

### ii. *The BAM IMA and Side Letter*

71. The third IMA for the provision of investment management and advisory services was between SHIP and BAM and was executed as of January 15, 2015 (the "BAM IMA").

72. Saks executed the BAM IMA on behalf of BAM.

73. BAM and BRILLC failed to comply with SHIP's investment policy. Rather, BAM and BRILLC, together with the Beechwood Insiders, utilized the BAM IMA and the Side Letter to take control over SHIP's assets and to deploy those assets to benefit Platinum, thereby enriching the Beechwood Insiders as well as Platinum's and Beechwood's owners and related parties, at the expense of SHIP. Beechwood did so without SHIP's knowledge of or consent to the risky and hopelessly conflicted relationship with Platinum that led to inappropriate investments.

74. During performance under the BAM IMA, BAM and BRILLC compounded the damage to SHIP by falsely overstating the value of the assets under management in the BAM IMA account to justify its retention of performance fees to which it would not otherwise be entitled as well as to extend the duration of the scheme and magnify the losses.

75.     Contemporaneous with execution of the BAM IMA, in January 2015, SHIP deposited an initial $50 million into a custody account at Wilmington Trust to be invested and managed by BAM, subject to investment guidelines prescribed by the IMAs and the insurance laws of Pennsylvania.  Subsequently, in March 2015, SHIP deposited an additional $60 million into the same account and subject to the same investment guidelines and legal limitations, for a total investment of $110 million to be managed by BAM under the BAM IMA.  This $110 million was in addition to the $160 million invested with Beechwood under the other two IMAs.  SHIP relied on Beechwood's false representations as to the nature, quality, value, and performance of investments under the BBIL IMA and the Beechwood Re IMA in agreeing to enter into the BAM IMA. These values were supported, in part, by the valuations Lincoln performed.  Had SHIP known the truth, SHIP would not have entered into the BAM IMA.

76.     Similar to the other two IMAs, the BAM IMA appointed BAM as an investment adviser and manager to invest and manage the funds on behalf of SHIP and subject at all times to fiduciary duties.  BAM IMA, ¶ 1.

77.      The language of the BAM IMA itself differed from the BBIL IMA and Beechwood Re IMA in that it did not expressly guarantee a specific investment return.  SHIP, however, entered into a side letter with BRILLC, which was commonly controlled along with the other Beechwood Advisors, and in the side letter BRILLC guaranteed an annual investment return of 5.85% (non-compounded) of the net asset value of the assets contributed by SHIP under the BAM IMA (the "Side Letter"). Nordlicht executed the Side Letter as "Authorized Signatory" for BRILLC.

78.     If a return of less than 5.85% was achieved, however, BAM would receive 1% of the net asset value, a feature not included in the other two IMAs. This allowed Beechwood and Platinum to extract even more funds. The Side Letter likewise promised a "True-Up Payment" in

the event of any shortfall in the annual return, and this mechanism was designed to work in a manner similar to the provision in the other IMAs.

79. From March 2015 to July 2016, BAM withdrew from the Wilmington Trust account at least $11,350,000 from SHIP in performance fees, according to the records available to SHIP, and the actual amount could be higher. Because these performance fees had not in fact been earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

**E. Lincoln's Central Role In the Fraud**

*i.* ***Platinum Engages Lincoln to Lend Credibility and Enable the Fraud***

80. The Platinum-Beechwood scheme—that is well documented in other complaints and summarized in pertinent part below—like any other Ponzi scheme, relied on the appearance of credibility and success. Under the IMAs and Side Letter, BBIL, Beechwood Re, BAM, and BRILLC promised an independent valuation firm would issue quarterly reports as part of the bargain struck with SHIP to induce their investments. These valuations would show SHIP's assets as secure, safely invested, and not diverging from SHIP's risk profile (and should have shown if they were not, if they had functioned as SHIP agreed to and expected from its agreements). Engaging Lincoln allowed Beechwood/Platinum to create the appearance of compliance with the contractual and fiduciary obligations BBIL, Beechwood Re, BAM, and BRILLC owed SHIP and enabled them to obtain and retain the funds of SHIP.

81. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

      *a.* ████████████████████████████████████████████████

82. ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

83. ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ █████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

84. █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███

85. █████████████████████████████████████████████████████████████

██████████████████████████████████████████

86. █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

87. █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  █████████████

---

[12] ███████████████████████████████████████████████████████████

████████████████████████████

88. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

89. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

90.

91.

92.

**b.** ███████████████████████████████
███████████

93. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

94. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████

95. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

ii.

96.

97.

a.

98.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████

99.      ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

100.     ████████████████████████████████████████████

████████████████████████████████████████████ by 2013, PPVA's books and records were showing the world that PPVA's NAV was nearly $1 billion, when in fact PPVA's true NAV was negative $400-$800 million. To keep their scheme afloat, Platinum and the Co-Conspirators needed someone to buy Platinum's assets at grossly inflated values (par or thereabouts for debt instruments, and artificial marks for equity investments) to make their self-reported $1 billion NAV appear believable. Since no bona fide buyer actually existed, Platinum and the Co-conspirators created Beechwood Re to elicit and then use the money of unwitting institutional investors, like SHIP, to do so. Upon information and belief, Lincoln ████████████████████

███████████████████████████████████████

████████████████████

101. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

102. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

103. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

104.

105.

██████████████████████████████████████████████

████████████████████████████████

106.  █████  ████  ████████  ████████  ████████  ███  ████████  ██

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

107.  ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

108.  ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████  As explained above, Beechwood Re had agreed to provide written quarterly reports setting forth the aggregate fair market value of the assets – with "fair market value" expressly defined in the IMAs as "in its reasonable discretion in a manner determined in ***good faith*** to reflect fair market value." (Emphasis added). Accordingly, any "fair market value" assigned to the Valued Investments by Beechwood Re, BBIL, BAM and BAM Adminstrative was improper and fraudulent under the terms of the IMAs.  ████████████████████████████████████

██████████████████████████████████████████████

109. ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████

110.     The Negative Assurance Letters and Positive Assurance Valuations were significant for several reasons, not least of which was that they constituted the purportedly

---

[13] ████████████████████████████████████████████
████████████████

independent third-party valuations SHIP was entitled to receive under the IMAs. The accuracy of these valuations was important because, among other things, and as explained above, at the end of the year, Beechwood Re, BBIL, and BRILLC were required to true up the IMA accounts if the net asset value of the IMA Accounts fell below a certain threshold. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

111.  ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

112.  ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

113. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

114. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

115. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

116.

