UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                                :
SENIOR HEALTH INSURANCE COMPANY   :
OF PENNSYLVANIA,                                :
                                                :   Master Case No. 1:18-cv-06658 (JSR)
                    Plaintiff,                  :
                                                :
          -v.-                                  :   Case No.: 1:19-cv-07137 (JSR)
                                                :
LINCOLN INTERNATIONAL LLC and     :
LINCOLN PARTNERS ADVISORS LLC,    :
                                                :
                    Defendants.                 :
----------------------------------------------------------x


## SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA'S AMENDED COMPLAINT

SEIDEN LAW GROUP LLP
Amiad Kushner
Michael Cilento
Dov B. Gold
469 Seventh Avenue, Fifth Fl.
New York, NY 10018
(212) 523-0686

*Counsel for Senior Health Insurance
Company of Pennsylvania*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................. 1

PARTIES ................................................................................................................................... 3

RELEVANT NONPARTIES ...................................................................................................... 3

JURISDICTION AND VENUE ................................................................................................. 7

FACTUAL BACKGROUND ..................................................................................................... 8

   A.   SHIP and How It Became Involved with Beechwood .................................................. 8

   B.   The Platinum-Beechwood Scheme To Secure Funds From Insurers Like SHIP
       Under False Pretenses To Keep the Platinum Ponzi Scheme Afloat ............................... 9

   C.   Beechwood's Misrepresentations to Induce SHIP to Enter Into the IMAs .................... 13

   D.   The Investment Management Agreements ................................................................... 15

   *i.*   *The BBIL and Beechwood Re IMAs* .......................................................................... 16

   *ii.*   *The BAM IMA and Side Letter* ................................................................................. 19

   E.   Lincoln's Critical Role In the Fraud ........................................................................... 21

   *i.*   *Platinum Engages Lincoln to Lend Credibility and Enable the Fraud* .......................... 21

   *ii.*   *Lincoln Knowingly Issues Valuation Reports Based on False and  Misleading
       Information* ............................................................................................................... 26

   *iii.*   *Lincoln Terminates the Relationship* ......................................................................... 47

   F.   Beechwood Disregards the IMAs, With Lincoln's Knowledge and Facilitation ............ 55

   *i.*   *Beechwood uses SHIP Assets to Engage in Related-Party Transactions* ...................... 55

   *ii.*   *Beechwood Overvalues Investments and Collects Performance Fees as a Result* ......... 57

   *iii.*   *Beechwood Takes Performance Fees* .......................................................................... 61

   G.   Revelation of the Fraudulent Beechwood-Platinum Scheme and Further
       Concealment ............................................................................................................. 64

COUNT ONE ........................................................................................................................... 65

COUNT TWO ........................................................................................................................... 68

COUNT THREE ....................................................................................................................... 71

COUNT FOUR ......................................................................................................................... 72

PRAYER FOR RELIEF ............................................................................................................. 73

DEMAND FOR TRIAL BY JURY ............................................................................................ 73

Plaintiff Senior Health Insurance Company of Pennsylvania ("SHIP") by and through its undersigned attorneys, as and for its Amended Complaint against Lincoln International LLC and Lincoln Partners Advisors LLC (collectively, "Lincoln"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action seeks damages from Lincoln for aiding and abetting the massive fraud perpetrated by Beechwood and its Platinum affiliates against SHIP. [1]  Beginning in 2014, Beechwood induced SHIP to invest hundreds of millions of dollars by cloaking itself with the appearance of a *bona fide* investment manager.  A critical underpinning of Beechwood's deception was Lincoln.  Beechwood boasted to SHIP that a supposedly independent valuation firm, Lincoln, would be independently marking assets that Beechwood bought and managed for SHIP, knowing that SHIP would never agree to invest with Beechwood unless an independent third party valuer was "kicking the tires" and checking Beechwood's marks.

2.      Far from providing an independent "check" on Beechwood, Lincoln enabled the fraud.  Lincoln knew from the beginning – and chose to conceal – the fact that Beechwood was related to Platinum.  Lincoln's valuation reports falsely represented that Beechwood's marks were "reasonable" under Financial Accounting Standards Board ("FASB") standards, when in fact Beechwood's investments on SHIP's behalf were non-arm's length transactions between affiliated entities and thus could not be valued under those standards.

3.      Indeed, Beechwood was totally controlled by Platinum and nothing more than a source of capital for Platinum, which siphoned cash from Beechwood's unsuspecting investors

---

[1] "Beechwood" means the entire Beechwood enterprise, which includes BAM I, BAM II, Beechwood Holdings, BBIL, BBL, and BAM Administrative (as defined below) and their affiliates and insiders described below.   "Platinum" means the entire Platinum enterprise, including Platinum Management (NY) LLC, N Management LLC, and their affiliates and insiders.

1

(such as SHIP) and vacuumed it into the black hole of Platinum's high risk and unsecured investments.   Beechwood's mark to market "values" were thus pure fiction — and yet Lincoln endorsed them as real values, placing the imprimatur of a supposedly reputable valuation firm on an egregious fraud.

4.     Lincoln knew that it was valuing SHIP's assets and that Beechwood would transmit Lincoln's marks to SHIP.   Indeed, the title of one of Lincoln's valuation reports is "Quarterly Portfolio Review Prepared for: SHIP."   And yet Lincoln never once warned SHIP that its Beechwood investments were at grave risk.

5.     Not knowing that Lincoln was effectively a vehicle for Beechwood's fraud, SHIP received and relied upon Beechwood's marks for which Lincoln was listed as the "price source." SHIP never would have invested with Beechwood in the first place (or continued to maintain its investments with Beechwood), had it known that Lincoln would knowingly disregard applicable valuation standards and issue false valuations.

6.     Further, Lincoln's valuation reports enabled Beechwood to withdraw millions of dollars in "performance fees" from SHIP's investment accounts.   Lincoln's inflated valuations made it appear that Beechwood exceeded performance benchmarks defined in its investment management agreements with SHIP (the "IMAs"), and thus gave Beechwood cover to charge unearned performance fees.  Of course, SHIP would not have authorized Beechwood to withdraw these "performance fees" if SHIP had known that the marks which Beechwood was using to demonstrate its supposed outperformance – blessed by Lincoln – were fraudulent.

7.     In February 2015, apparently concerned that its fraudulent valuation work would be exposed, Lincoln abruptly terminated its engagement with Beechwood.  Lincoln repeatedly ordered its valuation professionals to "cleanse" all of their files on the Beechwood valuations

starting two full weeks before terminating the engagement.   Lincoln never disclosed its concerns to SHIP.

8.      Lincoln's losses from Beechwood fraud are nearly $150 million and counting.  By this action, SHIP seeks to recover damages from Lincoln for its role as a critical enabler of that fraud.[2]

## PARTIES

9.      SHIP is an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

10.     Lincoln International LLC is a valuations company domiciled in Illinois, actively registered to do business in New York, with its principal place of business in New York, New York.

11.     Lincoln Partners Advisors LLC is a valuations company domiciled in Illinois, actively registered to do business in New York, with its principal place of business in New York, New York. Upon information and belief, Lincoln Partners Advisors LLC operates as a subsidiary of Lincoln International LLC.

## RELEVANT NONPARTIES

12.     Beechwood Re Ltd. ("Beechwood Re") is a reinsurance company domiciled in the Cayman Islands, which had offices in New York, New York at all relevant times.

---

[2] This complaint focuses specifically on Lincoln's role in the Platinum/Beechwood fraud, which has been extensively described in other related lawsuits which are also referenced herein.  *See SHIP v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515 (S.D.N.Y. 2018); *Trott, et. al. v. Platinum Management (NY), LLC, et al.*, ("PPVA Action") Second Amended Complaint [ECF 226] (March 29, 2019) (the "PPVA Complaint"); *Cyganowski v. Beechwood Re Ltd., et al*, ("PPCO Action") First Amended Complaint [ECF 207] (March 29, 2019) (the "PPCO Complaint"; *SEC v. Platinum Management (NY) LLC, et al.*, 16-cv-6848 (E.D.N.Y .) (the "SEC Complaint"); *U.S. v. Nordlicht, et al.*, 16-cr-640 (E.D.N.Y.) (the "Criminal Indictments").

13.     Beechwood Re Investments, LLC ("BRILLC") is a limited liability company domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.

14.     B Asset Manager LP ("BAM I") is a limited partnership domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.

15.     B Asset Manager II LP ("BAM II," and collectively with BAM I, "BAM") is a limited partnership domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times. BAM served as an investment advisor for the other Beechwood Entities, and enacted Investment Management Agreements with both BBIL and Beechwood Re. In their capacity as investment managers, BAM signed on behalf of SHIP, and was signatory to most of the deals Beechwood caused SHIP to enter. Through its controllers and ownership structure, BAM had knowledge of all aspects of the Platinum-Beechwood scheme and was used to further the scheme to the detriment of SHIP.

16.     Beechwood Re Holdings, Inc. ("Beechwood Holdings") is a corporation domiciled in Delaware. Beechwood Holdings holds all of the common stock of Beechwood Re.

17.     Beechwood Bermuda International, Ltd. ("BBIL") is a reinsurance company domiciled in Bermuda, which had offices in New York, New York at all relevant times.

18.     Beechwood Bermuda Ltd. ("BBL") is an entity organized under Bermuda law, with its principal place of business in Bermuda and a place of business in New York. BBL was a reinsurance company that was licensed as an insurer located in Hamilton, Bermuda and regulated by the Bermuda Monetary Authority. BBL is the parent company of BBIL.

19.     BAM Administrative Services LLC ("BAM Administrative") is a limited liability company domiciled in Delaware, which had its principal place of business in New York, New

4

York at all relevant times. BAM Administrative was a wholly owned subsidiary of BAM I. BAM Administrative served as agent for the Beechwood Trusts and as agent and signatory on behalf of Beechwood Re and BBIL as described more fully below. BAM Administrative also took management fees that it did not earn to move assets away from SHIP.

20.      Mark Nordlicht is a resident of New Rochelle, New York.  Nordlicht founded Platinum Partners and played a principal role in the creation of Beechwood.  He was an owner of Beechwood and exercised significant control over the enterprise's affairs, operating the business through the Beechwood Insiders.[3]  Nordlicht even maintained an office within Beechwood's offices, unbeknownst to SHIP. Nordlicht deliberately concealed his ownership in and control over Beechwood in order to perpetuate Platinum's fraudulent scheme.  In particular, he set up Beechwood Trust Nos. 1-6, one for each of his six children, which held Nordlicht's interests in Beechwood Holdings.  He also indirectly owned preferred shares in Beechwood Re Ltd. through several of the BRILLC Series, one of which was owned and controlled by his wife, Dahlia Kalter. Nordlicht was recently convicted in the Eastern District of New York for securities fraud, conspiracy to commit securities fraud, and conspiracy to commit wire fraud in connection with his role in the scheme described herein.

21.      Murray Huberfeld is a resident of Lawrence, New York.  Huberfeld is also a founder of Platinum Partners and was instrumental in Beechwood's creation.  Huberfeld is currently serving a 30-month sentence for conspiracy to commit fraud in conjunction with his activities at Platinum Partners. Huberfeld was also responsible for the solicitation of the initial funds that seeded Beechwood.  Huberfeld was a direct or indirect owner of Beechwood at all

---

[3] David Levy, Dhruv Narain, Eliot Feit, Daniel Saks, Hokyong Kim a/k/a Stewart Kim, Samuel Adler, Moti Edelstein, and Rick Hodgdon, Moshe M. Feuer, and Scott Taylor are collectively referred to as the "Beechwood Insiders."

relevant times through, among other vehicles, several of the BRILLC Series and Beechwood Trust Nos. 15-19.  Each of Huberfeld's five children is named as a beneficiary of one of those trusts.

22.     David Bodner is a resident of Monsey, New York, and is also a founder of Platinum Partners.  Like Nordlicht and Huberfeld, Bodner played a key role in Beechwood's formation. Bodner was a direct or indirect owner of Beechwood at all relevant times.  Bodner maintained ownership interests in Beechwood Holdings through Beechwood Trust Nos. 7-14, each of which named one of Bodner's eight children as the beneficiary.  Bodner also indirectly owned preferred shares in Beechwood Re through Beechwood Re Investments, LLC Series C, which in turn was owned and controlled by Monsey Equities, LLC, a vehicle owned and controlled by Bodner's wife, Naomi Bodner.

23.     Mark Feuer ("Feuer") is, and at all times material to the allegations in this pleading was, a resident of Lawrence, New York. Feuer is a Beechwood Founder, and together with Scott Taylor, and initially David Levy, presented the public face of the Beechwood Entities. Feuer was part of the Beechwood enterprise and its operations at all times relevant to these allegations. Feuer continuously misrepresented material facts regarding Beechwood's ownership, management, investment strategy, investments, and investment values and returns to SHIP and other clients of the Beechwood Entities. Feuer was one of the authors of the Platinum-Beechwood scheme, together with Scott Taylor, David Levy, Mark Nordlicht, Murray Huberfeld, and David Bodner. Feuer also was instrumental in carrying out the Platinum-Beechwood scheme, including the defrauding and otherwise harming of SHIP, in concert with the Co-Conspirators. Feuer is a named Defendant in the SHIP Action

24.     Scott A. Taylor ("Taylor") is, and at all times material to the allegations in this pleading was, a resident of New York, New York. Taylor was one of the founders of Beechwood

(each, a "Beechwood Founder"), and together with Feuer, and initially David Levy, presented the public face of the Beechwood Entities. Taylor was part of the Beechwood enterprise and its operations at all times relevant to these allegations. Taylor continuously misrepresented material facts regarding Beechwood's ownership, management, and investment strategy, investments, and investment values and returns to SHIP and other clients of the Beechwood Entities. Taylor was one of the authors of the Platinum-Beechwood scheme, together with Feuer, David Levy, Mark Nordlicht, Murray Huberfeld, and David Bodner.

25.    David I. Levy ("Levy") is, and at all times material to the allegations in this pleading was, a resident of New York, New York. Levy is the nephew of Murray Huberfeld. Levy was a portfolio manager at Platinum Management and rose through the ranks to become Co-Chief Investment Officer of Platinum Management with Mark Nordlicht. Levy is a Beechwood Founder and, together with Feuer and Taylor, presented the public face of the Beechwood Entities. Levy left Beechwood in late 2014 and returned to Platinum Management, but, as part of the Platinum-Beechwood scheme, surreptitiously continued to exert control over the Beechwood Entities throughout the relevant period. Levy was integral in every aspect of the Platinum-Beechwood scheme, including developing the scheme, founding Beechwood, selecting investments for SHIP contrary to the guidelines of the IMAs and against SHIP's best interest in consultation with Nordlicht and others, and concealing the true relationship between Platinum and Beechwood.

## JURISDICTION AND VENUE

26.    This Court has subject-matter jurisdiction under 28 U.S.C. 1332(a) because the parties are citizens of different states and the amount of controversy exceeds $75,000.00.

27.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because the Defendants are subject to personal jurisdiction in this district and a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this district.

## FACTUAL BACKGROUND

### A.     SHIP and How It Became Involved with Beechwood

28.     After sustaining significant and ongoing underwriting losses, SHIP stopped writing new business in 2003 and began to work with the Pennsylvania Insurance Department to develop a run-off strategy.  In 2008, the ownership of SHIP was transferred from a wholly owned subsidiary of Conseco, Inc. to the Senior Healthcare Trust, which was then merged into the Senior Healthcare Oversight Trust (the "Oversight Trust"), and the company's name was changed to the "Senior Health Insurance Company of Pennsylvania."  The Trustees of the Oversight Trust serve as SHIP's directors and are primarily former insurance regulators.