117.

118.

*b.*

119.

120.

121.

122.

███████████████████████████████████████████████████████

██████████████████████████████████████

123.  ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

*c.*  ████████████████████████████████████████████

124.    Beechwood Re had represented to SHIP that it would retain "independent" agencies to value and rate private investments and level three assets into which Beechwood Re, BAM and BAM Adminstrative invested SHIP's funds. What SHIP could not have known is that ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

125.  ██████████████████████████████████████████████

███████████████████████████████████████████████████████

126.

127.

128.

129.

130. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████

131. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ ██████

---

132.

133. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

134. ███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████.

135. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

136. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

137.   ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

138.   ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---



139.

140.

**d.** ██████████████████████████████████████

141. ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████

142. Lincoln's valuation reports were used to establish whether the actual value of the IMA account assets reported by Beechwood Re, BBIL, and BAM were reasonable (or, in the case of the Negative Assurance Letters, at least not unreasonable). In addition to the ways in which they were used by SHIP, described above, █████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

*iii.* ***Lincoln Terminates the Relationship***

143.

144.

145.

146.

147.

148. █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███

- ██ ████████████████████████
- ██ ██████████████████████████
- ██ ██████████████████████
- ██ ████████████████████████████████
- ██ ██████████████████████

149. █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

- ██ ███████████████████████████████
- ██ █████████████████████████████████
- ██ ██████████████████████████
- ████████████████████████████
- ██ █████████████████████████████

██████████████

█ ████████████████████████████████

████████████

████████████████████████████████████████

███████████████████████████████████

150. ██████████████████████████████████

██████████████████████████████████████████

██████████████████

151. ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

█ ████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████

█ ██████████████████████████████████

███████████████████████████████████

███████████████████████████████

████

█ ████████████████████████████████

█████████████████████████████████

█████████████████████████████████

152. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

153. ███████████████████████████████████████

█████████████████████████

154. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

███████████████████████████████████████

- ███████████████████████████████████████
  ████████
- ███████████████████████████████████████
  █████████
- ████████████████████████████

155. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

156. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████

157. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

158.

159.

160.

161. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████

162. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████

163. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

164. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

165.

166.

167.

**F.** **Beechwood Disregards the IMAs, With Lincoln's** ███████ **and Facilitation**

168.    In total, SHIP entrusted $270 million to the Beechwood Advisors and another $50 million was entrusted outside of the IMAs, based on representations—memorialized in the IMAs themselves—that Beechwood would invest prudently, conservatively, and in accordance with the terms of the three IMAs.  The amounts were entrusted to Beechwood over time, in increments, between May 2014 and June 2016.  SHIP relied on the material misrepresentations and omissions by the Beechwood Advisors—and the Beechwood Insiders who controlled the Beechwood Advisors' activities—in deciding, over time, to entrust Beechwood with the investment of funds, which SHIP held as reserves to pay policyholder claims.

169.    Notwithstanding the representations made about their investment protocols, disciplines, and security, not  to mention guaranteed returns, to induce SHIP to enter into the IMAs and to invest both the IMA funds and additional funds through them, and contrary to the promises made in the IMAs and in violation of the fiduciary duties owed to SHIP, the Beechwood Advisors placed SHIP's money into investments that were highly speculative, not adequately secured, opaque, and not appropriately disclosed to SHIP.

*i.*    ***Beechwood uses SHIP Assets to Engage in Related-party Transactions***

170.    Many of the Beechwood investments are invested in related-party transactions involving one or more of the principals of the Beechwood Advisors or the Platinum entities.  This was by design, as the deep connections and constant communications between Beechwood and Platinum demonstrate.  Indeed, immediately upon receiving SHIP's money, the Co-conspirators, led by Mark Nordlicht, set about funneling money into investments aimed at propping up illiquid investment positions Platinum funds were invested in with the aim of enriching the Co-conspirators, against the best interests of SHIP, to whom they owed a fiduciary duty.

171.     From the time that SHIP executed the first IMA, Beechwood was in close contact with Nordlicht regarding the status of SHIP's funds.  When SHIP funded the IMAs, Beechwood would inform Platinum and its founders almost immediately.  As previously noted, Nordlicht was aware within a day that the BBIL IMA had been funded and was already giving direction on how to invest SHIP funds.  On July 16, 2014, shortly after SHIP had wired an additional $25 million to Beechwood to fund the Beechwood Re IMA, Levy e-mailed Nordlicht to inform him that ████ ████████████████ Beechwood kept Platinum (through Nordlicht) fully apprised of the state of SHIP's funds.  In one August 2014 e-mail, for example, Nordlicht was provided detailed information regarding the available cash in SHIP's accounts, including the funds available in both the BBIL and Beechwood Re custody accounts maintained with Wilmington Trust.  On January 30, 2015, just two weeks after the BAM IMA execution date, $35,500,000 of SHIP's funds were sent without collateral or interest payment to support Montsant Partners, LLC, which was owned by Platinum.  This intimate and consistent connection to undisclosed principals who were not revealed to SHIP, except as a source of possible investment choices indistinguishable from other investment options in the world demonstrates that, from the beginning, SHIP's funds were used in a manner contrary to what Beechwood initially represented and continued to represent throughout the relationship and instead were used to prop up Platinum and perpetuate its fraudulent scheme.

172.     Rather than adhering to their representations and promises made in the IMAs, in periodic valuation reports, in the description given of each investment acquired, in the performance fee request forms, in oral communications, and otherwise, the Beechwood Advisors, in concert with the Beechwood Insiders, used most of the SHIP funds entrusted to them to acquire high-risk, complex, inadequately collateralized, and often distressed investments tied to Platinum that were

purposely structured by Beechwood, the Beechwood Insiders, and the Co-conspirators to enrich themselves and their related parties at the expense of SHIP and similarly situated investors.

173.    For example, Beechwood deployed SHIP's money in loans or other investments in which Platinum Entities, Beechwood Entities, and their owners, had direct or indirect interests, including investments into PPCO and PPVA, and loans to companies various Platinum Funds had taken large stakes in through equity or debt investments.  Beechwood made these investments without disclosing that they were related-party transactions that presented an obvious conflict of interest for Beechwood.