29.     SHIP is responsible for funding the covered long-term care expenses of its elderly policyholders.  When all of SHIP's policies and other obligations have been satisfied, proceeds from the liquidation of SHIP, if any, will be disbursed by the Oversight Trust to a common law trust, which at that time will select an ultimate beneficiary which must be one or more charities focused on senior health issues.

30.     SHIP is managed solely for the benefit of its policyholders and without a profit motive.  SHIP's policyholders are the primary beneficiaries of SHIP's statutory surplus (which equals the amount by which its assets exceed its obligations).  Since SHIP no longer writes new business, its access to capital and sources of income are limited to policyholder premiums and investment income.  SHIP's recently filed financial statement demonstrates a deficiency in its capital and surplus in excess of $450 million.

31.     In late 2013, SHIP was introduced to Beechwood Re.  On February 1, 2014, SHIP's affiliate, Fuzion ("Fuzion"), entered into a Master Services Agreement with Beechwood Re under which Fuzion agreed to administer the long-term care insurance policies that had been reinsured with Beechwood Re by WNIC and BCLIC with the approval of their respective state regulators.

32.     Beginning in 2014, SHIP's then-President and CEO, Brian Wegner, and, SHIP's then-CFO, Paul Lorentz, and others met with and otherwise communicated with Feuer, Taylor, and Levy electronically, by telephone, and in person to discuss SHIP's unique status as a run-off insurer and the particular challenges it faced with respect to its surplus.  Feuer, Taylor, and Levy advised SHIP that Beechwood Re was unable to enter into a reinsurance agreement with SHIP. But they proposed instead to assist SHIP in improving its capital and surplus status by offering SHIP the opportunity to participate in the same investments in which Beechwood Re invested the reserves associated with the WNIC and BCLIC policies and certificates that were reinsured by Beechwood Re.

33.     Unbeknownst to SHIP, and undisclosed by Beechwood, these investments were primarily investments in or involving Platinum Partners, an entity whose principals owned and controlled Beechwood, a fact that was intentionally hidden from SHIP from the beginning.  These investments also would favor the interests of Beechwood and Platinum and their related parties to SHIP's detriment.

**B.      The Platinum-Beechwood Scheme To Secure Funds From Insurers Like SHIP Under False Pretenses To Keep the Platinum Ponzi Scheme Afloat**

34.     Beginning in at least 2012, Platinum faced recurring liquidity crises that it kept concealed from its investors.  Platinum Partners Value Arbitrage Fund L.P. ("PPVA") became increasingly concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.  Many of PPVA's investors, however,

demanded their money back every quarter, as PPVA's own operating documents permitted them to do.  To satisfy these recurring redemption requests, Platinum Management was required to withdraw cash from more liquid investments, creating a feedback loop whereby PPVA's investment portfolio became increasingly illiquid as time went on.

35.     As a solution to Platinum's liquidity woes, the Platinum Insiders,[4] along with Feuer and Taylor, conceived of Beechwood, which was constructed specifically to seek out pockets of cash from unsuspecting institutional investors such as SHIP to serve the interests of Platinum and the Platinum Insiders.

36.     In early 2013, Nordlicht, Huberfeld, and Bodner, in their individual capacities and on behalf of Platinum, entered into a conspiracy with Feuer and Taylor, in their individual capacities and on behalf of Beechwood Capital Group, a company that they had previously founded. The conspirators agreed to establish a reinsurance company, Beechwood Re, and use it as a vehicle for fraudulently inducing insurers to hand over funds to Beechwood via reinsurance agreements or otherwise, so that Beechwood could use those funds to keep Platinum afloat, thereby enriching the Co-conspirators.

37.     Beechwood Re served as one of the three main vehicles — along with BBIL and BAM (collectively referred to as the "Beechwood Advisors") — through which Nordlicht, Huberfeld, Feuer, Taylor, Levy, Bodner and the rest of the Platinum Insiders and Beechwood Insiders perpetrated a fraudulent conspiracy, over several years, aimed at SHIP and other insurers,

---

[4] Mark Nordlicht, Murray Huberfeld, David Bodner (collectively, the "Platinum Founders"), Estate of Uri Landesman, Naftali Manela, Joseph SanFilippo, Daniel Small, Ezra Beren, David Steinberg, David Ottensoser, Brian Jedwab, Will Slota, Bernard Fuchs, Isaac Barber and Paul Poteat, David Levy are collectively referred to as the "Platinum Insiders."

with Feuer, Taylor and Levy serving as the front men. The Lincoln valuations were a key component of this fraudulent conspiracy.

38.     Indeed, by February 28, 2013, Beechwood and Platinum were alter egos and had interchangeable management, as demonstrated, inter alia, by an e-mail exchange between Taylor and Feuer from their Beechwood emails and Levy from his Platinum email, discussing the execution of an agreement between Beechwood Capital and Alpha Re Limited, another reinsurance company.

39.     The Co-conspirators agreed that the key to the conspiracy's success was to keep the relationship between Beechwood and Platinum a secret from everyone, especially their targets. The Co-conspirators agreed that Beechwood would misrepresent the persons who owned and controlled Beechwood, making sure never to divulge that Nordlicht, Huberfeld or Bodner controlled Beechwood and had substantial ownership interests in the many Beechwood Entities, particularly including Beechwood Re. They created a complex and elaborate ownership structure with the sole intent of confusing interested parties.

40.     The Co-conspirators expressly contemplated how to utilize Beechwood's intentionally complex structure to avoid revealing Nordlicht, Huberfeld, Bodner and Levy's control over the investments to SHIP and other clients. In a series of e-mails between Feuer, Taylor, Nordlicht and Levy on May 11 and 12, 2014, Taylor informed the group that "[t]he way the structure will work is that BBIL will sign the IMA with Brian Wegner's company [SHIP] and then we will use the IMA that BBIL has with [BAM] to name [BAM] the manager on the account." Nordlicht responded asking to have primary brokerage accounts set up "quickly" and asked who was internally responsible for getting that done; David Levy replied that he and Sam Adler were.

Nordlicht responded: "Can we be all over this?  Want to get started seamlessly when money comes in."

41.     At all relevant times, the management teams of the Beechwood Entities worked in concert with and under the direction of the Platinum Entities and the Platinum Insiders, who were in turn controlled by Nordlicht, Huberfeld, Bodner and Levy.  In fact, at its founding, Beechwood was initially operated out of Platinum Partners' offices.   Furthermore, Nordlicht and other Platinum executives, including Naftali Manela and Daniel Saks, maintained e-mail accounts with both Beechwood and Platinum Partners that they used interchangeably to direct Beechwood's investment activities.  Huberfeld was also intimately involved in Beechwood-related transactions, having been included on numerous e-mails concerning those transactions and having provided advice to Beechwood on a number of occasions.

42.     In short, Beechwood was nothing more than an instrumentality of Platinum's fraudulent scheme, with the Beechwood and Platinum Insiders all in on it, and SHIP and other Beechwood investors serving as their targets.  Bodner confirmed as much in a July 29, 2015 e-mail in which he stated that "We weren't exactly honest . . . that beechwood and platinum are really integrated."  Bodner recognized that the Beechwood Advisors were merely Platinum's alter egos and that the connections between the entities were deliberately concealed from third parties.  Bodner knew that if Beechwood's investors, including SHIP, knew the truth about the improper connections between Beechwood and Platinum and the resultant improper investments, the entire scheme would collapse.

43.     SHIP's confidence in Beechwood was bolstered by its knowledge that, in early 2014, Beechwood Re had entered into regulator-approved reinsurance transactions with BCLIC and WNIC (collectively, and as part of the CNO Financial Group, or "CNO").

44.     SHIP was aware of the BCLIC and WNIC reinsurance arrangements through SHIP's affiliate, Fuzion Analytics, LLC, which acts as a third-party policy and claims administrator for policies of long-term care business issued by various insurers, including SHIP. Beechwood itself lacked internal policy or claim administration infrastructure and capabilities. Hence, in seeking to reinsure the BCLIC and WNIC business, Beechwood engaged Fuzion to continue its role as administrator.  In communications with SHIP and Fuzion personnel regarding the CNO reinsurance block that occurred in late 2013 into 2014, Beechwood repeatedly represented that Beechwood's skill was in investments and that Beechwood had access to investments that yielded high returns and thus would enable Beechwood to profit from the reinsurance of the CNO portfolio.

45.     On February 1, 2014, Fuzion entered into a Master Services Agreement with Beechwood Re under which Fuzion agreed to administer the WNIC and BCLIC long-term care insurance policies and certificates reinsured by Beechwood Re.

46.     Beechwood Re indicated that it was unwilling to enter into a similar regulator-approved reinsurance arrangement with SHIP under which Beechwood would, in essence, take SHIP's reserves and then assume the financial obligation to pay policy claims.  Instead Beechwood advised SHIP that it could gain access to the same kinds of allegedly high-quality, high-yield investments that supported the BCLIC and WNIC agreements by entering into investment management agreements with the Beechwood Advisors.

**C.     Beechwood's Misrepresentations to Induce SHIP to Enter Into the IMAs**

47.     In March or early April 2014, SHIP's former chief executive officer Brian Wegner and SHIP's former chief financial officer Paul Lorenz met in person in New York with representatives of Beechwood.  At the meeting, Beechwood gave an extensive presentation touting

13

its relationships with leading third-party service partners, including Lincoln, which Beechwood identified as its independent valuation firm.

48.     On April 10, 2014, Taylor, on behalf of Beechwood sent SHIP's CEO Wegner an e-mail, with copies to Levy and Feuer.  The e-mail attached documents that provided information concerning Beechwood's purported "asset management capabilities, strategies, and platform" and advised that Beechwood's "focus for SHIP will be in the Asset Backed Senior Secured Credit class of investments."  Taylor noted in his April 10, 2014 e-mail that those classes of investments were "where we [Beechwood] are particularly strong, and can provide you [SHIP] some superior yield on a risk adjusted basis."

49.     The April 10, 2014 e-mail included a "Discussion Document" that indicates that, in investing assets, Beechwood uses "[b]est in class third party vendors."  The document emphasized Beechwood's relationship with Lincoln and promised "independent valuation and reporting" from Lincoln on "all valuations on a quarterly basis."  Beechwood's presentations further emphasized Lincoln's purported seven-step valuation methodology for secured credit opportunities, such methodology including monthly "negative assurance" valuations as well as quarterly "positive assurance" valuations.

50.     The monthly negative assurance valuations by Lincoln were promised to include "Confirmation that nothing came to Lincoln's attention to suggest that the values are unreasonable in relation to fair value measurement principles of ASC 820."  The quarterly positive assurance valuations by Lincoln were promised to include "Confirmation that the process and values are reasonable in relation to fair value measurement principles of ASC 820."

51.     Unbeknownst to SHIP, Beechwood's representations were false, misleading, and material, and Beechwood knew, or they were at least grossly negligent in not knowing, that they

were false, misleading, and material when they made them to SHIP in order to induce SHIP to enter the IMAs and to turn over, in time, more than $270 million for investment.

52.    Beechwood fraudulently concealed from SHIP that it intended to place SHIP's assets into investments that were highly speculative, opaque, and not adequately secured.  It also hid the reality that Beechwood intended to convert SHIP's assets to the uses of Platinum and the individuals controlling Beechwood and Platinum in a manner fundamentally inconsistent with the safe and conservative portfolio they promised would result in a guaranteed return.

53.    Beechwood concealed from SHIP that it intended to place SHIP's assets in related-party transactions involving one or more of the principals of the Beechwood Advisors or the Platinum Entities and their associates.

54.    Based upon and in reliance on Beechwood's false and misleading representations and the fraudulent or grossly negligent omission or concealment of material information, SHIP entered into the IMAs to its detriment.

**D.    The Investment Management Agreements**

55.    SHIP entered into three Investment Management Agreements with the Beechwood Advisors.  All three IMAs contain the same basic structure.  The IMAs all were controlled by the Beechwood Insiders and their related parties in essentially the same manner, even though the individual agreements had different contractual counterparties, purportedly because such diversification would further protect SHIP's invested funds.

56.    SHIP also was subject to investment guidelines limiting investment concentration. SHIP further understood from Beechwood prior to executing the IMAs that Beechwood was managing assets that were achieving returns well in excess of the IMA guaranteed returns, which guarantees were considered additional protection for SHIP.

57.     Each of the IMAs granted Beechwood full discretion over the specific investments made and promised independent valuations by Lincoln of investment returns that would allow Beechwood to withdraw performance fees.

58.     Further, the IMAs required, among other things, that Beechwood "cause to be delivered to [SHIP] the reports and other information" included in a schedule annexed to the IMA.  That schedule, in turn, provided that Beechwood would provide SHIP on a quarterly basis with "valuation reports from an independent third-party valuation company (currently Lincoln International) on all non-public securities, as well as the quarter end investment holding report and Net Asset Value."

59.     Lincoln's role as the "independent" valuation company was a negotiated term in the IMAs that SHIP relied upon to enter the agreements.

### i.     The BBIL and Beechwood Re IMAs

60.     The first IMA between SHIP and BBIL for the provision of investment management and advisory services was executed as of May 22, 2014 (the "BBIL IMA").

61.     The second IMA for the provision of investment management and advisory services was between SHIP and Beechwood Re and was executed as of June 13, 2014 (the "Beechwood Re IMA").

62.     Taylor executed the BBIL IMA and Beechwood RE IMA on behalf of BBIL and Beechwood Re, respectively.

63.     The BBIL and Beechwod Re IMAs were identical in some respects.  For example:

   a.   They appointed BBIL/Beechwood Re as SHIP's investment adviser and manager to invest and manage the funds on behalf of SHIP and "subject at all times to the fiduciary duties imposed upon it by reason of its appointment to invest and manage the Assets."

   b.   They guaranteed an annual investment return to SHIP equal to 5.85% (non-compounded) of the net asset value of the assets contributed to the account.

     c.   In the event that SHIP's investments under the IMAs did not achieve an annual Investment Return of 5.85%, they were obligated to "(i) pay the Client [SHIP] any Investment Return shortfall from its own account and (ii) as necessary, contribute assets to the Account from its own account such that the net asset value of the Account equals the Initial NAV."

     d.   They promised to make all investment decisions and to manage SHIP's invested funds "consistent with the general investment policy, guidelines and restrictions" as described on Exhibit A.

     e.   The IMAs permitted returns above the 5.85% guaranteed Investment Return to be retained as a Performance Fee.

64.    Under the BBIL IMA, SHIP ultimately deposited a total of $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

65.    From September 2015 to July 2016, BBIL withdrew from the Wilmington Trust account at least $12,343,891 of SHIP's funds in performance fees, according to the records available to SHIP, and the actual amount could be higher. Because these performance fees had not in fact been earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

66.    Indeed, on June 23, 2014, Mark Nordlicht sent an e-mail to Nicholas Marzella of Platinum, copying Israel Wallach and David Shirreffs of Beechwood, stating that he "want[s] to move/sell 10 million of black elk bonds to bbil the nomura account" and requests that they "take care of it today." The same day, the Wilmington Trust Account Statement for the BBIL SHIP account shows a purchase of $10 million par value of Black Elk Energy notes at 99% of par value. Three days later, on June 26, 2014, $9,900,000 was debited from the BBIL SHIP Account. On July 1, 2014, Nordlicht e-mailed the same group, asking them to trade $7 million in Black Elk Bonds to BBIL SHIP. That same day, the Wilmington Trust Account statement shows the purchase of $6,987,000 par value of Black Elk Energy bonds at 99% par value; that transfer settled

on July 7, 2014.  As established in the PPVA and Platinum Partners Credit Opportunities Master Fund, LP ("PPCO") complaints, it was well known to Beechwood and Platinum that Black Elk was a distressed asset at the point these investments were made.