174.    Indeed, Beechwood and the Co-conspirators instructed their retained third-party valuation and ratings companies, including Lincoln, to delete references to Platinum-controlled investments in their quarterly reports to SHIP, knowing that such disclosures would raise suspicion.

175.    Examples of such related-party transactions include, but are not limited to:

a.    <u>Golden Gate Oil, LLC</u>: In April 2015, BAM purchased a note from Golden Gate Oil, LLC, valued at $7.3 million.  Forty-eight percent of the equity in Golden Gate was owned by PPVA through another of its wholly owned subsidiaries, Precious Capital LLC.  Despite internal knowledge that Golden Gate Oil was a distressed asset, the Platinum Insiders and Beechwood Insiders continued to make false representations as to the company's value.  In February 2014, Platinum had sold its loan to BAM, as an agent for another Beechwood entity, for par value, which was stated to be just over $28 million.  When BAM sold a portion of that note to SHIP in April 2015, it did not disclose the related-party nature of this transaction or that it was internally known to be very distressed;

b.    <u>Montsant Partners, LLC</u>: In January 2015, acting on SHIP's behalf, BAM acquired an unsecured note issued by Montsant Partners, LLC.  Montsant (discussed in detail later) is a wholly owned subsidiary of PPVA, a fund in which Beechwood had already caused SHIP to become heavily invested in.  BAM, as SHIP's agent,

executed the Note Purchase Agreement on SHIP's behalf. Nordlicht and David Steinberg, both Platinum executives, executed the Note Purchase Agreement on behalf of Montsant. That Montsant is wholly owned by PPVA was not disclosed to SHIP before BAM acquired the unsecured note using SHIP's assets;

c.  <u>Milberg Hamilton Capital Credit Facility:</u> In April 2015, BAM acquired a participation interest in the Milberg Hamilton Capital Credit Facility for approximately $8 million ("Milberg"). Milberg's original credit facility (into which SHIP acquired a participation interest) was between Milberg and Hamilton Capital. Hamilton Capital is a wholly owned subsidiary of PPCO—a fund in which Beechwood had already caused SHIP to become heavily invested in—a fact which was never disclosed to SHIP;

d.  <u>Lumens Energy Group LLC</u>: On September 1, 2015, Beechwood caused SHIP to participate in a prior loan to a company called Lumens Energy Group LLC ("Lumens"). Lumens was founded by David Levy, Michael Katz, and Isaac Barber, another Platinum Insider and principal of Marbridge Energy Finance Fund—a Platinum fund which Beechwood also caused SHIP to subscribe to in the amount of nearly $7 million. As per Lumens' December 10, 2013 Amended and Restated Operating Agreement, Lumens' membership included IBLE Holdings LLC (owned by Isaac Barber), IBDL Holdings LLC (owned by Barber and David Levy), Manor Lane Associates LLC (having the same address as Murray Huberfeld, and having Huberfeld's daughter Jessica Beren as a signator), Grosser Lane Associates LLC (having the same address as David Bodner, and having Bodner's daughter Tzipporah Rottenberg as signator), and Palladium Resources LLC (having the same address as Platinum Partners offices, and having Dahlia Kalter as signator). Lumens, along with a subsidiary, was sold to Agera on or around September 30, 2015, for a profit and the assumption of all of the company's debt. The related-party nature of the transactions was never revealed to SHIP;

e.  <u>China Horizon Investment Group</u>: The Platinum and Beechwood Insiders caused SHIP to invest in two promissory notes with China Horizon Investment Group. Platinum was heavily invested in China Horizon Investment Group. A September 22, 2015 letter from the SEC to Mark Nordlicht regarding certain investigations

asserts that: "After providing assistance on China Horizon for some time, [Bernard] Fuchs approached [Mark Nordlicht] about becoming a Partner [at Platinum Partners] and the Partnership commenced in January 2014." Mr. Fuchs and Danny Saks were both on the Board of Directors of China Horizon Investment Group. The related-party nature of the transactions was never revealed to SHIP. Neither transaction was negotiated at arm's-length;

f.  <u>Kennedy Sobli Consultants</u>:  In November 2015, the Platinum and Beechwood Insiders caused Beechwood to buy a promissory note from Kennedy Sobli Consultants, a company owned by Bernard Fuchs—a partner at Platinum Partners—and his family. The loan was related to the purchase of three nursing homes. The loan was personally guaranteed by Fuchs. Fuchs claimed to be worth approximately $30 million, based largely on investments in PPCO and PPVA. Bernard Fuchs' relationship with Platinum Partners was never revealed to SHIP. The negotiation was not made at arm's-length.

Other examples of related-party transactions include, but are not limited to: Desert Hawk Gold Corp.; LC Energy Operations LLC; Implant Sciences; ALS Capital Ventures LLC; Marbridge Energy Finance Fund; Mysyrl Capital LLC; NorthStar Group Holdings; Black Elk Offshore, and Principal Growth Stategies LLC. Additionally, other of the loans and investments entered into by Beechwood on SHIP's behalf have counterparties with close connections to Nordlicht, Huberfeld, Bodner, or Levy. None of these investments conformed to the investment guidelines incorporated into the IMAs. None of these investments were made with the best interest of SHIP in mind. All of these investments were made with the sole intent to enrich the Co-conspirators.

176.  Additionally, despite requirements to do so, none of the Platinum Funds, including PPVA, PPCO, Marbridge, or Bayberry, ever reported any of these transactions on their annual financial statements as related-party transactions, despite reporting other such transfers and transactions. Platinum furnished upon Beechwood, as SHIP's agent, Annual Reports which misrepresented material facts by omitting any of these transactions as related-party transactions on

its financial statements. The omission of these transactions in Platinum's annual reports was intentional. SHIP, through its agent, relied on these misrepresentations, causing SHIP to continue its relationship with Beechwood, and thereby causing financial harm to SHIP.

177. Further, Platinum never sought nor acquired consent from SHIP, a client of Platinum Funds, as required by Platinum's 2011 and 2015 Compliance Policies and Procedures Manual—which was supposed to be signed and acknowledged by all employees of Platinum— and Section 206(3) of the Investment Advisers Act of 1940 prior to entering into these related-party transactions. Platinum's failure to acquire such consent from SHIP is further proof that Platinum and Beechwood were attempting to conceal their relationship in order to further the Beechwood-Platinum scheme and defraud their investors.