67.     On June 29, 2014, just one day after the BBIL IMA was funded, Nordlicht (using a Beechwood e-mail address) recommended certain equity allocations for SHIP's investments to Taylor.  This level of direct involvement by Platinum in the management of SHIP's money by Beechwood, its fiduciary, was not disclosed in relation to any of the three IMAs and conflicted with Beechwood's ongoing representations that it was acting in SHIP's best interests and was solely in control of all decision-making.  To the extent Platinum was identified by Beechwood to SHIP at all, it was in the context of post-acquisition reporting of investment in one or more of PPCO or PPVA.  Neither Beechwood, nor Lincoln in its provision of independent valuations of SHIP'S investments, ever disclosed to SHIP any Platinum connection to other assets in which SHIP was invested, that Platinum was directing SHIP's investments, that Platinum and Beechwood Insiders were personally benefiting from fees and charges related to those investments, or the related-party nature of such transactions and the inherent conflicts of interest that such ties reflect. In connection with the Beechwood Re IMA, SHIP ultimately deposited a total of $80 million into a custody account at Wilmington Trust for investment by Beechwood Re on SHIP's behalf.  This amount was in addition to the previously described $80 million invested under the BBIL IMA. The deposits were made over time and SHIP, based on Beechwood's assurances, relied on Beechwood's false representations as to the nature, quality, value, and performance of the BBIL IMA and the initial investments made under the Beechwood Re IMA in agreeing to increase the amount to be managed by Beechwood Re under the Beechwood Re IMA.  Had SHIP known the truth, SHIP would never have authorized these increases.

18

68.     From September 2014 to April 2016, Beechwood Re withdrew from the Beechwood Re Wilmington Trust account at least $11,275,000 of SHIP's funds in performance fees, according to the records available to SHIP, and the actual amount could be higher.  Because these performance fees had not in fact been earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

ii.     *The BAM IMA and Side Letter*

69.     The third IMA for the provision of investment management and advisory services was between SHIP and BAM and was executed as of January 15, 2015 (the "BAM IMA").

70.     Saks executed the BAM IMA on behalf of BAM.

71.     BAM and BRILLC failed to comply with SHIP's investment policy.  Rather, BAM and BRILLC, together with the Beechwood Insiders, utilized the BAM IMA and the Side Letter to take control over SHIP's assets and to deploy those assets to benefit Platinum, thereby enriching the Beechwood Insiders as well as Platinum's and Beechwood's owners and related parties, at the expense of SHIP.  Beechwood did so without SHIP's knowledge of or consent to the risky and hopelessly conflicted relationship with Platinum that led to inappropriate investments.

72.     During performance under the BAM IMA, BAM and BRILLC compounded the damage to SHIP by falsely overstating the value of the assets under management in the BAM IMA account to justify its retention of performance fees to which it would not otherwise be entitled as well as to extend the duration of the scheme and magnify the losses.

73.     Contemporaneous with execution of the BAM IMA, in January 2015, SHIP deposited an initial $50 million into a custody account at Wilmington Trust to be invested and managed by BAM, subject to investment guidelines prescribed by the IMAs and the insurance laws of Pennsylvania.  Subsequently, in March 2015, SHIP deposited an additional $60 million into the same account and subject to the same investment guidelines and legal limitations, for a

total investment of $110 million to be managed by BAM under the BAM IMA. This $110 million was in addition to the $160 million invested with Beechwood under the other two IMAs. SHIP relied on Beechwood's false representations as to the nature, quality, value, and performance of investments under the BBIL IMA and the Beechwood Re IMA in agreeing to enter into the BAM IMA. These values were supported, in part, by the valuations Lincoln performed. Had SHIP known the truth, SHIP would not have entered into the BAM IMA.

74.     Similar to the other two IMAs, the BAM IMA appointed BAM as an investment adviser and manager to invest and manage the funds on behalf of SHIP and subject at all times to fiduciary duties. BAM IMA, ¶ 1.

75.     The language of the BAM IMA itself differed from the BBIL IMA and Beechwood Re IMA in that it did not expressly guarantee a specific investment return. SHIP, however, entered into a side letter with BRILLC, which was commonly controlled along with the other Beechwood Advisors, and in the side letter BRILLC guaranteed an annual investment return of 5.85% (non-compounded) of the net asset value of the assets contributed by SHIP under the BAM IMA (the "Side Letter"). Nordlicht executed the Side Letter as "Authorized Signatory" for BRILLC.

76.     If a return of less than 5.85% was achieved, however, BAM would receive 1% of the net asset value, a feature not included in the other two IMAs. This allowed Beechwood and Platinum to extract even more funds. The Side Letter likewise promised a "True-Up Payment" in the event of any shortfall in the annual return, and this mechanism was designed to work in a manner similar to the provision in the other IMAs.

77.     From March 2015 to July 2016, BAM withdrew from the Wilmington Trust account at least $11,350,000 from SHIP in performance fees, according to the records available to SHIP, and the actual amount could be higher. Because these performance fees had not in fact been

earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

### E.     Lincoln's Critical Role In the Fraud

### i.     *Platinum Engages Lincoln to Lend Credibility and Enable the Fraud*

78.     Under the IMAs and Side Letter, Beechwood promised that an independent valuation firm, Lincoln, would value SHIP's investments.   As further explained below, rather than functioning as a "check" on Beechwood, Lincoln enabled the fraud.

### a.     *Lincoln Accepts the Platinum Engagement as an Opportunity to Gain Future Business, Knowing That Platinum and Beechwood Are Related*

79.     On or around November 12, 2013, before SHIP entered the IMAs, the Managing Director of Lincoln's Valuations and Opinions Group ("VOG"), Michael Fisch, received a phone call from Will Slota, the Chief Operating Officer ("COO") of Platinum, regarding Lincoln's valuation services. As memorialized in an internal Lincoln memo from the time (described below), Slota told Fisch that he was seeking valuation services "on behalf of its [Platinum's] newly formed reinsurance company, Beechwood Re Ltd."

80.     The following day, November 13, 2013, Fisch emailed Slota seeking additional information on Beechwood and the names of the "illiquid investments" to be valued on its behalf. Fisch attached a proposed non-disclosure letter, addressed to Slota in his role as COO of Platinum. The letter "confirms that Lincoln Partners LLC […] has requested and Platinum Partners, L.P. ("Company" or "you" or "your") has agreed to supply information regarding the Company [Platinum] to Lincoln," and that Lincoln "agree[s] not to use any of the Information for any purpose other than in connection with possible valuation services for the Company [Platinum]."[5]

---

[5] Under the letter, Lincoln also agreed to promptly destroy, at Platinum's request, any information supplied to it by Platinum and any materials prepared by Lincoln based on such information.

Fisch concluded his cover email by assuring Slota that "[w]e [Lincoln] are very interested in working with Platinum/Beechwood." Lincoln understood that it was performing valuation services for Platinum, that Platinum and Beechwood were related, and that Lincoln needed information about Platinum in order to value investments made by Beechwood.

81.    Lincoln also sent a near identical non-disclosure letter to Slota as COO of Beechwood Re, also dated November 13, 2013.  The only difference was the words "Beechwood Re."

82.    On November 18, 2013, Slota signed and returned to Lincoln one non-disclosure letter as the COO of Platinum, and the other as COO of Beechwood Re.

83.    On December 4, 2013, representatives of Lincoln (specifically, Michael Fisch, Ron Kahn, Patricia Luscombe, and Wes Trowbridge) met with representatives of Platinum, including Slota, at Platinum's offices in New York.[6]

84.    Following the December 4, 2013 meeting at Platinum, the VOG prepared a memo to Lincoln's Commitment Committee (the "Committee") entitled "Platinum Partners – Portfolio Valuation Assignment" (the "Lincoln Memo"). The Lincoln Memo, dated December 11, 2013, recommended to the Committee that Lincoln "approve the pursuit" of an engagement with Platinum Partners.  The Lincoln Memo made clear that (emphasis added), "*Platinum Partners ('Platinum') is considering hiring Lincoln*," and that the purpose of the engagement was "*to provide portfolio valuation services on behalf of its [Platinum's] newly formed reinsurance company, Beechwood Re Ltd*." The very next sentence explained the context in which Lincoln's valuation services would be needed (emphasis added): "*CNO Financial Group . . .  will cede $900*

---

[6] Like Fisch, Ron Kahn and Patricia Luscombe were Managing Directors of Lincoln's VOG; Trowbridge was an Associate in the VOG.

*million of insurance obligations to Beechwood in a transaction expected to close in late December. Beechwood will then begin investing $100 million from funding provided by Platinum in approximately seven (7) to ten (10) illiquid, senior secured, obligations in U.S. corporations across various industries. Beechwood is committed to adopting operational best practices, including the use of independent third-party valuations for its illiquid investments, and has requested a proposal from Lincoln for such services.*"  That is to say, Lincoln understood that it was being engaged by Platinum to provide independent valuations of the investments Platinum would be making through Beechwood Re, including investments made with "insurance obligation" assets belonging to CNO (some of which Beechwood later forced SHIP to purchase from CNO).

85.    The VOG made clear that they understood Platinum's use of Beechwood as a source of capital when they referred to the "growing trend in the hedge fund industry of managers setting up reinsurers which offer the benefits of permanent capital, tax efficiency and high returns . . . ," and that "[m]ore asset managers are likely to launch their own reinsurance firms as they seek to emulate the successful hedge fund reinsurer strategy to leverage reinsurance premiums as a source of capital." Lincoln understood that Platinum had established Beechwood Re as an affiliated reinsurer that it controlled for the specific purpose of providing Platinum with "permanent capital," including by "leverag[ing] reinsurance premiums as a source of capital."

86.    In addition, the Lincoln Memo made clear that Lincoln's objective in providing valuation services for Platinum's new reinsurance arm was to secure bigger work from Platinum in the future; specifically, Lincoln hoped to replace Sterling Valuation Group ("Sterling") as Platinum's valuation firm for all of the Platinum funds. As the VOG put it, "while appointing a valuation provider for Beechwood is Platinum's immediate priority, they expect to resource its hedge fund valuations to another provider in the near future. Sterling is currently valuing twenty-

seven (27) investments representing approximately $700 million in aggregate value." The VOG had even "reviewed a copy of the Sterling report and believe we could perform the valuations, subject to further diligence."  In other words, if Lincoln showed Platinum that it could do a good job with its investments through Beechwood now, Platinum might give it an even bigger chunk of work in the future.  Being a relatively new entrant in the valuation space and looking to gain traction and credibility, Lincoln was fully incentivized to aid and participate in Beechwood's scheme.  What is more, Platinum and Beechwood could then "serve as a referral source for opportunities with other hedge fund managers and / or reinsurance firms," and would "add another insurance company to our growing portfolio valuation practice and bolster our credentials in the hedge fund and reinsurance communities."

87.   Despite its zeal for taking on the Platinum engagement, Lincoln was well aware that it had little to no experience in valuing the types of risky and illiquid investments that Platinum sought to make through Beechwood using SHIP's, WNIC's, and BCLIC's funds.  To reassure the Committee, the VOG explained that it intended to perform sample valuations on representative investments owned by Platinum.

88.   Ultimately, the appeal of a prospective lucrative engagement by a hedge fund purporting to have a billion dollars under management proved too good an opportunity to pass up. On or about February 19, 2014, Lincoln sent an engagement letter to Slota, but this time addressed to Slota as COO of Beechwood Re's investment manager, BAM. For fear of losing track, this was the third distinct entity at which Lincoln had dealt with and addressed a letter to Slota.  What is more, although the letter was addressed to Slota as COO of BAM, Slota signed the engagement letter as COO of Beechwood Re.  Of course, the decision to have Lincoln sign its engagement letter with a "Beechwood" entity, and not with Platinum which had actually engaged it, was a

calculated and strategic one, meant to affirmatively conceal Platinum's involvement with Beechwood Re.

89.     And Lincoln went along with it.  As discussed below, it was not until about February 2015, a full year after it was first engaged, that Lincoln apparently decided the opportunity of future business from Platinum was not worth doing its fraudulent bidding for Beechwood Re, with Lincoln refusing to provide any further valuation work for "Beechwood" without an engagement letter between Lincoln and funds – further proving that Lincoln was well aware that SHIP was in fact relying upon Lincoln's valuations all along.

### b.     Despite an Engagement Letter with "Beechwood," Lincoln Knowingly Works for Platinum

90.     Lincoln's engagement by a "Beechwood" entity did nothing to change the fact that Lincoln worked for – and knew it was engaged by – Platinum. On February 25, 2014, just a few days after purportedly being engaged by "Beechwood," Lincoln representatives (Fisch and Luscombe) met with Platinum representatives at Platinum's offices in New York. The meeting invitation was sent to Lincoln by Slota using his Platinum email address, and included Platinum principals David Levy, Eli Rakower and Naftali Manela, as well as Elliot Feit and Samuel Adler.

91.     On February 27, 2014, Lincoln's Vice President-Controller, Donna Criel, circulated the "client code" assigned to the "Platinum/Beechwood valuation" work at Lincoln. The email was addressed to Lincoln employees comprising the "Platinum / Beechwood team."

92.     Similarly, on March 11, 2014, Fisch suggested that the following description be used to describe the "Platinum/Beechwood valuation" engagement on Lincoln's internal Intranet site (emphasis added): "*Lincoln-U.S. valuations assignment to provide portfolio valuation services for Beechwood Re Ltd., a reinsurance company of affiliate of [sic] Platinum Partners, a New York based hedge fund with more than $1 billion in assets under management*." Lincoln's description

further acknowledged that "*Beechwood is investing approximately $500 million*" – that is, the near entirety of the trust assets ceded by WNIC and BCLIC to Beechwood Re in the Reinsurance Agreements – "in approximately fifty (50) illiquid investments, including senior secured loans made to energy, mining and other companies, project finance, and structured investments, such as receivables finance, loans against stock of public companies, and consumer lending." This was five times the number of illiquid investments Platinum initially told Lincoln it would be investing through Beechwood Re.

ii.     *Lincoln Knowingly Issues Valuation Reports Based on False and Misleading Information*

93.     As described above, as early as November 2013, and at all relevant times thereafter, Lincoln had actual knowledge of at least the following facts: (1) Beechwood Re/BAM and Platinum were affiliated (through both ownership and funding); (2) Lincoln was working with and for Platinum (despite Beechwood Re/BAM appearing on its engagement letter); (3) the assets Lincoln would be valuing for Platinum/Beechwood were SHIP's assets and that SHIP had three separate IMAs with Beechwood Re, BAM, and BBIL; (4) the type of investments Platinum sought to make through Beechwood were in risky, illiquid investments.

94.     Nevertheless, beginning in late February 2014 and continuing throughout the entirety of its one-year engagement, Lincoln knowingly composed and issued valuation reports supporting Platinum/Beechwood's self-serving valuation of investments and continued to conceal the relationship between Platinum and Beechwood. These reports were knowingly false and misleading for a variety of reasons.

a.     *Lincoln Knowingly Relied on Deficient Information to Issue Valuations*

95.     Lincoln had actual knowledge that its valuation reports were based on deficient documentation and information. Lincoln knew they were deficient because Lincoln either (i)

agreed with Beechwood to value certain investments for which Beechwood had no supporting documentation or, (ii) was not provided with the requested information.  Rather than terminate the engagement or refuse to issue valuations however, Lincoln continued to perpetuate the elaborate scheme and proceeded to issue valuation reports which Lincoln knew were false and misleading.