178. Far removed from the safe, well-vetted, well-collateralized middle market credit transactions that SHIP expected based on Beechwood's representations, the Platinum-related loans were high-risk investments that had been made to entities pursuing highly speculative ventures. The loans carried artificially high interest rates and were subject to fees and upfront payments that were not reasonably supported by the financial condition or outlook of the obligors. Beechwood, the Beechwood Insiders, and the Co-conspirators knew, or were grossly negligent in not knowing, when they structured these loan investments that a high probability existed that the obligors would default and would fail to repay the principal. When they purchased these investments on SHIP's behalf (typically from PPCO, PPVA, an entity managed by or related to Beechwood, or an entity related to someone the Beechwood Insiders knew), they knew, or were grossly negligent in not knowing, that the investments were severely distressed, defaulting, or about to default.

179. Additionally, in direct contravention of the IMA language directing Beechwood to "minimize commodities market exposure" in "loans collateralized by natural resources reserves,"

many of the Platinum-related investments and high-risk investments were in fact collateralized by "natural resources reserves[.]" These loans include, but are not limited to, San Gold Corp., Golden Gate Oil, Black Elk Energy Offshore, and Desert Hawk Gold Corp.

180.     As noted, Beechwood entered into numerous transactions that placed its interests and those of Platinum or Platinum-related individuals ahead of SHIP's, in breach of the IMAs, the fiduciary duties, and the representations Beechwood had made in seeking to induce SHIP's investments.  In addition to using SHIP funds to acquire high-risk and over-valued investments that had been owned or structured by Platinum, Beechwood caused SHIP to invest nearly $40 million directly in certain Platinum funds, including PPCO and PPVA.  This was particularly harmful to SHIP, because the same high-risk investments, with their false and inflated values, in which SHIP became invested directly, also represented a significant percentage of the PPCO and PPVA portfolios.  SHIP thus was victimized through double exposure to Platinum's problems.

181.     Beechwood's actions prevented SHIP, among other things, from discovering the true nature and value of investments made with its assets, denied SHIP the ability to protect its assets from speculative investments, depletion, and misuse by Beechwood.  Beechwood further denied SHIP access to full and accurate information about the nature and performance of the investments, thus preventing SHIP from taking earlier actions to protect itself and limit the damage being done to it.  Beechwood caused SHIP to expend significant amounts in order to uncover the true nature and value of investments made with its assets as well as additional amounts in an effort to alter or exit investments and otherwise to realize any value from such investments in mitigation of Beechwood's unlawful acts.  The full extent of the harm caused by Beechwood and Lincoln's manipulations still is not fully known, though we do know that SHIP paid performance fees to Beechwood that Beechwood never earned, due in part, to Lincoln's "independent" valuations,

which resulted in further loss of SHIP's principal, as a result of Beechwood's fraudulent misrepresentations and omissions.

### ii.    *Beechwood Overvalues Investments and Collects Performance Fees as a Result*

182.    Although Beechwood claimed to use "independent valuation" based on "fair valuation practices and methods," SHIP learned after the fact that no truly independent valuation was ever conducted, as Beechwood controlled all material information provided to its third-party valuation consultants, who accepted that information at face value and did not attempt to audit or verify the accuracy or completeness of any of the information relevant to the valuation of those assets.  Instead, the Co-conspirators grossly overvalued the investments in SHIP's portfolio, and intentionally fed the "independent" valuation firms misleading information, tailored to achieve the desired result: inflated values.  The process enabled Beechwood to provide an air of legitimacy to its inflated valuations by essentially laundering them through a third party.  This all went on while the Co-conspirators were well aware of the distressed nature of the investments.

183.    To avoid detection of these practices and to justify their claims to performance fees under the IMAs, which were recoverable only if the overall annual return exceeded the 5.85% guaranteed to SHIP, Beechwood, other purported employees of Beechwood, and Beechwood's paid advisors and consultants submitted reports that contained inflated, and in some cases, entirely falsified valuations that purported to show that the Platinum-related investments were performing well and that SHIP's investments were sound.

184.    As discretionary investors under the IMAs who were investing primarily in illiquid, private-company debt obligations that did not have a readily ascertainable public market value, Beechwood enjoyed and exercised material discretion and control over the reported valuations of the assets in which it invested SHIP's funds.  See BBIL IMA ¶ 7; Beechwood Re IMA ¶ 7; BAM IMA ¶ 7 (non-publicly traded assets "shall be valued by or at the direction of [Beechwood] in its

reasonable discretion in a manner determined in good faith to reflect fair market value"). Beechwood had a contractual obligation to use good faith judgment in their valuation efforts, a duty which they knowingly and maliciously breached time and time again. The valuations relayed to SHIP were vastly overvalued and misrepresented the true value of the investments.

185. This lack of an available public market valuation and lack of transparency into the valuation process, coupled with Beechwood's status as SHIP's discretionary investment advisor and fiduciary, meant that SHIP had little choice but to rely—and it did rely—on Beechwood to report accurately and in good faith the value of SHIP's investment assets. Lincoln was also responsible for independently verifying these values and ███████ capitulated to Beechwood's demands to fraudulently over-value them to SHIP's detriment. These misrepresentations and SHIP's reliance on them caused SHIP to continue their relationship with Beechwood, causing additional harm to SHIP and depriving SHIP of mitigating harm inflicted upon it by Beechwood and the Co-conspirators.

186. Beechwood reported each investment made under the IMAs to Wilmington Trust and provided a description of the asset acquired, the value of that asset, and in most instances the document evidencing the assets such as, for example, a copy of a promissory note. By acquiring and reporting the acquisition of an asset under an IMA, Beechwood was affirmatively representing that the asset met the requirements of the IMA, including the requirement that the asset fit within SHIP's investment guidelines. Each time that Beechwood made and reported on an investment to Wilmington Trust, Beechwood knew and intended that Wilmington Trust would reflect the information provided by Beechwood on the statement for the applicable IMA account submitted to SHIP by Wilmington Trust each month and that SHIP would trust and believe that the information on the applicable Wilmington Trust statement was true, correct, and complete.