96.     Lincoln's knowing failure to obtain sufficient information to prepare proper, independent valuations dates back to before its engagement agreement with Platinum/Beechwood was even signed.  Indeed, Lincoln agreed to accept Platinum/Beechwood's self-reported and self-serving valuation of Platinum investments as part of the engagement negotiation process.  Manela confirmed this in an email to Levy on February 13, 2014, five days before Lincoln executed its engagement letter with Beechwood Re/BAM: "Spoke to Mike Fisch at Lincoln just now by the way. They should not have much of an issue valuing the fund of fund investments each month off of NAV [Net Asset Value] statements.  He's going to send me something that explains the process but I think it's going to be doable."

97.     Platinum's "NAV" is the subject of "Scheme 1" in the PPVA Action against Beechwood Re and its Co-conspirators. To summarize, by 2013, PPVA's books and records were showing the world that PPVA's NAV was nearly $1 billion, when in fact PPVA's true NAV was negative $400-$800 million. To keep their scheme afloat, Platinum and the Co-Conspirators needed someone to buy Platinum's assets at grossly inflated values (par or thereabouts for debt instruments, and artificial marks for equity investments) to make their self-reported $1 billion NAV appear believable. Since no bona fide buyer actually existed, Platinum and the Co-conspirators created Beechwood Re to elicit and then use the money of unwitting institutional investors, like SHIP, to do so. Upon information and belief, Lincoln continued relying on these

grossly inflated, self-reported and unsupported NAV figures in valuing the Platinum fund investments throughout the duration of its engagement.

98.    Lincoln's readiness to knowingly value investments with incomplete and unverified information extended past accepting the NAV for the Platinum funds.  On February 27, 2014, shortly after signing its engagement letter with "Beechwood," Fisch requested the following information from Manela with respect to three Platinum-controlled entities to be valued in the reports – Golden Gate, PPCO, and Black Elk:  (1) investment committee memoranda, (2) financial statements, and (3) the offering memoranda. However, Manela responded that he could only provide Lincoln with "financial statements for these investments," and the financial statements he provided for one of the investments, PPCO, was from 2012. Instead of pushing for the necessary documentation, Fisch meekly responded, "Ok, thanks."  And once again, in their typical self-serving mode and in an effort to stay in the good graces of Beechwood, Lincoln continued to turn a blind eye, ultimately to the detriment of SHIP.

99.    A day later, February 28, 2014, Fisch asked whether Beechwood Re/BAM prepared "internal underwriting or investment committee memos describing the investments/transactions." Manela responded that it did not, but offered to "discuss doing something in the future for you." Again, Fisch did not push for the requested information.

100.    Instead, despite lacking the minimum documentation it asked for to perform its job, on March 7, 2014, Lincoln submitted to Levy, as CIO of BAM, a Negative Assurance Letter concluding there was "nothing that came to our attention that would lead us to believe that management's fair value estimates as shown" – all of which had been given a 100% fair value by Beechwood – "are unreasonable." That is, Lincoln determined that there was nothing "unreasonable" about how Beechwood came up with  fair value estimates for each investment –

which (unsurprisingly) matched up perfectly (100%) to the "principal/cost basis" figures Beechwood had supplied for each investment – despite knowing that Beechwood did not have the underlying documentation needed to perform the valuation. Lincoln knew this because it asked to review that documentation, and Beechwood said they did not have it.  In other words, "nothing came to [Lincoln's] attention" only because of their own failure to insist on the necessary documentation.

101.   In an effort to avoid the natural consequences of its actions, Lincoln included boilerplate disclaimer language in its Negative Assurance Letters, including  a February 19, 2015 Negative Assurance Letter for SHIP's assets with Beechwood Re, BBIL, and BAM, as of January 31, 2015, claiming that Lincoln had "relied upon and assumed the accuracy and completeness of the financial information supplied to us and considered in our analysis" of fair value, but that, based on Lincoln's analysis, "nothing came to our attention that would lead us to believe that management's fair value estimates as shown are unreasonable."  Similar language appeared in Lincoln's January 19, 2015 Quarterly Portfolio Review for SHIP's assets as of December 31, 2014– namely, that "[i]n arriving at the valuations herein, Lincoln has relied upon and assumed the accuracy and completeness of the financial information supplied to us and considered in our analysis," but that, based on Lincoln's analysis, "Lincoln has concluded that the Beechwood fair values [ ] as shown [ ] are reasonable."  These representations were knowingly false and misleading.

102.   The February 19, 2015 Negative Assurance Letter valued about $133 million of SHIP's assets, while the January 19, 2015 Quarterly Portfolio Review valued about $74 million of SHIP's assets, for a total of about $207 million of SHIP's assets.

103.    Amazingly,   even   Lincoln's   disclaimer   language   was   controlled   by Platinum/Beechwood. The disclaimer language that Lincoln initially included in its quarterly Positive Assurance Valuations stated that "Lincoln has not made any independent valuation or appraisal of the assets." However, independent valuations were required under the IMAs. At Beechwood's request, Lincoln removed the reference to "independent valuation."

104.    *First*, in conducting its review of the investments, Lincoln had actual knowledge that Beechwood did not have the information necessary to properly value any of its investments.

105.    *Second*, as discussed further below, Lincoln also had actual knowledge that Beechwood and Platinum were related – something else SHIP did not know – and Lincoln therefore knew that any transaction between them *could not*, by definition, have fair market value. As explained above, Beechwood Re had agreed to provide written quarterly reports setting forth the aggregate fair market value of the assets – with "fair market value" expressly defined in the IMAs as "in its reasonable discretion in a manner determined in ***good faith*** to reflect fair market value." (Emphasis added). Accordingly, any "fair market value" assigned to the Valued Investments by Beechwood was improper and fraudulent under the terms of the IMAs. It was also objectively "unreasonable," as valuing something as being between an unrelated buyer and seller, when Lincoln in fact knew that not to be the case, is the antithesis of reasonable.

106.    Lincoln nevertheless represented that there was nothing "unreasonable" about Beechwood assigning a 100% or greater fair value to four of the investments (MYSYRL Capital, LLC, The New Bradley House Ltd., Partners Credit Opportunities Fund LLC, Platinum Partners

Value Arbitrage Fund LLC )[7] in its February 2015 Negative Assurance Letter for investments as of January 31, 2015.

107.     At all relevant times, Lincoln not only lacked the necessary documentation to independently evaluate these investments and their purported fair market values, but it also had actual knowledge that these transactions were not arm's-length transactions. Consequently, Lincoln was not entitled to accept and rely upon the market values supplied to it by Beechwood. Lincoln was instead required to undertake further investigation to determine whether those values – which it knew were not the product of arm's- length transactions – in fact represented the fair market value for such transactions before relying on them to perform the valuations. Yet, Lincoln routinely failed to do so, and instead relied upon the unsupported and facially unreasonable values supplied to it by Beechwood to put Lincoln's total stamp of approval on Beechwood's transactions in each of its valuation reports.

108.     As late as December 22, 2014 – nearly a year after it began issuing valuation reports for Beechwood Re/BAM – Lincoln was still asking Beechwood for "(1) evidence for the guarantee arrangement for each loan with a guarantee, (2) identification for each portfolio company (whether Platinum or another affiliate was a controlling equity investor, minority investor or lender), and (3) the expected time to repayment for each company."  It was also attempting (unsuccessfully) to schedule a conference call with Platinum's auditor (BDO) to discuss the guarantees between Platinum and Beechwood.

109.     Beechwood responded to Lincoln's request for this bare-minimum level of information by sending Lincoln a single-page spreadsheet identifying (1) a dozen investments in

---

[7] The Q4 Positive Assurance Valuation for BBIL assigned these investments a fair value range of 96.5% to 105.3%.

entities which Beechwood self-identified as having some affiliation with Platinum, including five loans purportedly guaranteed by Platinum (ALS, Golden Gate ("put option"), Implant Sciences, LC Energy and Northstar), and (2) nearly a dozen more investments in entities which Beechwood claimed had "no affiliation" to Platinum, despite several of them (Viveros, New Bradley House and CashCall, to name a few) being entities in which Platinum either held a significant interest or debt or directed Beechwood to invest.

110.    As set forth above, in preparing the Negative Assurance Letters, Lincoln accepted Beechwood's "fair value" mark, as well as their underlying valuation conclusions and data, and when that mark matched up perfectly to the investment's "principal/cost basis" – data which Beechwood Re also provided, and Lincoln accepted – Lincoln concluded that Beechwood's fair value figures were not unreasonable. As for the Positive Assurance Valuations, Lincoln employed its own methodologies – though, as described below, Beechwood often dictated which methodologies – to assign a range of fair value to Beechwood investments. Beechwood's fair value marks and Lincoln's ranges were then divided by the "cost basis" dollar amount – figures also provided by Beechwood – to obtain the percentage fair value range figure to include in the report. Beechwood's marks were deemed "reasonable" as long as they fell within the low to high range assigned by Lincoln. However, as described in more detail below, if Lincoln did not find the marks provided by its client to be within that range, the client would "typically . . . adjust their mark" so that Lincoln would be able to provide "positive assurance."

111.    What is more, after reviewing Beechwood's spreadsheet of Platinum-related investments in December 2014, Trowbridge sent a series of emails to members of Lincoln's VOG admitting that Lincoln had seen "no support" for any of the five Platinum-guaranteed loans, including having "never [been] provided the details of the 'guarantees' Beechwood says they have

in Implant Sciences, LC Energy and Northstar."   Yet, Lincoln had been rubber-stamping valuations for each of these loans at 100% fair value since its Q1 Positive Assurance Valuation as of March 31, 2014. In addition to being unsupported by documentation, these loans were also the definition of non-arm's-length transactions, and thus incapable of receiving a fair market value to begin with.

112.   The true egregiousness of Lincoln's knowingly inaccurate and incomplete valuations is perhaps best exemplified by its valuation of the New Bradley House loan in which SHIP invested at least $2.57 million through BBIL, and $1.46 million through Beechwood Re. Trowbridge's notes from an internal December 2014 call with Lincoln's "Platinum / Beechwood team" reflect that, as of December 2014, Lincoln had received only an income statement for New Bradley House, and was still "working on getting a balance sheet" – nearly nine months after it began including New Bradley House in its valuation reports.  Perhaps most egregiously, however, Trowbridge's notes confirm that Lincoln knew "Beechwood underwrote the loans without financial information." Yet Lincoln had issued nine Negative Assurance Letters and Positive Assurance Valuations between March and November of 2014, in which New Bradley House was valued at 100% fair value. Lincoln continued to value SHIP's investments in New Bradley House at 100% fair value in its February Q4 2014 Positive Assurance Letter and its 2015 Negative Assurance Letter that were prepared for SHIP. Here too, New Bradley House was a Platinum-connected investment, the antithesis of an arm's-length transaction, and thus incapable of receiving a fair market value to begin with. And yet, as noted above, Lincoln's Positive Assurance Valuations and Negative Assurance Letters repeatedly confirmed that Beechwood's valuations of the New Bradley House investment were reasonable (or not unreasonable, respectively), and that Lincoln had seen nothing to suggest otherwise.

113.    Lincoln knew the valuations it was providing were based on insufficient, unverified and/or inaccurate information, and it admitted as much in its discussions surrounding its decision to terminate the Platinum-Beechwood relationship.  As Fisch summarized in his February 6, 2015 email to other Lincoln personnel, discussed below, Beechwood's "Valuation policies need work – Lincoln needs more transparency as to the investments, underwriting, financial performance, beneficial owners, etc.," and a "better understanding what Beechwood is, source of funds, ownership, and management's reputation." That is to say, six months after it began providing valuation reports for Beechwood Re/BAM reviewing and approving countless investments of SHIP's assets valued at 100% fair value, Lincoln still lacked the basic information needed to even understand what Beechwood was, let alone value its investments.

### b.    Lincoln Knew That the Information Contained in Its Valuation Reports was Inaccurate

114.    As referenced above, Lincoln's Negative Assurance Letters and Positive Assurance Valuations each contained boilerplate language purporting to disclaim any responsibility for the accuracy of its reports, while expressly concluding that the fair values attributed to those investments by Beechwood (and confirmed by Lincoln) were reasonable. However, Lincoln had actual knowledge that this was false – that the fair market valuations were not reasonable – and that it was relying on inaccurate information in confirming as much in its reports.

115.    One of the most glaring examples of Lincoln knowingly relying on inaccurate information to compose its valuation information is the "fair market value" assigned to Beechwood's investments in Platinum and Platinum-related entities. As discussed above, an investment can be assigned a fair market value under the IMAs if it is reasonable and in good faith. In other words, a non-arm's length transaction between two related entities could not be reasonably assigned fair market value in good faith. By definition, then, any investment that Beechwood made

in Platinum or Platinum-related entities was incapable of being assigned a fair market value under the IMAs, period.  In addition to the terms of the IMAs, however, it is objectively improper to value a transaction at fair value as if it was between an unrelated buyer and seller when in fact it is not. Lincoln knew the fair values assigned to Beechwood's investments in Platinum and Platinum-related entities were improper because, as set forth above, it had actual knowledge that (i) Beechwood and Platinum were affiliated entities dating back to at least November 2013, and (ii) that many of Beechwood's investments were in Platinum and Platinum-related entities. In fact, virtually all of Beechwood's portfolio being valued by Lincoln had some affiliation with Platinum or its principals.

116.    Nevertheless, Lincoln issued valuation reports in which it evaluated Platinum or Platinum-related investments that Beechwood made at fair value, as if they were arm's- length transactions.  Thus, for example, Lincoln's Positive Assurance Valuation as of December 31, 2014 (which Lincoln delivered to Beechwood on January 19, 2015) falsely represented that Beechwood's fair values of SHIP's assets were "reasonable," in accordance with FASB fair value measurement principles, when in fact Beechwood acquired those assets for SHIP in non-arm's length transactions between affiliated entities and thus, the assets not be valued under the cited FASB standards.

117.    In fact, for Agera, one of SHIP's largest investments, Lincoln had actual knowledge – because Beechwood explicitly told it in December 2014 – that Beechwood-affiliated entities and individual members of Beechwood had interests in Agera i.e., the definition of a non-arm's-length transaction. Lincoln not only did nothing to correct its prior valuations, which had consistently found "reasonable" fair values assigned to these investments as if they were arm's-length transactions (and at 100% fair value, to boot); it also brazenly asked Beechwood to "confirm" for

Lincoln that these transactions were "negotiated at arm's length" – a lie that Beechwood happily

obliged.  Lincoln then proceeded to assign Agera a high-end fair value of 100% in its next quarterly

Positive Assurance Valuation – knowing for a fact the transactions were the product of self-

dealing.

118.    Lincoln understood the significance of an "arm's-length transaction" in assigning

fair value to an investment. In an email dated October 6, 2014, Manela informed Trowbridge that

Beechwood was contemplating "selling a handful of loans from Bre to BBIL," and asked, "Do we

need to transact it at the marked up price or would it be ok to sell it at par?" Trowbridge emailed

Fisch and Luscombe saying (emphasis added), "[i]t does seem we would value the loans lower if

they were not receiving the upfront fee (*unless it could be argued that it is an arms length

transaction?*)."