Beechwood also knew and intended that SHIP would rely on the information reported on the Wilmington Trust account statements to track its IMA investments.

187. Likewise, Beechwood provided reports to SHIP on a regular basis that included an overview of the investments that Beechwood managed on SHIP's behalf. These reports did not accurately or adequately disclose the profound involvement and conflicted entanglements of Platinum Partners or other Platinum-affiliated entities in the investments or that many of the investments were severely distressed, defaulting, or nearly defaulting at the time of the reports and were likely to default prior to repayment of principal. SHIP relied on Beechwood as its investment manager and fiduciary to provide accurate information regarding the assets under management and to disclose fully any potential conflicts of interest or related-party transactions.

188. Although SHIP did not and could not know it at the time, the asset valuations provided by Lincoln, Beechwood's allegedly independent advisors, were largely inflated or falsified and did not reflect accurate or honest representations regarding SHIP's assets under Beechwood's control, based on the information that we now know Beechwood and Lincoln had available.

189. SHIP reasonably relied on Beechwood as its investment manager to provide SHIP with accurate and honest information concerning the nature and value of SHIP's investments, and made decisions relating to the IMAs and the IMA investments to its detriment based on the information provided. SHIP would not have continued to entrust its assets to Beechwood, increased the investments under the Beechwood Re IMA, entered into the BBIL IMA, or made investments with Beechwood outside of the IMAs, but for the false information given to SHIP by Beechwood regarding the nature and value of the investments, including the concealment of material facts that adversely affected their value.

190.    Further, SHIP would never have authorized Beechwood to withdraw performance fees from the IMA accounts had SHIP known the true value of the IMA assets.  Each of the IMAs provided that performance fees were to be calculated based on both "realized and **unrealized**" net trading profit.  See BBIL IMA, Exhibit B ¶ 1(b); Beechwood Re IMA, Exhibit B ¶ 1(b); BAM IMA, Exhibit B ¶ 1(b) (emphasis added).  In other words, the IMAs entitled Beechwood to include in its calculation of performance fees not just the gain or loss realized on an actual disposition of an investment, but also any unrealized gain or loss in the value of SHIP's extant investments at the time of the valuations.  Thus, the value of SHIP's current investments played a central role in the calculation of Beechwood's performance fees.

191.    Rather than value SHIP's assets in a manner that reflected their true value, or even a good faith best estimate of such true value, Beechwood ignored the distressed and manufactured nature of many of SHIP's "investments" and took full advantage of its control over the asset valuation process by assigning significantly inflated valuations to SHIP's investments based on false and misleading information, thereby securing outsized and unearned performance fees for itself.  Indeed, Beechwood repeatedly reported asset valuations to SHIP that SHIP would later discover—despite continued reassurances orally and in writing from Beechwood that lasted into the fall of 2016—had no basis in reality.  Some of the investments that had inflated valuations are described in detail above. Lincoln simply went along with what it ███ were vastly over-valued valuations.

192.    Further, as a result of these inflated valuations, Beechwood never made any true-up payments to SHIP's account, as required by the IMAs.  Thus, Beechwood's misrepresentations regarding the value of SHIP's assets constituted both a breach of the "good faith" required by the IMAs in the valuation process and a breach of the true-up provisions of the IMAs.  Each of the

Co-conspirators had knowledge that the values provided to SHIP were misrepresented, and each took actions to help facilitate these misrepresentations.

### iii.    *Beechwood Takes Performance Fees*

193.    Beechwood used Lincoln's valuation reports to induce SHIP to authorize the payment of "performance fees" to Beechwood under the IMAs, even though such fees had not actually been earned.

194.    For example, on April 2, 2015, Elliot Feit, Finance Director of Beechwood, acting for and at the direction of Beechwood and through the mails and wires of interstate commerce, requested authorization from Lorentz to withdraw $3,500,000 as a performance fee from the BAM IMA account. In support of this request, Feit represented in writing to Lorentz that the assets contained in the BAM IMA account at that time possessed a market value of $115,143,472.39 "and a principal plus interest owed to SHIP of $110,780,801.37." In light of the asserted "excess" of $4,362,671.02, Feit requested approval of a withdrawal of $3,500,00 in performance fees, and submitted a "Withdrawal Notice" for that amount signed by Saks for countersignature by Lorentz. Feit further supported this request by attaching the Wilmington Trust statements for this account for the period ending on March 31, 2015, to illustrate the purported investment activity and interest accrued on the account.

195.    In reasonable reliance on Beechwood's representations, on April 6, 2015, Lorentz authorized the withdrawal of $3,500,000 in performance fees from the BAM IMA account by countersigning the submitted "Withdrawal Notice." On that same day, $3,500,000 was withdrawn from the BAM IMA account. Beechwood and Feit followed the same general pattern of conduct for withdrawals from Beechwood RE and BBIL's IMA accounts.

196.    In fact, the representations upon which Lorentz and SHIP reasonably relied were false, because the Lincoln valuations provided for the assets contained in the BAM IMA account

were grossly misstated and overvalued in that, as noted below in greater detail, they did not take into consideration the distressed conditions of several assets, including, but not limited to, the MYSYRL investments. The valuations of these assets were calculated by or through Beechwood, which reported them to Wilmington Trust to include in its account statements in order to further the air of legitimacy surrounding the knowingly fraudulent investment values.

197.    The asset valuations and appreciation asserted by Beechwood cannot be reconciled with the facts at least partially now known to SHIP, but known at the time by Beechwood, which should have been factored by Beechwood into any calculation of performance fees – including, for example, the distressed conditions of the MYSYRL investments – and thus the reported valuations were demonstrably false at the time BAM requested approval of the performance fees. Upon information and belief, had the value of those assets been properly stated and considered by Lincoln, BAM could not have claimed at least the $3,500,000 in performance fees it took.

198.    Beechwood engaged in a similar pattern of conduct with respect to the withdrawal of performance fees over the period that Lincoln provided valuations under the Beechwood Re IMA, requesting withdrawal of at least $3,100,000, and under the BBIL IMA, requesting withdrawal of at least $500,000.

199.    Each of these requests included, and was based on, Beechwood's misrepresentation that the aggregate investment return on the assets held in the BAM, Beechwood Re, and BBIL IMA accounts had appreciated beyond the 5.85% threshold required by the BBIL IMA, such that Beechwood was entitled to receive the performance fees requested.