119.    The knowing inaccuracies in Lincoln's reports, however, did not stop at falsely

ascribing fair market value to non-arm's-length transactions.  On March 6, 2014, Lincoln analyst

Jason Wirth emailed Trowbridge a detailed analysis of Black Elk's Moody's rating downgrade

and Weighted Average Cost of Capital. Wirth concluded that "the old corporate rating can be

thrown out on the basis of the change in yields for the traded 13.75% Notes which no longer

perform at the CCC- they were rated on 6/7/13," and that (emphasis added), "the yields of the

Notes which *once traded at par now trade significantly below that level*." However, the very next

day, Lincoln provided Beechwood Re/BAM with a Negative Assurance Letter approving

Beechwood's valuation of its $27 million investment of BCLIC and WNIC's funds in Black Elk

at 100% fair value. As discussed above, this investment was part of the Black Elk Note scandal at

the center of the Platinum-Beechwood fraud.

    **c.**  ***Lincoln Knew That It Was Not Operating As An Independent Agent***

120.     Beechwood Re had represented to SHIP that it would retain "independent" agencies to value and rate private investments and level three assets into which Beechwood invested SHIP's funds. Indeed, on multiple occasions Beechwood represented that Lincoln would perform independent valuations of SHIP's assets including during face to face meetings and within each of the IMA's.  What SHIP could not have known is that Lincoln's so-called "independence" took the form of taking instruction from Platinum/Beechwood, deleting references to Platinum in its valuations of Beechwood's investments of SHIP's assets, ignoring the self-dealing in those valuations and changing valuation methodologies at Platinum/Beechwood's beck and call.

121.     In addition to valuing the Platinum funds at whatever NAV Platinum/Beechwood told it to use, and without any independent verification whatsoever (see above), throughout its engagement, Lincoln capitulated to Beechwood's requests to change loan descriptions and to remove ratings, references to Platinum, and any discussion of "speculative assets" from its valuations. Lincoln's demonstrated willingness to aid Beechwood and to be its puppet was undoubtedly motivated by the prospect of getting more business from Beechwood.

122.     Beechwood began making demands of Lincoln almost immediately.  On March 6, 2014, Trowbridge sent Manela, Elliot Feit and others at Beechwood a draft of Lincoln's first proposed monthly Negative Assurance Letter, asking Beechwood Re to confirm whether the "form and content of this letter suits your needs." The email indicated that Lincoln had included placeholders for Beechwood to insert various substantive valuation items, including Beechwood's cost basis, fair values and balances for investments.

123.     Lincoln's draft Negative Assurance Letter valued five entities in which Beechwood had invested nearly $134.4 million of – ALS, Black Elk, CashCall, Golden Gate, and PPCO. All were Platinum or Platinum-related entities. Upon seeing that Lincoln's letter included an $18

37

million Platinum-related investment (CashCall) which Beechwood omitted from the holdings report it previously provided to WNIC and BCLIC, Manela and Feit directed Lincoln to remove CashCall from its letter. Manela also asked Trowbridge to replace the existing loan descriptions ("term loans," "senior secured revolving credit facility," and "promissory notes") with the description "senior secured promissory notes" for all of the investments but PPCO.

124.    Lincoln obliged. nThe following day, Lincoln sent Beechwood a revised Negative Assurance Letter which omitted any reference to CashCall – and with it, any indication that $18 million of WNIC's and BCLIC's reinsurance trust assets were then invested in that entity – and incorporated the "senior secured promissory notes" loan descriptions, as requested by Beechwood.

125.    On March 21, 2014, Lincoln sent Beechwood a draft of its first quarterly Positive Assurance Valuation for ALS and Golden Gate. Rakower emailed Manela – and later communicated the message to Lincoln by phone – that Lincoln needed to remove multiple items from its report because, as Rakower put it, "It's important we get this right, as this will be used for future reports and will likely get the most scrutiny in its initial reports." Among other things, Rakower told Lincoln to remove the following:

- For ALS, Lincoln was told to remove (1) reference to shadow credit ratings ("It doesn't serve any purpose for us"), (2) reference to "PPVA involvement," and (3) reference to ALS being collateralized by a "speculative asset." To implement Beechwood's changes, Trowbridge proposed moving from a "shadow rating" to a "different approach based on the implied spread at close and adjusting for changes in LTV over time."

- For Golden Gate, Lincoln was told to remove (1) a reference to Platinum ("again, Platinum is being referenced"), (2) the inclusion of "yield analysis," and (3) the term "development stage" ("raises concerns on being speculative?").

As discussed above, Lincoln was also told to amend its disclaimer language to remove reference to having not provided Beechwood with an "independent valuation." Lincoln incorporated all but

one of the above changes in its final Q1 Positive Assurance Valuation as of March 31, 2014 (for Golden Gate, it buried the reference to Platinum in a later bullet point, rather than removing it altogether), which it sent to Beechwood Re/BAM on April 8, 2014.

126.    Lincoln's results-driven approach to valuing Beechwood's investments did not stop there, however.  Lincoln routinely changed its *valuation methodologies* so that it could arrive at a valuation for entities in which Beechwood was investing that matched the values at which they needed those investments to be valued. For example, on or about June 27, 2014, Rakower identified "troubling" language describing Agera's collateral risk in a draft Lincoln valuation, noting that "[t]he one key comment that sticks out since [the] loan is ~90% of collateral, if this worsens even ever so slightly, the discount rate will increase and the loan value will decline."  That was because Beechwood's loan to Agera was collateralized only by the accounts receivable of the entity recently acquired by Agera, Glacial Energy – and virtually all (over 90%) of Glacial Energy's accounts receivable at that. Lincoln's draft calculation had therefore (accurately) reflected Beechwood's loan-to-value ratio at a concerning 93%. To resolve this problem, Rakower asked Lincoln to instead calculate its loan-to-value ratio using the enterprise value of Agera as a whole – and not just the portion of Agera's assets actually collateralizing the loan – as it would "give us [Beechwood] more flexibility."

127.    And that is what Lincoln did.  On July 1, 2014, Lincoln (Trowbridge) confirmed to Beechwood that Lincoln would update its report on Agera to reflect Beechwood's proposed modeling, and would support it with documentation provided to it by Rakower.[8]  Lincoln's final

---

[8] And, as noted above, even where Lincoln did not manipulate its methodologies, it conducted the valuation improperly by, among other things, accepting without any verification Beechwood-supplied "fair market values" for transactions it knew were not conducted at arm's-length. For example, in its valuation of Implant Sciences, while Lincoln used the appropriate Enterprise Valuation Model to value the publicly traded company itself, there is no indication that Lincoln

report included a much more attractive and prudent-looking loan-to-value ratio for the Agera loan (reflecting a loan-to-value ratio of 49.3%, instead of the actual 93%), and made it appear as if all of Agera's collateral was backing the loan – when in fact neither of those things were true. And Lincoln knew it.

128.     Other times, Lincoln would disregard industry-standard valuation models entirely, and instead based their valuations on the wholly arbitrary valuation figures supplied to it by Beechwood itself. For example, Lincoln was asked to value a loan Beechwood made to Aura Minerals Inc. ("Aura"), a publicly-traded gold-copper production company. Lincoln utilized an enterprise valuation model to value the collateral which, for publicly-traded companies, involved utilizing publicly-available information about the number of shares outstanding, the actual price at which those shares are trading, and the company's net debt as of the valuation date to determine a company's enterprise value. Or at least that is what Lincoln had done when the results suited Beechwood. Now, however, publicly-available information put Aura's enterprise value at approximately $84 million. But Beechwood needed to make their multi-million investment in Aura look prudent to WNIC and BCLIC, and thus needed Lincoln to value Aura at $305 million as if it were not the product of self-dealing – which they were. A value three times higher than what publicly-available information said Aura was worth – based on what Beechwood purported would be Aura's "projected cash flows." Valuing Aura using Beechwood's wholly speculative projections as to what Aura might produce in the future – as opposed to using publicly-available

---

conducted an independent examination of whether the fair market value Beechwood assigned to its *loan* to Implant Sciences – a Platinum-related entity – was in fact the rate that a transaction between unrelated parties negotiated at arm's-length would have garnered in the marketplace. Instead, Lincoln just did Beechwood's bidding, and accepted and used the unsupported, unverified and facially-unreasonable "fair market values" provided to it by Beechwood as if the transactions were not the product of self-dealing – which they were.

information as to the company's then-present value – was particularly outrageous (and at the very least, objectively unreasonable) given that Aura's mines had produced nothing as of the valuation date, and had only $15.4 million of cash on its balance sheet (information which was again publicly available).  But Lincoln ignored all of that, and instead went with the valuation method Beechwood wanted ("projected cash flows"), representing in its Positive Assurance Valuation that Aura in fact had a "[t]otal collateral value of $305.6 million."

129.    In other words, Lincoln, the purportedly independent valuation provider, ignored and disregarded its own standard valuation practices and used objectively unreasonable and wholly speculative valuation figures and methods, supplied to it by Beechwood, to value a publicly-traded company in its valuation reports.

130.    Similar misconduct occurred with respect to Lincoln's valuation of Golden Gate – an oil company that, according to publicly-available information, had not produced a single barrel of oil as of the valuation date and had revenue barely hovering above $1 million.

131.    Nevertheless, Lincoln accepted Beechwood's representation that the company's assets (in the form of "reserves"), had a purported value of over $614 million.  To determine whether that was in fact accurate, Lincoln would have needed to review the financial data for comparable, publicly-traded companies – that is, companies of similar size and revenues. Of course, there were no companies generating $1 million in revenue that had "assets" over 600 times that amount.  So Lincoln just found companies that could get it close to the value it needed, and deemed them "comparable."

132.    As Lincoln represented in its Q1 Positive Assurance Valuation, "Lincoln identified seventeen public companies in the oil and gas industry, focusing on companies of comparable size to [Golden Gate]" in rendering its valuation. But the companies identified by Lincoln were not

even remotely comparable to Golden Gate. Indeed, to consider just one metric, these 17 "comparable" companies boasted revenues ranging from $70 to $433 million – nothing remotely comparable to the $1 million generated by Golden Gate. But Lincoln went with it, using these companies' purportedly "comparable" metrics to generate arbitrary enterprise value multiples for Golden Gate – multiples for which Lincoln provided absolutely no explanation – to come up with an enterprise value range for Golden Gate of $228 to $291.1 million.

133.   Unsurprisingly, the fair value mark Beechwood had assigned to Golden Gate fell precisely within Lincoln's fair value range. In a particularly audacious move, Lincoln even represented that its valuation of Golden Gate was "conservative," and that "an increase in enterprise value may be merited, which would align the companies [sic] metrics with those of the selected public companies" once Golden Gate's sales and profits began to materialize. Lincoln made this representation as it simultaneously admitted that "we are comparing a development stage company to established companies with meaningful operating metrics."[9]

134.   Lincoln even worked with Beechwood to ensure that the investment values unilaterally set by Beechwood aligned with the valuation ranges Lincoln included in its reports. For example, when Manela asked Trowbridge on July 4, 2014, how Lincoln's valuation report would describe Beechwood investment values that were lower than Lincoln's valuation ranges, Trowbridge responded (emphasis added), "We're engaged to provide positive assurance on the reasonableness of the marks you've provided. Typically if we don't find a client[']s mark to be

---

[9] Furthermore, as described above with respect to other investments, Lincoln again accepted the Beechwood-supplied implied rate of return at close of 11.22%, using this rate to determine, among other things, the spread over benchmark for Golden Gate. But, as explained above, because Lincoln knew that this rate was not the product of arm's-length negotiations, it was required to confirm that the assigned rate was aligned with the fair market rate (that is, the rates of transactions that were actually negotiated at arm's-length). Once again, there is no indication that Lincoln took any steps to do so.

within out [sic] range they adjust their mark such that we can provide positive assurance on the mark." Manela responded, "I hear you… Ok so for any positions where we are below Lincoln's range show our mark at the low end of the range. Thanks." As noted above, the purpose of obtaining a positive assurance is to confirm that Beechwood's fair value mark is reasonable.

135.    This is completely undermined if the mark is simply "adjusted" in order to find that it is reasonable. But that's exactly how Beechwood and Lincoln discussed proceeding – with Lincoln having actual knowledge that Beechwood was supplying false and inflated valuation numbers as its purported "fair value."

136.    Likewise, on September 7, 2014, Trowbridge informed Rakower that Beechwood's August Holdings Report still showed the MYSYRL Capital LLC ("MYSYRL")[10] and Salt Lake[11] loans marked at cost, suggesting, "I think you intended to adjust these marks?" Another Beechwood employee (Moti Edelstein) asked Manela, "Can you let me know what mark Lincoln wants for MYSYRL and Salt Lake and I will reflect it in our report?" Manela instructed Edelstein to "Look at the 6/30 report and you'll see the mark as a price above 100.  Mark the August month end principal balance at the higher price and add in any accrued income."  Manela added, "I think I got it . . . Lets show column C the way we always did and only show fair value at the higher

---

[10] MYSYRL was controlled by Platinum. The principal of MYSYRL, Moshe Oratz (who had a criminal record), was the former President and CEO of ALS, of which PPCO was a majority owner. Huberfeld even personally reviewed the terms of the deal and draft agreements between MYSYRL and Beechwood. And Lincoln was aware of the Platinum connection. Andrew Bartolotta, an analyst at Lincoln who prepared a valuation for MYSYRL, expressly stated that, "[P]latinum (by virtue of owning ALS Capital Ventures) owns the assets that MYSYRL has a beneficial interest in."

[11] Beechwood owned warrants on Salt Lake, another Platinum-connected loan. Notably, Lincoln was unable to obtain equity ownership data or documentation on the purchase price or value of the collateral on Salt Lake.

mark. That way column C will be true cost value and the fair value column will show the marked up amount." Again, such instruction from Beechwood defeated the purpose of Lincoln providing "positive assurance." Because of Lincoln's manipulation of the mark – which was done at Beechwood's direction – such assurance is, at best, misleading and fraudulent.

            **d.**       ***SHIP Received Lincoln's Marks From Beechwood, and Lincoln Knew That SHIP Would Rely on Those Marks***

137.    Lincoln knew that it was valuing SHIP's assets and that its valuations were specifically prepared "for SHIP."   Indeed, on January 19, 2015, Lincoln emailed to Beechwood a valuation report entitled "Quarterly Portfolio Review Prepared for: SHIP."   The report, which was on Lincoln Partners letterhead, was sub-titled "Positive Assurance Valuations as of December 31, 2014" and was dated January 19, 2015.   The report spanned nearly eighty pages and contained valuations of seven of SHIP's assets that Beechwood was managing.

138.    Beechwood relayed Lincoln's marks to SHIP.  After SHIP entered into the first IMA, Beechwood sent SHIP spreadsheets listing the prices of SHIP's assets that were managed by Beechwood and indicating that Lincoln was the price source for those assets.  These spreadsheets, listing Lincoln as the "price source," further confirmed SHIP's understanding that (i) Lincoln was independently valuing and pricing SHIP's assets that were managed by Beechwood, and (ii) Beechwood was calculating the performance fees it charged SHIP using the same values and prices that were purportedly independently valued by Lincoln.

139.    On October 14, 2014, Elliot Feit of Beechwood emailed Paul Lorentz of SHIP, stating: "Attached are the custody agreements as well as the 9/30 SHIP holdings reports.  I have also attached the spreadsheet we calculate our payable to you."   The attachments included: BRe SHIP custody agreement-10142014113322.pdf (216.7 kB); BBIL SHIP custody agreement-10142014113442.pdf (223.99 kB); SHIP Holdings as of 9-30-14.xlsx (353.84 kB); SHIP Income

Tracking 9-30.xlsx (22.1 kB).  One of the attachments is an excel spreadsheet containing financial information regarding certain assets including Agera Energy and Bre-Ship.  The "price source" for these two calculations is listed as Lincoln.