200.    SHIP relied on Beechwood's falsely overstated returns and Lincoln's inflated valuation reports, which remained essentially unchanged over that entire period aside from minor fluctuations, in authorizing the withdrawal of at least the amounts provided above – and potentially

more – which were taken as performance fees that had, in fact, not been earned under the IMAs. SHIP was damaged when it relied on these false valuations and paid out unearned performance fees. When SHIP reasserted control over its assets from Beechwood in and around November 2016, it quickly discovered the distressed, illiquid, and impaired value of many of its largest holdings. This condition, which existed across the investments in all three IMAs, is irreconcilable with Lincoln and Beechwood's consistent representations that values existed at or near par values, and in some cases valuing purportedly accrued interest that did not exist because the funds had not in fact truly been "invested" but rather served, in some examples, as interest-free loans to related parties.

201.    Beechwood therefore, with the assistance of Lincoln, falsely overstated and intentionally misrepresented SHIP's returns on the investments made under the IMAs in order to receive substantial unearned performance fees. Because these performance fees had not in fact been earned, Beechwood essentially paid itself out of SHIP's invested principal and not out of excess earnings, resulting in additional damages to SHIP and further reducing the ability to generate true positive returns on SHIP's assets.

202.    Beechwood fraudulently valued SHIP's investments with the help of Lincoln for the period Lincoln provided valuations, and grossly overstated SHIP's returns not only to retain for itself unearned performance fees, but also to prevent SHIP, CNO and others, from becoming aware of Beechwood's scheme and attempting to extract its funds out of the irresponsible and conflicted investments at an earlier time.

**G. Revelation of the Fraudulent Beechwood-Platinum Scheme and Further Concealment**

203. SHIP was unaware of, and had no reason to suspect, Beechwood's deep ties to Platinum or the pervasive nature of Beechwood's fraudulent conduct or their failure to perform in accordance with the IMAs and their fiduciary duties, in large part because of Lincoln's role in successfully concealing Platinum's involvement and in endorsing artificially high valuations through its reports. Indeed, the Beechwood-Platinum scheme required that the relationship be concealed at all costs.

204. The truth did not start to come out until news reports in the summer and fall of 2016 gradually began to expose the nature and extent of Beechwood's involvement with and control by Platinum. Murray Huberfeld of Platinum was arrested on June 8, 2016, and news articles followed, but they did not reveal Platinum's complex connections to Beechwood. The first article to reveal connections between Platinum and Beechwood was published by the WSJ on July 25, 2016.

205. After its connections to Platinum were identified, Beechwood continued its pattern of deceiving SHIP. A July 26, 2016 Beechwood letter to Wegner, SHIP's CEO, represented that Beechwood had reviewed investments that Beechwood made involving Platinum Partners and reassured SHIP that Beechwood has "no reason to believe that either Beechwood or any of your related portfolios suffered financial harm." Beechwood also continued to tout its "appropriate risk management" and "strong safeguards" for SHIP's investments. Beechwood likewise represented to SHIP that it was in the process of, and was capable of, severing all ties with Platinum. The July 26 letter misrepresents that all Platinum investments "made in assets related to that fund … were made by a former employee who worked for Beechwood in 2014."

206. Indeed, into the fall of 2016, SHIP continued to be assured that its investments were sound, secured by appropriate collateral, and appropriately valued. Beechwood offered no indication that it had favored its own interests and those of its affiliates, including Platinum-related interests, over SHIP's. To the contrary, Beechwood assured SHIP that Beechwood had "no reason to believe that either Beechwood or any of [SHIP's] related portfolio's suffered financial harm" and affirmatively represented that the value of SHIP's investments continued to increase. Relying on these representations, SHIP continued to approve Beechwood's requests to withdraw cash and assets from the Wilmington Trust accounts as performance fees payable to Beechwood.

207. Despite SHIP's efforts to limit its harm, by November 2016 much of the damage already was done. Over the course of the next several months, SHIP gradually began to uncover misrepresentations and omissions by Beechwood and the pervasive cover-up of Beechwood's disastrously harmful and unsuitable investment of SHIP assets, including through Lincoln's anything but "independent" valuations, and its favoring of its own interests and those of its affiliates over the interests of its client, SHIP.

208. As a result, SHIP has undertaken substantial efforts to uncover—or more accurately unravel—the full breadth of Beechwood's fraudulent scheme and remediate the harm it suffered as a result of Beechwood's actions. These efforts are ongoing, and they include retaining third parties to assist with the investigation into Beechwood's misconduct and to assist with the unwinding and divestiture of the distressed and fraudulently valued investments. In connection with these efforts, SHIP has incurred considerable costs, fees, and expenses. Given Beechwood's breaches of the IMAs and the degree and complexity of the fraudulent scheme, the costs, fees, and expenses associated with the necessary chasing of assets and unwinding of investments were foreseeable and probable.

# CLAIMS FOR RELIEF

## COUNT ONE

**Fraudulent Misrepresentation and Omission**

**(Against Lincoln International LLC and Lincoln Partners Advisors LLC)**

209.    SHIP incorporates each and every allegation above as if set forth fully in this count.

210.    As set forth above, ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ As detailed throughout this pleading, the Beechwood Advisors perpetrated a longstanding and wide-ranging fraud against SHIP through numerous sham transactions designed to benefit themselves, Platinum Partners, and their related parties at SHIP's expense.

211.    In addition, as detailed above, Lincoln ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

212.    As described above, ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ Lincoln had a duty to disclose the accurate and complete facts concerning BBIL, Beechwood Re, and BAM's investments in the valuation reports.

213.    As set forth above, ██████████████████████████████████████

██████████████████████████████████ with the intent of inducing SHIP to believe that BBIL,

Beechwood Re, and BAM's investments were safe, reliable and prudent and that the contractual threshold was exceeded such that BBIL, Beechwood Re, and BAM were entitled to collect the performance fees.

214. SHIP was thereby actually induced to believe, among other things, that the investments BBIL, Beechwood Re, and BAM were making with their assets were safe, reliable, and valuable and that BBIL, Beechwood Re, and BAM were entitled to collect performance fees.