140.     Based on the information provided by Beechwood, SHIP's board of directors was informed that Lincoln was the price source for the valuation of certain assets managed by Beechwood for SHIP.   For example, a December 2, 2014 SHIP Board meeting agenda indicated that SHIP owned a Platinum Partners asset and listed the price source as "Lincoln."  As another example, a February 24, 2015 SHIP Board meeting agenda indicated that SHIP owned a Platinum Partners asset and listed the price source as "Lincoln."

141.     Throughout this time, SHIP firmly believed that Lincoln was pricing and valuing SHIPs assets in its capacity as Beechwood's independent valuation firm.  Indeed, on December 17, 2014, Gerald Hochgesang of Fuzion emailed Paul Lorentz of SHIP, indicating that he was able to find "a lot of information on Lincoln International, the Beechwood Re pricing and valuation service."  He attached information on Lincoln's global reach, leadership, valuation and opinions, history, and private equity, private company, and public company client lists.

142.     Consistent with this understanding, on February 23, 2015, Janna Zaichek of Fuzion emailed Jeffrey Kardatzke of SHIP a document entitled "Beechwood Collateral Loan Review_12_31_14.xlsx.  One of the tabs in the attachment referenced Lincoln as the "price source" for Agera and Platinum assets.  This attachment is titled "Beechwood Collateral Loan Fair Market Value and OTTI Impairment Review."

143.     In addition to transmitting marks with a designation of Lincoln as the "price source" for those marks, on at least one occasion, Beechwood provided SHIP with a draft valuation report prepared by its "independent valuation service," Lincoln.   On July 1, 2014, David Levy of

Beechwood emailed Brian Wegner of SHIP, stating: "Mark asked that I prepare a brief review of several of the investments we have made on your behalf. Please see a short description below for each of the investments. I have also attached a bit of additional information on each one. For black elk I have attached the publicly available information pulled from Bloomberg and for Agera (a private position) I have attached a draft of a valuation report prepared by our independent valuation service. Please let me know if you have any questions."  The attachment to this email was a valuation report on Agera Energy, LLC prepared by Lincoln.

### e)   *SHIP Also Received Lincoln's Inflated Marks From Wilmington Trust*

144.   Beechwood also sent Lincoln's valuations to Wilmington Trust, the trustee of the reinsurance trusts.  For example, on March 7, 2014, Will Slota of Beechwood emailed David Young at Wilmington Trust, stating: "Our CFO asked that I send you the attached report from Lincoln International, our independent valuation agent, for the purpose of marking the private positions as of 2-28.  Can you update positions as discussed?"  As this email makes clear, Lincoln's valuation reports were used by Wilmington Trust to mark positions for Beechwood's investment management clients.

145.   SHIP received Wilmington Trust statements by mail, email, online downloading, and also received email notifications when statements were ready. The Wilmington Trust statements reflected Lincoln's marks of assets managed by Beechwood for SHIP.

146.   Indeed, Beechwood sent Wilmington Trust statements to SHIP, because Beechwood wanted SHIP to see the marks that had been purportedly independently confirmed by Lincoln, in order to justify Beechwood's "performance fees."

147.   Thus, for example, on April 2, 2015, Elliot Feit of Beechwood emailed SHIP's CFO Paul Lorentz the March 31, 2015 Wilmington Trust statements for the 3 SHIP IMA accounts.  Feit

wrote: "please note that the SHIP BAM account has a MV of assets of $115,143,472.39 (p.3) and a principal plus interest owed to SHIP of $110,780,801.37. We are requesting to withdraw $3.5M of the $4,362,671.02 excess." Feit specifically directed Lorentz to the market value of the assets reflected in the Wilmington statements to procure Lorenz's signature on the withdrawal letter.

### iii.    Lincoln Terminates the Relationship

148.    By December 2014, it was becoming more and more difficult for Lincoln to simply ignore the glaring issues with Beechwood's investment values, insufficient collateral and countless self-dealing investments in Platinum and Platinum-related entities.

149.    As discussed above, Trowbridge had been asking Beechwood to provide Lincoln with information on investments Lincoln had been evaluating for months – including such basic information as the identity of the entities in which Beechwood had invested and guarantee agreements purportedly supporting the subject transactions – to little or no avail. And, the information Lincoln did receive only confirmed the multiple Platinum connections in virtually all of Beechwood's investments. Internally, Lincoln began discussing reverting to the standard discount rate methodologies they had abandoned or ignored at Beechwood's requests, and accounting for credit enhancement due to the insufficient Platinum guarantees.

150.    On December 26, 2014, Trowbridge notified several Lincoln analysts that "We've been having some internal debate regarding some of these investments and spoke with Beechwood about making some changes to our methodology this morning." As a result, Trowbridge instructed all team members to hold off on preparing any further reports until they "make some changes to these methodologies."

151.    The response of the Lincoln team members shows that, all the way down to its junior analysts, Lincoln understood that the investments it was valuing (at 100% fair value) for Beechwood were, and had always been, highly suspect and problematic. Analyst Christopher

Buck replied to Trowbridge's email by sending the various members of the "Platinum/Beechwood team" a link to a South Park video clip, in which a character, confronted by two men at his front door, exclaims, "Oh my God," as he drops his coffee mug and runs away.[12]   Analyst Jason Wirth responded with a link to an even more damning South Park video clip, in which a bank teller is describing a series of convoluted investments being made with investors' money as the investors watch their money disappear in real time.[13] Wirth's email asked, "Beechwood's investment strategy?"

152.    Just three days earlier (December 23, 2014), Wirth had emailed the "Platinum / Beechwood team" a quote from Mark Nordlicht's personal website which stated that, "[a]ccording to Mark Nordlicht, charity is not only considered a practice, it is also a virtue." Wirth wrote, "Tis the season to give Beechwood par marks?" That is, Wirth was equating the valuations Lincoln had been performing for Beechwood Re – and specifically, rubber-stamping the "100% fair values" for Beechwood Re's numerous investments – with charity.

153.    Lincoln then began trying to perform the type of diligence it should have been doing all along.   For example, to gain insight into the financial condition of the Beechwood Re investments, on December 28, 2014, Lincoln discussed the need to perform Technical Review

---

[12] Available at www.youtube.com/watch?v=1chFxv0JllA.

[13] Available at https://www.youtube.com/watch?v=2fEUNUVt5j0. The following is a transcript of the teller's descriptions of the investment schemes:

Description 1 - "We'll just take that money and employ significant leverage using computer-assisted high frequency trading and index fund rebalancing to buy ahead of certain stock movements AND it's gone!"

Description 2 - "First thing we'll do is take that money and invest in a Colorado tax-free municipal bond fund and then give the dividend to my buddy at Goldman Sachs Who'll give it to his buddy at JP Morgan who has a LIBOR-adjusted cross-currency obligation AND it's gone!"

Description 3 - "Let's just take that money and put it into a secure and qualified account AND it's gone!"

Committee ("TRC") re-reviews of the entire Beechwood portfolio. To determine whether the TRCs would be necessary, Trowbridge charged Lincoln's analysts with performing the following tasks:

(1)   Conducting a comprehensive news search;

(2)   Reviewing all new materials provided by Beechwood;

(3)   Reviewing the terms of any guarantees;

(4)   Checking the underwriting materials to identify any Platinum connection; and

(5)   Identifying the equity owners of assets.

154.   The TRC re-reviews were initiated the day after the analysts reported their findings with respect to (1)-(5) above.  The goal of the TRC asset re-reviews was to determine the extent of Platinum's involvement in Beechwood's holdings, acquire more detailed investment ownership information, and collect additional collateral support and financial documentation for the portfolio – that is, information Lincoln should have been collecting all along. The TRC process required Lincoln to request specific information from Beechwood about Platinum's involvement, including:

(1)   Any Platinum economic or legal relationship with the subject company;

(2)   Any Platinum person's economic or legal relationship with the subject company;

(3)   Evidence of a Beechwood-affiliated entity having an economic or legal relationship with the subject company;

(4)   Whether any Beechwood person has an economic or legal relationship with the subject company; and

(5)   Whether the transaction between the borrower and Beechwood was negotiated at arm's-length.

This basic information was not requested by Lincoln until one year *after* it began issuing valuation reports on Beechwood's investments.

155.    On January 7, 2015, following the TRC asset re-reviews, Trowbridge emailed the "Platinum / Beechwood team" estimating that a 5-10% write-down of the entire Beechwood investment portfolio was warranted.

156.    The following day, Lincoln started sending Beechwood drafts of its Q4 2014 Positive Assurance Valuation, which dropped the value of multiple investments Lincoln had been approving at 100% fair value for months. By way of just a few examples:

- Lincoln was now valuing the China Horizon investment at 79.3% - 88.8%, where it had previously issued seven valuation reports approving valuation of China Horizon at 100% fair value;

- Lincoln was now valuing the Salt Lake investment at 74.8% - 76.8%, where it had previously issued nine valuation reports approving valuation of Salt Lake at 100% fair value;

- Lincoln was now valuing the SMRTV investment at 68.4% - 72%, where it had previously issued three valuation reports approving valuation of SMRTV at 100% fair value. Again, Lincoln knew that Beechwood-affiliated entities and members of Beechwood Re themselves had interests in SMRTV – the definition of self-dealing; and

- Lincoln was now valuing the Implant Sciences investment at 84.1% - 89.3%, where it had previously issued nine valuation reports (six Negative Assurance Letters and three Positive Assurance Valuations) approving valuation of Implant Sciences at 100% fair value.

157.    As it was sending Beechwood drafts of its Q4 Positive Assurance Valuation, Lincoln was also discussing internally whether it needed new engagement letters with the entities that actually owned assets, rather than Beechwood.  As Trowbridge wrote in a January 16, 2015 internal Lincoln email, "we have an [engagement letter] with them [Beechwood Re/BAM] that fully covers us, but [ ] we just decided we would prefer to be engaged by the funds rather than the asset manager [BAM].  If we want to hold off on issuing the report because of this I'll just send them another draft tonight, but I imagine it may be fairly problematic for them internally."

158.    Lincoln principals ultimately decided that the best course of action was to simply terminate the Beechwood relationship.

159.    Beechwood tried to persuade Lincoln to reconsider its decision by dangling the same carrot it had always dangled (successfully) in front of Lincoln: the promise of additional future business with Platinum/Beechwood. Beechwood had every reason to believe that they would be successful in their efforts to keep Lincoln on board.  After all, up until that point the lure of additional business had kept Lincoln engaged as an active partner and participant in the scheme. Fisch recounted the substance of Beechwood's offer in an email to his Lincoln colleagues on February 6, 2015. According to Fisch, in addition to committing to "doing the right thing" and "adopting best practices," Beechwood offered Lincoln the following inducements:

- Increased fees for Lincoln "to make the economics work for Lincoln";

- Beechwood would work with counsel "to become completely independent of Platinum";

- A new CIO would be hired to replace David Levy (who would go back to Platinum); and

- The prospect of "9-10 high quality deals in the pipeline."

160.    Fisch presented Beechwood's offer to the other managing directors at Lincoln, Trowbridge, and Senior Advisor John O'Kane, and proposed several issues/open questions for their consideration. According to Fisch, the first and most critical issue for Lincoln was "client integrity." "[T]his is the threshold question – do we trust them?" ("Need a better understanding what Beechwood is, source of funds, ownership, and management's reputation.") Additional concerns cited by Fisch were (1) investment transparency ("Lincoln needs more transparency as to the investments, underwriting, financial performance, beneficial owners, etc.") and (2) the risky nature of Beechwood's "off-the-run type investments" that are more difficult to value.

51

161.    Apparently deciding that the prospect of future business from Platinum would not "make the economics work" for Lincoln anymore, Lincoln confirmed its plan internally to disengage from Beechwood ("After much additional deliberation, we concluded that right course of action was to resign"). Fisch conveyed the decision to Manela on February 9, 2015. Manela asked Lincoln to issue its final Negative Assurance Letter.

162.    On February 5, 2015, after the decision was made to terminate Beechwood but before the message was conveyed to Beechwood, Trowbridge sent an email to members of the "Platinum / Beechwood team" with the subject line "Beechwood File Clean-up." Trowbridge requested that the team members "go back and cleanse your files on the Beechwood valuations in accordance with our record retention policy. Please delete any draft models or reports and just hang onto the final models and analyses."

163.    Then, on February 11, 2015 – rather than involving any of the members of the "Platinum / Beechwood team" who had been working on the Beechwood valuations for over a year – Trowbridge asked two new, very junior analysts to complete the final Negative Assurance Letter that Beechwood had asked for.  Under the subject line "Zombie Beechwood Valuations," Trowbridge instructed the junior analysts to set up models and perform a TRC on each of the two new deals therein – one of which (Kennedy RH Holdings) was Platinum-related, while the other (MNYK Developers at Prospect) had owners with connections with Murray Huberfeld.  They were also asked to evaluate a new Platinum-related deal, Montsant Partners, which Beechwood had invested in for SHIP.

164.    The two analysts tasked with these valuations were not only brand new to the Beechwood valuation team; they were brand new to Lincoln altogether.  In fact, on information and belief, one of the two junior analysts had joined Lincoln just two months earlier, and had only

passed her Series 79 and Series 62 investment banking exams a few weeks before receiving the assignment.  The other junior analyst had joined Lincoln only seven months prior.

165.     Trowbridge nevertheless instructed these junior analysts, who had not previously worked on Beechwood valuations, to "make sure the deal is arm's length, no warrants, and that cost is reasonable." He did not, however, explain to them that there were connections between Platinum and Beechwood that made it impossible for the Montsant Partners and Kennedy RH Holdings deals to be arm's-length.

166.     Moreover, Trowbridge noted that "[i]f it is a complex investment of some sort and we're just going to backsolve into a mark of par at close, we may not even need a full model. In that case we might just be able to talk through it in a [Technical Review Committee meeting]." In other words, for "complex investment[s]," Lincoln already knew the value they wanted to get (par at close), so the analysts were instructed not to bother with the actual modeling work.

167.     Trowbridge concluded, "[t]hese Beechwood investments are sometimes very outside the box, so let me know if you have any questions," and advised that the valuations were to be completed "by tomorrow."  Lincoln had decided, however, to withhold providing Beechwood Re/BAM with its final Negative Valuation Letter until it received payment on outstanding invoices.

168.     The analyst responsible for the one-day turnaround valuation of Kennedy RH Holdings and MNYK, was the more junior of the two – the one who had been employed by Lincoln for only two months. The more senior analyst (of seven-months' tenure), was responsible for the one-day turnaround valuation of Montsant Partners. The following day, upon receipt of a request from Trowbridge for answers to several "follow up questions" regarding SHIP's investment in Montsant, Manela requested that Montsant be removed from the Negative Assurance Letter to

SHIP altogether.   The junior analyst reacted to this, emailing Trowbridge, "Interesting . . ." Trowbridge replied, "These guys. . ."

169.    Lincoln sent Beechwood Re/BAM a Notice of Termination letter dated February 19, 2015. That same day, February 19, 2015, Trowbridge sent another email to the "Platinum/Beechwood team" reminding them to make sure the Platinum/Beechwood file cleansing was performed by the *next day*.  Lincoln took such a robust approach to spoliating evidence because it knew that its shameful conduct, if examined, could not be justified.  Lincoln knew that Beechwood had been using Lincoln's bogus valuations to con SHIP into believing that assets in the IMA accounts were properly valued, and was aware of its complicity in the scheme.

170.    Throughout its engagement, the valuations issued by Lincoln made it appear as though the fair market value assigned to the IMA accounts managed by Beechwood Re, BAM and BAM Administrative were legitimate.  Simply put, all of Lincoln's valuations were false, and Lincoln knew it, which is why senior management repeatedly instructed Lincoln's staff to destroy evidence.