██████████████████████████████████████████████████

████████████████████████████

215. SHIP justifiably relied upon Lincoln's misrepresentations and omissions in the valuation reports to their detriment.

216. As a proximate result of Lincoln's fraudulent misrepresentations, omissions, and concealments in the valuation reports, SHIP sustained damages.

217. Consequently, SHIP is entitled to a judgment of compensatory damages in an amount to be determined at trial, together with interest at the statutory rate.

218. Because Lincoln's misrepresentations, omissions, and/or concealments in its valuation reports were intentional and deliberate, malicious, outrageous and demonstrated a wanton disregard of SHIP's rights, SHIP is entitled to punitive damages.

<u>**COUNT TWO**</u>
**Civil Conspiracy**

**(Against Lincoln International LLC and Lincoln Partners Advisors LLC)**

219. SHIP incorporates each and every allegation above as if set forth fully in this count.

220. As alleged in this Complaint and in the SHIP Action, the PPVA Complaint, the PPCO Complaint, the SEC Complaint, the Criminal Indictments, and the CNO Pleading[20], Lincoln, the Co-Conspirators, the Beechwood Owner Trusts, the BRILLC Series Entities, and the BRILLC Series Members conspired with Beechwood, Feuer, Taylor, and Levy to commit fraud in the inducement against SHIP by fraudulently inducing SHIP to enter each of the three IMAs and in turn invest SHIP's funds under those IMAs, as well as by causing or inducing SHIP to enter into other investments.

221. Lincoln conspired to commit fraud with the Co-conspirators in the performance against SHIP ███████████████████████████████████████████ thereby causing SHIP to remain in unsuitable investments that favored the interests of the Co-conspirators and their related parties over SHIP's best interests and to pay performance fees as well as continue to invest and not terminate the fraudulently induced IMAs or other investments.

222. Lincoln also conspired with the Co-Conspirators, Beechwood, Feuer, Taylor, and Levy to breach the fiduciary duties that Beechwood, Feuer, Taylor, and Levy owed to SHIP as SHIP's investment managers by engaging in transactions for the benefit of Beechwood and Platinum and to the detriment of SHIP, by denying SHIP access to full and accurate information about the nature and performance of its investments, and by claiming and collecting millions of dollars in performance fees from SHIP which were, in fact, unearned.

223. At all relevant times, Lincoln and each Co-conspirator ███████████████ ████████████████████████████████████ The Co-conspirators were closely related entities or individuals. The Platinum Insiders, together with the Beechwood

---

[20] "CNO Pleading" means the crossclaims and third-party claims filed by Washington National Insurance Company and Bankers Conseco Life Insurance Company in the PPCO Action.

Insiders, exercised control and ownership of the Beechwood Advisors, which acted as a revolving door of Platinum executives.

224.    Lincoln and each Co-conspirator ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

225.    SHIP has been injured as a proximate result of the wrongful acts committed by Beechwood in furtherance of the conspiracy.

226.    As a result of Lincoln' conduct, SHIP has suffered damages in excess of $75,000.

227.    Because of the intentional, deliberate, and malicious nature of Lincoln's acts, SHIP is entitled to punitive damages.

## COUNT THREE

### Negligent Misrepresentation

### (Against Lincoln International LLC and Lincoln Partners Advisors LLC)

228.    SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

229.    SHIP and Lincoln had a special, privity-like relationship with one another arising out of Lincoln's unique and specialized expertise and its role as the purportedly independent valuation provider with respect to SHIP's assets entrusted by SHIP to BBIL, Beechwood Re, and BAM. When Lincoln was acting as the valuation provider, its reports were SHIP's only source of information regarding the value of BBIL, Beechwood Re, and BAM's investments of its assets. Given the importance of Lincoln's valuation reports to SHIP from the outset of SHIP's investments, Lincoln and SHIP were in a special position of confidence and trust.

230. Lincoln had a duty, as a result of its special relationship with SHIP, to give SHIP correct information regarding, among other things, the value of BBIL, Beechwood Re, and BAM's investments of its assets.

231. As described above, however, ███████████████████████████ ████████████████████████████████████████████████████ ████████████ Lincoln ████████████████████ that ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

232. As set forth above, ██████████████ its valuation reports were relied upon by SHIP for a serious purpose, including but not limited to evaluating and monitoring the value of the assets in order to, among other things, ensure that the assets were invested in a reliable manner such that the investments were over-secured by collateral that Beechwood could seize in the event that a loan or other investment was not repaid, which would enable Beechwood to recover the value of any investment and to pay performance fees to Beechwood.

233. At all times relevant herein, ████████████████ SHIP intended to and actually relied and acted upon Lincoln's valuation reports.

234. At all times relevant herein, SHIP reasonably and/or justifiably relied, to its detriment, on each of Lincoln's valuation reports in not terminating the IMAs, taking other actions to ameliorate the damages that SHIP was incurring while the IMAs were continuing, and to pay performance fees to Beechwood.

235. Consequently, SHIP is entitled to a judgment of compensatory damages in an amount to be determined at trial, together with interest at the statutory rate.

236. Because Lincoln's misrepresentations were malicious, reckless, outrageous and demonstrated a wanton disregard of SHIP's rights, SHIP is entitled to punitive damages.

## COUNT FOUR

**Aiding and Abetting Fraud**

**(Against Lincoln International LLC and Lincoln Partners Advisors LLC)**

237. SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

238. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ As set forth in detail above, the Beechwood Advisors, defrauded SHIP by, among other things, (a) fraudulently misrepresenting to SHIP the fair market value of the assets that BBIL, Beechwood Re, and BAM invested in Platinum-controlled funds and entities, among other investments, which were the product of self-dealing; (b) fraudulently misrepresenting to SHIP that an independent valuation company would issue independent valuations that would reveal whether the assets were being safely and prudently invested; (c) fraudulently misrepresenting that BBIL, Beechwood Re, and BAM intended to invest SHIP's assets prudently, and with the intention to safeguard those assets, when in fact Beechwood, BBIL, Beechwood Re, and BAM intended to infect the IMA accounts with investments in egregious Platinum-controlled funds and entities and then leverage and encumber the assets with their egregious "investment strategy"; and (d) fraudulently misrepresenting the nature and identities of Beechwood Re's senior management team as being Beechwood Re personnel, when in fact the individuals were loyal to, if not employed by, Platinum.