171.    Lincoln's false pricing and valuations were critical to the success of the Platinum/Beechwood fraud.  The appearance of independent valuations enabled Beechwood to withdraw millions in excess of the purported 5.85% return while avoiding its obligations to true-up the IMA accounts by claiming that the IMA accounts were at the appropriate levels because the investments had a fair market value which they in fact did not have.  This harmed SHIP because it left the value of the IMA accounts below the contractual threshold.

172.    Furthermore, despite knowing that their valuations were improper, Lincoln did nothing to correct or withdraw its valuations – which Lincoln knew to have been false – or otherwise inform the entities that they knew were relying on their valuations (i.e., SHIP) of these

inaccuracies.  Neither did Lincoln advise SHIP of its concerns in terminating the engagement in

an attempt to mitigate further damage.  Rather, knowing of its participation in the fraud and after

it repeatedly instructed staff to destroy evidence concerning such participation, Lincoln sought to

extricate itself from the scheme only after it knew that it severely harmed SHIP.

## F.    Beechwood Disregards the IMAs, With Lincoln's Knowledge and Facilitation

173.    In total, SHIP entrusted $270 million to the Beechwood Advisors and another $50

million was entrusted outside of the IMAs, based on representations—memorialized in the IMAs

themselves—that Beechwood would invest prudently, conservatively, and in accordance with the

terms of the three IMAs.  The amounts were entrusted to Beechwood over time, in increments,

between May 2014 and June 2016.  SHIP relied on the material misrepresentations and omissions

by the Beechwood Advisors—and the Beechwood Insiders who controlled the Beechwood

Advisors' activities—in deciding, over time, to entrust Beechwood with the investment of funds,

which SHIP held as reserves to pay policyholder claims.

174.    Notwithstanding the representations made about their investment protocols,

disciplines, and security, not to mention guaranteed returns, to induce SHIP to enter into the IMAs

and to invest both the IMA funds and additional funds through them, and contrary to the promises

made in the IMAs and in violation of the fiduciary duties owed to SHIP, the Beechwood Advisors

placed SHIP's money into investments that were highly speculative, not adequately secured,

opaque, and not appropriately disclosed to SHIP.

### i.    Beechwood uses SHIP Assets to Engage in Related-Party Transactions

175.    Many of the Beechwood investments are invested in related-party transactions

involving one or more of the principals of the Beechwood Advisors or the Platinum entities.  This

was by design, as the deep connections and constant communications between Beechwood and

Platinum demonstrate.  Indeed, immediately upon receiving SHIP's money, the Co-conspirators,

led by Mark Nordlicht, set about funneling money into investments aimed at propping up illiquid investment positions Platinum funds were invested in with the aim of enriching the Co-conspirators, against the best interests of SHIP, to whom they owed a fiduciary duty.

176. From the time that SHIP executed the first IMA, Beechwood was in close contact with Nordlicht regarding the status of SHIP's funds. When SHIP funded the IMAs, Beechwood would inform Platinum and its founders almost immediately. As previously noted, Nordlicht was aware within a day that the BBIL IMA had been funded and was already giving direction on how to invest SHIP funds. On July 16, 2014, shortly after SHIP had wired an additional $25 million to Beechwood to fund the Beechwood Re IMA, Levy e-mailed Nordlicht to inform him that "25 mln form [sic] ship came in." Beechwood kept Platinum (through Nordlicht) fully apprised of the state of SHIP's funds. In one August 2014 e-mail, for example, Nordlicht was provided detailed information regarding the available cash in SHIP's accounts, including the funds available in both the BBIL and Beechwood Re custody accounts maintained with Wilmington Trust. On January 30, 2015, just two weeks after the BAM IMA execution date, $35,500,000 of SHIP's funds were sent without collateral or interest payment to support Montsant Partners, LLC, which was owned by Platinum. This intimate and consistent connection to undisclosed principals who were not revealed to SHIP, except as a source of possible investment choices indistinguishable from other investment options in the world demonstrates that, from the beginning, SHIP's funds were used in a manner contrary to what Beechwood initially represented and continued to represent throughout the relationship and instead were used to prop up Platinum and perpetuate its fraudulent scheme.

177. Rather than adhering to their representations and promises made in the IMAs, in the description given of each investment acquired, in the performance fee request forms, in oral communications, and otherwise, the Beechwood Advisors, in concert with the Beechwood

Insiders, used most of the SHIP funds entrusted to them to acquire high-risk, complex, inadequately collateralized, and often distressed investments tied to Platinum that were purposely structured by Beechwood, the Beechwood Insiders, and the Co-conspirators to enrich themselves and their related parties at the expense of SHIP and similarly situated investors.

178.    Indeed, Beechwood and the Co-conspirators instructed their retained third-party valuation and ratings companies, including Lincoln, to delete references to Platinum-controlled investments in their quarterly reports to SHIP, knowing that such disclosures would raise suspicion.

179.    Additionally, despite requirements to do so, none of the Platinum Funds, including PPVA, PPCO, Marbridge, or Bayberry, ever reported any of these transactions on their annual financial statements as related-party transactions, despite reporting other such transfers and transactions.  Platinum furnished upon Beechwood, as SHIP's agent, Annual Reports which misrepresented material facts by omitting any of these transactions as related-party transactions on its financial statements.  The omission of these transactions in Platinum's annual reports was intentional.  SHIP, through its agent, relied on these misrepresentations, causing SHIP to continue its relationship with Beechwood, and thereby causing financial harm to SHIP.

*ii.*     ***Beechwood Overvalues Investments and Collects Performance Fees as a Result***

180.    Although Beechwood claimed to use "independent valuations" based on "fair valuation practices and methods," SHIP learned after the fact that no truly independent valuation was ever conducted, as Lincoln accepted Beechwood's information at face value and did not attempt to audit or verify the accuracy or completeness of any of the information relevant to the valuation of those assets.  Instead, the Co-conspirators grossly overvalued the investments in SHIP's portfolio, and intentionally fed the "independent" valuation firms misleading information, tailored to achieve the desired result: inflated values.  The process enabled Beechwood to provide

an air of legitimacy to its inflated valuations by essentially laundering them through a third party. This all went on while the Co-conspirators were well aware of the distressed nature of the investments.

181.    To avoid detection of these practices and to justify their claims to performance fees under the IMAs, which were recoverable only if the overall annual return exceeded the 5.85% guaranteed to SHIP, Beechwood, other purported employees of Beechwood, and Beechwood's paid advisors and consultants submitted reports that contained inflated, and in some cases, entirely falsified valuations that purported to show that the Platinum-related investments were performing well and that SHIP's investments were sound.

182.    As discretionary investors under the IMAs who were investing primarily in illiquid, private-company debt obligations that did not have a readily ascertainable public market value, Beechwood enjoyed and exercised material discretion and control over the reported valuations of the assets in which it invested SHIP's funds.  See BBIL IMA ¶ 7; Beechwood Re IMA ¶ 7; BAM IMA ¶ 7 (non-publicly traded assets "shall be valued by or at the direction of [Beechwood] in its reasonable discretion in a manner determined in good faith to reflect fair market value").  Beechwood had a contractual obligation to use good faith judgment in their valuation efforts, a duty which they knowingly and maliciously breached time and time again.  The valuations relayed to SHIP were vastly overvalued and misrepresented the true value of the investments.

183.    This lack of an available public market valuation and lack of transparency into the valuation process, coupled with Beechwood's status as SHIP's discretionary investment advisor and fiduciary, meant that SHIP had little choice but to rely—and it did rely—on Beechwood to report accurately and in good faith the value of SHIP's investment assets as independently verified by Lincoln. What Lincoln actually did though, unbeknownst to SHOP, was capitulate to

Beechwood's demands to fraudulently over-value them to SHIP's detriment. These misrepresentations and SHIP's reliance on them caused SHIP to continue their relationship with Beechwood, causing additional harm to SHIP and depriving SHIP of mitigating harm inflicted upon it by Beechwood and the Co-conspirators.

184.    Beechwood reported each investment made under the IMAs to Wilmington Trust and provided a description of the asset acquired, the value of that asset as provided by Lincoln, and in most instances the document evidencing the assets such as, for example, a copy of a promissory note.   By acquiring and reporting the acquisition of an asset under an IMA, Beechwood was affirmatively representing that the asset met the requirements of the IMA, including the requirement that the asset fit within SHIP's investment guidelines.   Each time that Beechwood made and reported on an investment to Wilmington Trust, Beechwood knew and intended that Wilmington Trust would reflect the information provided by Beechwood on the statement for the applicable IMA account submitted to SHIP by Wilmington Trust each month and that SHIP would trust and believe that the information on the applicable Wilmington Trust statement was true, correct, and complete.   Beechwood also knew and intended that SHIP would rely on the information reported on the Wilmington Trust account statements to track its IMA investments.

185.    Beechwood also sent Wilmington Trust statements to SHIP, knowing that these statements contained mark to market values that would purportedly justify Beechwood's "performance fees."   These marks had purportedly been independently confirmed by Lincoln, as Beechwood knew and intended SHIP to rely on in approving Beechwood's calculation of its purported performance fees.

186.    Likewise, Beechwood provided information to SHIP on a regular basis that included an overview of the investments that Beechwood managed on SHIP's behalf.   This

information did not accurately or adequately disclose the profound involvement and conflicted entanglements of Platinum Partners or other Platinum-affiliated entities in the investments or that many of the investments were severely distressed, defaulting, or nearly defaulting at the time of the reports and were likely to default prior to repayment of principal. SHIP relied on Beechwood as its investment manager and fiduciary to provide accurate information regarding the assets under management and to disclose fully any potential conflicts of interest or related-party transactions.

187.    Although SHIP did not and could not know it at the time, the asset valuations provided by Lincoln, Beechwood's allegedly independent advisors, were largely inflated or falsified and did not reflect accurate or honest representations regarding SHIP's assets under Beechwood's control, based on the information that we now know Beechwood and Lincoln had available.

188.    SHIP reasonably relied on Beechwood as its investment manager to provide SHIP with accurate and honest information concerning the nature and value of SHIP's investments, and made decisions relating to the IMAs and the IMA investments to its detriment based on the information provided. SHIP would not have continued to entrust its assets to Beechwood, increased the investments under the Beechwood Re IMA, entered into the BBIL IMA, or made investments with Beechwood outside of the IMAs, but for the false information given to SHIP by Beechwood regarding the nature and value of the investments which were valued by Lincoln, including the concealment of material facts that adversely affected their value.

189.    Lincoln's valuation reports were the critical lever that enabled Beechwood to take unearned "performance fees" from SHIP's investment accounts. It was Lincoln's inflated valuations that appeared to confirm that Beechwood exceeded performance benchmarks defined in the IMAs. Lincoln knew that these valuations were inflated.

190.    Further, SHIP would never have authorized Beechwood to withdraw performance fees from the IMA accounts had SHIP known the true value of the IMA assets, and that the marks which Beechwood was using to demonstrate its supposed outperformance (blessed by Lincoln) were fraudulent.

191.    Each of the IMAs provided that performance fees were to be calculated based on both "realized and **unrealized**" net trading profit.  In other words, the IMAs entitled Beechwood to include in its calculation of performance fees not just the gain or loss realized on an actual disposition of an investment, but also any unrealized gain or loss in the value of SHIP's extant investments at the time of the valuations.

192.    Rather than value SHIP's assets in a manner that reflected their true value, Lincoln rubber-stamped Beachwood's inflated valuations of SHIP's investments.  As a result, Beechwood never made any true-up payments to SHIP's account, as required by the IMAs.   Thus, Beechwood's misrepresentations regarding the value of SHIP's assets constituted both a breach of the "good faith" required by the IMAs in the valuation process and a breach of the true-up provisions of the IMAs.  Each of the Co-conspirators had knowledge that the values provided to SHIP were misrepresented, and each took actions to help facilitate these misrepresentations.

### iii.    *Beechwood Takes Performance Fees*

193.    Beechwood used Lincoln's valuation reports to induce SHIP to authorize the payment of "performance fees" to Beechwood under the IMAs, even though such fees had not actually been earned.

194.    For example, on April 2, 2015, Elliot Feit, Finance Director of Beechwood, acting for and at the direction of Beechwood and through the mails and wires of interstate commerce, requested authorization from Lorentz to withdraw $3,500,000 as a performance fee from the BAM IMA account.  In support of this request, Feit represented in writing to Lorentz that the assets

contained in the BAM IMA account at that time possessed a market value of $115,143,472.39 "and a principal plus interest owed to SHIP of $110,780,801.37."  In light of the asserted "excess" of $4,362,671.02, Feit requested approval of a withdrawal of $3,500,00 in performance fees, and submitted a "Withdrawal Notice" for that amount signed by Saks for countersignature by Lorentz. Feit further supported this request by attaching the Wilmington Trust statements for this account for the period ending on March 31, 2015, to illustrate the purported investment activity and interest accrued on the account.

195.    In reasonable reliance on Beechwood's representations, on April 6, 2015, Lorentz authorized the withdrawal of $3,500,000 in performance fees from the BAM IMA account by countersigning the submitted "Withdrawal Notice."  On that same day, $3,500,000 was withdrawn from the BAM IMA account. Beechwood and Feit followed the same general pattern of conduct for withdrawals from Beechwood RE and BBIL's IMA accounts.

196.    In fact, the representations upon which Lorentz and SHIP reasonably relied were false, because the Lincoln valuations of the assets contained in the BAM IMA account were grossly misstated and overvalued in that, as noted below in greater detail, they did not take into consideration the distressed conditions of several assets, including, but not limited to, the MYSYRL investments.  The valuations of these assets were calculated by or through Beechwood and Lincoln, which reported them to Wilmington Trust to include in its account statements.

197.    The asset valuations by Lincoln and Beechwood cannot be reconciled with the facts at least partially now known to SHIP, but known at the time by Beechwood, which should have been factored by Beechwood into any calculation of performance fees – including, for example, the distressed conditions of the MYSYRL investments – and thus the reported valuations were demonstrably false at the time BAM requested approval of the performance fees.   Upon

information and belief, had the value of those assets been properly stated and considered by Lincoln, BAM could not have claimed at least the $3,500,000 in performance fees it took.

198.    Beechwood engaged in a similar pattern of conduct with respect to the withdrawal of performance fees over the period that Lincoln provided valuations under the Beechwood Re IMA, requesting withdrawal of at least $3,100,000, and under the BBIL IMA, requesting withdrawal of at least $500,000.

199.    Each of these requests included, and was based on, Beechwood's misrepresentation that the aggregate investment return on the assets held in the BAM, Beechwood Re, and BBIL IMA accounts had appreciated beyond the 5.85% threshold required by the BBIL IMA, such that Beechwood was entitled to receive the performance fees requested.

200.    SHIP relied on Beechwood's falsely overstated returns and Lincoln's inflated valuations, which remained essentially unchanged over that entire period aside from minor fluctuations, in authorizing the withdrawal of at least the amounts provided above – and potentially more – which were taken as performance fees that had, in fact, not been earned under the IMAs. SHIP was damaged when it relied on these false valuations and paid out unearned performance fees. When SHIP reasserted control over its assets from Beechwood in and around November 2016, it quickly discovered the distressed, illiquid, and impaired value of many of its largest holdings.  This condition, which existed across the investments in all three IMAs, is irreconcilable with Lincoln and Beechwood's consistent representations that values existed at or near par values, and in some cases valuing purportedly accrued interest that did not exist because the funds had not in fact truly been "invested" but rather served as interest-free loans to related parties.

201.    Beechwood therefore, with the substantial assistance of Lincoln, falsely overstated and intentionally misrepresented SHIP's returns on the investments made under the IMAs in order

to receive substantial unearned performance fees. Because these performance fees had not in fact been earned, Beechwood essentially paid itself out of SHIP's invested principal and not out of excess earnings, resulting in additional damages to SHIP and further reducing the ability to generate true positive returns on SHIP's assets.