239. BBIL, Beechwood Re, BAM, and BRILLC's misrepresentations and/or omissions were made knowingly and were intended to induce SHIP's reliance by inducing SHIP to enter into

the IMAs with BBIL, Beechwood Re, and BAM, and not to terminate the IMAs or to take other actions to ameliorate the damages SHIP was incurring while the IMAs were continuing to pay performance fees. As set forth above, SHIP justifiably relied, to their detriment, upon each of BBIL, Beechwood Re, BAM, and BRILLC's false representations and/or omissions.

240. █████████████████████████████████████████████

████ Among other things, and as set forth in detail above, ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

241. █████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████ As explained previously, this was a crucial element of the fraudulent scheme. This was accomplished by, among other things, ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

242. SHIP has been injured as a proximate result of ██████████████████████

████████████████ were at least the reasonably foreseeable result of Lincoln's conduct: ████

███████████████████████████████████████████

█████████████████████████████████

243. Consequently, SHIP is entitled to a judgment of compensatory damages in an amount to be determined at trial, together with interest at the statutory rate.

244. ████████████████████████████████████████

indeed, as set forth above, █████████████████████████████████████

███████████████████████████████████████████

This evidences a high degree of moral turpitude, and demonstrates Lincoln's wanton dishonesty or reckless disregard of SHIP's rights.

245. Because Lincoln's substantial assistance with the fraud was malicious, reckless, outrageous and demonstrated a wanton disregard of SHIP's rights, SHIP is entitled to punitive damages.

## COUNT FIVE

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Lincoln International LLC and Lincoln Partners Advisors LLC)

246. SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

247. As set forth above, BBIL, Beechwood Re, BAM, and BRILLC owed fiduciary duties to SHIP in the investigation, recommendation, management and supervision of SHIP's assets. BBIL, Beechwood Re, BAM, and BRILLC breached their fiduciary duties to SHIP by, among other things, making egregious investments of the assets in Platinum-controlled funds and entities, misrepresenting their "investment strategy" to SHIP and fraudulently concealing from SHIP their true investment strategy. Additionally, under the IMAs, BBIL, Beechwood Re, and BRILLC were required to pay SHIP the guaranteed investment return and maintain the asset base,

whether the investments performed as represented they would or not. As set forth above, BBIL, Beechwood Re, BAM, and BRILLC overvalued assets to create the false impression that the IMA accounts had exceeded the guaranteed 5.85% return, thus allowing BBIL, Beechwood Re, and BRILLC to avoid their obligations to true-up IMA accounts and taker performance fees. Because these performance fees had not in fact been earned, BBIL, Beechwood Re, and BAM paid themselves out of SHIP's invested principal and not out of excess earnings.

248.    SHIP has been injured as a proximate result of BBIL, Beechwood Re, BAM, and BRILLC's breaches of their fiduciary duties.

249.    As described above, ███████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████

250.    █████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████

251. SHIP has been injured as a proximate result of BBIL, Beechwood Re, BAM, and BRILLC's breaches of their fiduciary duties and Lincoln's substantial participation in furthering those breaches.

252. In other words, ███████████████████████████████████████████ ████████████████████████████████

253. Consequently, SHIP is entitled to a judgment of compensatory damages in an amount to be determined at trial, together with interest at the statutory rate.

254. Because Lincoln's actions were malicious, reckless, outrageous and demonstrated a wanton disregard of SHIP's rights, SHIP is entitled to punitive damages.

## COUNT SIX

### Contribution and Indemnity

**(Against Lincoln International LLC and Lincoln Partners Advisors LLC)**

255. SHIP incorporates each and every allegation above as if set forth fully in this count.

256. The Complaint entitled Melanie L. Cyganowski v. Beechwood Re Ltd., et al. was filed on December 20, 2018 alleging damages against SHIP. The Complaint entitled Levy v. Senior Health Insurance Company of Pennsylvania was filed in April 10, 2019 alleging damages against SHIP. The Complaint B Asset Manager, L.P. et al. v. Senior Health Insurance Company of Pennsylvania was filed in May 16, 2019 alleging damages against SHIP. The Complaint entitled Principal Growth Strategies, LLC v. AGH Parent, LLC et al. was filed in June 7, 2019 alleging damages against SHIP. Said Complaints, for purposes of its allegations only, is incorporated by reference herein as though fully set forth herein.

257. SHIP is incurring and has incurred attorneys' fees, court costs, investigative costs, and other costs in connection with defending said Complaints, the exact amount of which is unknown at this time.

258.    If SHIP is held liable and responsible to plaintiff for damages as alleged in the Complaints, it will be solely due to the conduct of Lincoln and/or other parties.  Therefore, SHIP is entitled to be indemnified by Lincoln and/or other parties, and each of them should such liability arise.

259.    If SHIP is held liable or responsible to the plaintiff for damages, if said liability is vicarious only and said liability will be the direct and proximate result of the active and affirmative conduct on the part of Lincoln and/or other parties, and each of them.

260.    SHIP is entitled to complete indemnification by said Lincoln and/or other parties, and each of them, for any sums which SHIP may be adjudicated liable to plaintiff, with costs of defense, costs of suit, and reasonable attorneys' fees incurred therefrom.

## COUNT SEVEN
### Unjust Enrichment/Constructive Trust
### (Against Lincoln International LLC and Lincoln Partners Advisors LLC)

261.    SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

262.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

263.    It is against equity and good conscience to permit ████████████████████████████████████████████████████████████████████████████████████████████████████████████

SHIP seeks an accounting of the monies paid to Lincoln, and a constructive trust should be imposed on all funds that Beechwood removed from SHIP's accounts and paid to Lincoln.

## PRAYER FOR RELIEF

WHEREFORE, SHIP respectfully demands judgment in the amount of actual damages proven at trial, including all direct or consequential damages, punitive damages under state law, damages for diminution of value, and restitution, plus all applicable interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
JUly 30, 2019

Respectfully submitted,

By: _____

Dov Byron Gold
The Seiden Group
469 Seventh Avenue, 5th Floor
New York, New York 10018
T: (646) 766-1703
F: (646) 304-5277
E: dgold@seidenlegal.com

*Attorneys for Plaintiff*
*Senior Health Insurance Company of*
*Pennsylvania*