**G.    Revelation of the Fraudulent Beechwood-Platinum Scheme and Further Concealment**

202.    News reports in the summer and fall of 2016 gradually began to expose the nature and extent of Beechwood's involvement with and control by Platinum. Murray Huberfeld of Platinum was arrested on June 8, 2016, and news articles followed, but they did not reveal Platinum's complex connections to Beechwood. The first article to reveal connections between Platinum and Beechwood was published by the WSJ on July 25, 2016.

203.    After its connections to Platinum were identified, Beechwood continued its pattern of deceiving SHIP. A July 26, 2016 Beechwood letter to Wegner, SHIP's CEO, represented that Beechwood had reviewed investments that Beechwood made involving Platinum Partners and reassured SHIP that Beechwood has "no reason to believe that either Beechwood or any of your related portfolios suffered financial harm." Beechwood also continued to tout its "appropriate risk management" and "strong safeguards" for SHIP's investments. Beechwood likewise represented to SHIP that it was in the process of, and was capable of, severing all ties with Platinum. The July 26 letter misrepresents that all Platinum investments "made in assets related to that fund … were made by a former employee who worked for Beechwood in 2014."

204.    Indeed, into the fall of 2016, SHIP continued to be assured that its investments were sound, secured by appropriate collateral, and appropriately valued. Beechwood assured SHIP that Beechwood had "no reason to believe that either Beechwood or any of [SHIP's] related portfolio's suffered financial harm" and affirmatively represented that the value of SHIP's investments

continued to increase. Relying on these representations, SHIP continued to approve Beechwood's requests to withdraw cash and assets from the Wilmington Trust accounts as performance fees payable to Beechwood.

205.    Despite SHIP's efforts to limit its harm, by November 2016 much of the damage already was done.  Since then, SHIP gradually began to uncover misrepresentations and omissions by Beechwood and the pervasive cover-up of Beechwood's disastrously harmful and unsuitable investment of SHIP assets, as well as the critical role of Lincoln in aiding and abetting Beechwood's fraud though "independent" valuations.

## CLAIMS FOR RELIEF

## COUNT ONE
### Aiding and Abetting Fraud

### (Against Lincoln International LLC and Lincoln Partners Advisors LLC)

206.    SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

207.    As set forth in detail above, the Beechwood defrauded SHIP by, among other things, (a) fraudulently misrepresenting the fair market value of the assets that Beechwood invested in Platinum-controlled funds and entities, among other investments, which were the product of self-dealing; (b) fraudulently misrepresenting to SHIP that an independent valuation company would issue independent valuations that would reveal whether the assets were being safely and prudently invested; (c) fraudulently misrepresenting that Beechwood intended to invest SHIP's assets prudently, and with the intention to safeguard those assets, when in fact Beechwood intended to infect the IMA accounts with investments in egregious Platinum-controlled funds and entities and then leverage and encumber the assets with their egregious "investment strategy";  (d) fraudulently misrepresenting the nature and identities of Beechwood senior management team as

being Beechwood personnel, when in fact the individuals were loyal to, if not employed by, Platinum;  (e) fraudulently divert unearned "performance fees" from SHIP's accounts based on inflated valuations.

208.    Beechwood's misrepresentations and/or omissions were made knowingly and were intended to induce SHIP's reliance by inducing SHIP to enter into the IMAs with Beechwood, and not to terminate the IMAs or to take other actions to ameliorate the damages SHIP was incurring while the IMAs were continuing to pay performance fees.  As set forth above, SHIP justifiably relied, to their detriment, upon each of BBIL, Beechwood Re, BAM, and BRILLC's false representations and/or omissions.

209.    Lincoln knowingly provided substantial assistance to Beechwood's fraud.

210.    Lincoln knew that (i) Platinum and BBIL/Beechwood Re/BAM/BRILLC were inseparable entities and, therefore, that the transactions Lincoln was asked to value were not arm's length transactions and were incapable of being assigned a fair market value without at least independent verification by Lincoln; (ii) Lincoln's valuations were based on inaccurate or false or incomplete information provided by Beechwood; (iii) SHIP's assets were acquired by Beechwood in non-arm's length transactions, (iv) Platinum controlled Beechwood's investments,  and (v) certain individuals identified as Beechwood representatives were actually employed by Platinum.  Lincoln also knew that its valuations of SHIP's assets were false and inflated, because they applied valuation standards based on arm's length transactions to non-arm's length transactions.  Further, Lincoln prepared valuation materials for SHIP, and knew that SHIP would receive and rely on Lincoln's inflated marks.

211.    Lincoln provided substantial assistance to Beechwood in its efforts to defraud SHIP.   Absent Lincoln's mark to market valuations (which Beechwood transmitted to SHIP with

66

an indication that Lincoln was the "price source"), SHIP never would have entered the IMAs in the first place, or remained invested with Beechwood. Lincoln's marks further facilitated the overvaluation of SHIP's investments which allowed Beechwood to fraudulently divert unearned "performance fees" from SHIP's accounts.

212.   Lincoln knowingly provided substantial, affirmative assistance to advance Beechwood's fraud by, among other things, providing valuations that made Beechwood's self-dealing look legitimate. As explained previously, this was a crucial element of the fraudulent scheme. This was accomplished by, among other things, Lincoln rubber-stamping investments at fair value without sufficient or sometimes any supporting documentation, Lincoln capitulating to Beechwood's demands with respect to the methodologies and information used by Lincoln to price assets, as well as Lincoln intentionally endorsing valuations of the Platinum-related investments as arm's length transactions that could be assigned a fair market value.

213.   SHIP has been injured as a proximate result of Lincoln's substantial assistance in that SHIP's injuries were at least the reasonably foreseeable result of Lincoln's conduct: Lincoln knew that its valuations would reach SHIP and that SHIP would rely on such valuations to falsely assure SHIP that the assets were being prudently invested.

214.   Consequently, SHIP is entitled to a judgment of compensatory damages in an amount to be determined at trial, together with interest at the statutory rate.

215.   Lincoln's substantial assistance with the fraud was intentional and deliberate – indeed, as set forth above, Lincoln acted with the intent of pleasing BBIL/Beechwood Re/BAM by doing its fraudulent bidding, in the hopes of securing future business for itself from Platinum. This evidences a high degree of moral turpitude, and demonstrates Lincoln's wanton dishonesty or reckless disregard of SHIP's rights.

216.    Because Lincoln's substantial assistance with the fraud was malicious, reckless, outrageous and demonstrated a wanton disregard of SHIP's rights, SHIP is entitled to punitive damages.

## COUNT TWO

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Lincoln International LLC and Lincoln Partners Advisors LLC)

217.    SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

218.    As set forth above, BBIL, Beechwood Re, BAM, and BRILLC owed fiduciary duties to SHIP in the investigation, recommendation, management and supervision of SHIP's assets. BBIL, Beechwood Re, BAM, and BRILLC breached their fiduciary duties to SHIP by, among other things, making egregious investments of the assets in Platinum-controlled funds and entities, misrepresenting their "investment strategy" to SHIP and fraudulently concealing from SHIP their true investment strategy. Additionally, under the IMAs, BBIL, Beechwood Re, and BRILLC were required to pay SHIP the guaranteed investment return and maintain the asset base, whether the investments performed as represented they would or not. As set forth above, BBIL, Beechwood Re, BAM, and BRILLC overvalued assets to create the false impression that the IMA accounts had exceeded the guaranteed 5.85% return, thus allowing BBIL, Beechwood Re, and BRILLC to avoid their obligations to true-up IMA accounts and taker performance fees. Because these performance fees had not in fact been earned, Beechwood paid themselves out of SHIP's invested principal and not out of excess earnings.

219.    SHIP has been injured as a proximate result of BBIL, Beechwood Re, BAM, and BRILLC's breaches of their fiduciary duties.

220.    As described above, Lincoln had actual knowledge that BBIL, Beechwood Re, BAM, and BRILLC were engaging in schemes to defraud SHIP and thereby breaching their fiduciary duties to SHIP, among other things, misrepresenting the value of Beechwood investments of the assets as having 100% fair market value.

221.    Lincoln knowingly and substantially assisted, participated in, enabled, and promoted BBIL, Beechwood Re, BAM, and BRILLC's breaches of their fiduciary obligations to SHIP by, among other things, preparing false and misleading overvaluations of Beechwood's investments to make it appear that the investments had a fair market value, and were being safely and prudently invested, when in fact they were not. The fraudulent valuations calculated by Lincoln at the direction of BBIL, Beechwood Re, BAM, and BRILLC also enabled BBIL, Beechwood Re, BAM, and BRILLC to breach their fiduciary duties by enabling Beechwood to take unearned performance fees, and to avoid the obligation to replenish the IMAs.

222.    SHIP has been injured as a result of BBIL, Beechwood Re, BAM, and BRILLC's breaches of their fiduciary duties and Lincoln's substantial participation in those breaches.

223.    Consequently, SHIP is entitled to a judgment of compensatory damages in an amount to be determined at trial, together with interest at the statutory rate.

224.    Because Lincoln's actions were malicious, reckless, outrageous and demonstrated a wanton disregard of SHIP's rights, SHIP is entitled to punitive damages.

## COUNT THREE
### Civil Conspiracy

**(Against Lincoln International LLC and Lincoln Partners Advisors LLC)**

225.    SHIP incorporates each and every allegation above as if set forth fully in this count.

69

226.    As alleged in this Complaint and in the SHIP Action, the PPVA Complaint, the

PPCO Complaint, the SEC Complaint, the Criminal Indictments, and the CNO Pleading,[14]

Lincoln, the Co-Conspirators, the Beechwood Owner Trusts, the BRILLC Series Entities, and the

BRILLC Series Members conspired with Beechwood, Feuer, Taylor, and Levy to commit fraud in

the inducement against SHIP by fraudulently inducing SHIP to enter each of the three IMAs and

in turn invest SHIP's funds under those IMAs, as well as by causing or inducing SHIP to enter

into other investments.

227.    Lincoln conspired to commit fraud with the Co-conspirators in the performance

against SHIP by misrepresenting the value, nature and performance of SHIP's investments,

thereby causing SHIP to remain in unsuitable investments that favored the interests of the Co-

conspirators and their related parties over SHIP's best interests and to pay performance fees as

well as continue to invest and not terminate the fraudulently induced IMAs or other investments.

228.    Lincoln also conspired with the Co-Conspirators, Beechwood, Feuer, Taylor, and

Levy to breach the fiduciary duties that Beechwood, Feuer, Taylor, and Levy owed to SHIP as

SHIP's investment managers by engaging in transactions for the benefit of Beechwood and

Platinum and to the detriment of SHIP, by denying SHIP access to full and accurate information

about the nature and performance of its investments, and by claiming and collecting millions of

dollars in performance fees from SHIP which were, in fact, unearned.

229.    At all relevant times, Lincoln and each Co-conspirator was a knowing and

intentional participant in the conspiracy and agreed to pursue its aims.  The Co-conspirators were

closely related entities or individuals.  The Platinum Insiders, together with the Beechwood

---

[14] "CNO Pleading" means the crossclaims and third-party claims filed by Washington National
Insurance Company and Bankers Conseco Life Insurance Company in the PPCO Action.

Insiders, exercised control and ownership of the Beechwood Advisors, which acted as a revolving door of Platinum executives.

230.    Lincoln and each Co-conspirator committed one or more overt acts in furtherance of the conspiracy, including, but not limited to, issuing fraudulent valuation reports that overvalued SHIP's assets, providing inflated marks for SHIP's assets, fraudulently concealing material information from SHIP concerning the performance and value of its assets, egregiously and maliciously mishandling the assets that SHIP entrusted to Beechwood, and accepting ill-gotten benefits of the scheme.

231.    SHIP has been injured as a proximate result of the wrongful acts committed by Beechwood in furtherance of the conspiracy.

232.    As a result of Lincoln' conduct, SHIP has suffered damages in excess of $75,000.

233.    Because of the intentional, deliberate, and malicious nature of Lincoln's acts, SHIP is entitled to punitive damages.

## COUNT FOUR
### Contribution and Indemnity

### (Against Lincoln International LLC and Lincoln Partners Advisors LLC)

234.    SHIP incorporates each and every allegation above as if set forth fully in this count.

235.    The Complaint entitled Melanie L. Cyganowski v. Beechwood Re Ltd., et al. was filed on December 20, 2018 alleging damages against SHIP. The Complaint entitled Levy v. Senior Health Insurance Company of Pennsylvania was filed in April 10, 2019 alleging damages against SHIP.  The Complaint B Asset Manager, L.P. et al. v. Senior Health Insurance Company of Pennsylvania was filed in May 16, 2019 alleging damages against SHIP.  The Complaint entitled Principal Growth Strategies, LLC v. AGH Parent, LLC et al. was filed in June 7, 2019 alleging

damages against SHIP.  Said Complaints, for purposes of its allegations only, is incorporated by reference herein as though fully set forth herein.

236.    SHIP is incurring and has incurred attorneys' fees, court costs, investigative costs, and other costs in connection with defending said Complaints, the exact amount of which is unknown at this time.

237.    If SHIP is held liable and responsible to plaintiff for damages as alleged in the Complaints, it will be solely due to the conduct of Lincoln and/or other parties.  Therefore, SHIP is entitled to be indemnified by Lincoln and/or other parties, and each of them should such liability arise.

238.    If SHIP is held liable or responsible to the plaintiff for damages, if said liability is vicarious only and said liability will be the direct and proximate result of the active and affirmative conduct on the part of Lincoln and/or other parties, and each of them.

239.    SHIP is entitled to complete indemnification by said Lincoln and/or other parties, and each of them, for any sums which SHIP may be adjudicated liable to plaintiff, with costs of defense, costs of suit, and reasonable attorneys' fees incurred therefrom.

<u>**COUNT FIVE**</u>

**Unjust Enrichment/Constructive Trust**

**(Against Lincoln International LLC and Lincoln Partners Advisors LLC)**

240.    SHIP incorporates each and every allegation above as if set forth verbatim in this paragraph.

241.    Lincoln was unjustly enriched, at SHIP's expense. BBIL, Beechwood Re, and BRILLC avoided their obligations to true-up the IMA accounts by using Lincoln's bogus valuations to claim that the investments were adequately capitalized with investments having a fair market value which they in fact did not have; the investments were the product of self-dealing.

Lincoln used SHIP assets to keep the Platinum-Beechwood fraud scheme afloat, and to enrich themselves in the process in the form of compensation and/or other payouts.

242.    It is against equity and good conscience to permit Lincoln to retain any portion of the funds they received in the form of compensation and/or other payouts, as Beechwood made Lincoln's compensation and/or payouts with the ill-gotten gains Beechwood received from SHIP. SHIP seeks an accounting of the monies paid to Lincoln, and a constructive trust should be imposed on all funds that Beechwood removed from SHIP's accounts and paid to Lincoln.

## PRAYER FOR RELIEF

WHEREFORE, SHIP respectfully demands judgment in the amount of actual damages proven at trial, including all direct or consequential damages, punitive damages under state law, damages for diminution of value, and restitution, plus all applicable interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 31, 2019
New York, New York

SEIDEN LAW GROUP LLP


By:   /s/ Amiad Kushner
      Amiad Kushner
      Michael Cilento
      Dov B. Gold
      469 Seventh Avenue, Fifth Fl.
      New York, NY 10018
      (212) 523-0686

      *Counsel for Senior Health Insurance*
      *Company of Pennsylvania*

73