USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/5/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
In re PLATINUM-BEECHWOOD LITIGATION  :      18-cv-6658 (JSR)
------------------------------------- x
SENIOR HEALTH INSURANCE COMPANY OF   :
PENNSYLVANIA,                        :
                                     :
       Plaintiff,                    :      19-cv-7137 (JSR)
                                     :
       -v-                           :
                                     :
LINCOLN INTERNATIONAL LLC, et al.,   :
                                     :      MEMORANDUM ORDER
       Defendants.                   :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.

Familiarity with the procedural background to this case is here assumed. As relevant here, on October 31, 2019 plaintiff Senior Health Insurance Company of Pennsylvania ("SHIP") filed an amended complaint against defendants Lincoln International LLC and Lincoln Partners Advisors LLC (collectively, "Lincoln"), charging Lincoln with: (1) aiding and abetting fraud, (2) aiding and abetting breach of fiduciary duty, (3) civil conspiracy, (4) contribution and indemnity, and (5) unjust enrichment. ECF No. 39. Now before the Court is Lincoln's motion to dismiss the amended complaint. ECF No. 42. SHIP opposes. Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Complaint, ECF No. 45 ("SHIP Opp."). For the reasons set forth below, the Court grants the motion to dismiss the claims

for civil conspiracy, contribution and indemnity, and unjust enrichment, but denies the motion in all other respects.

## Background

The following allegations are taken from the amended complaint and are assumed true for the purposes of assessing the motion to dismiss:

Parties

Plaintiff SHIP is an insurance company domiciled in the state of Pennsylvania with its principal place of business in Carmel, Indiana. Amended Complaint, ECF No. 39 ("Amended Complaint") ¶ 9. Defendants Lincoln International LLC and Lincoln Partners Advisors LLC are valuation companies domiciled in the state of Illinois with their principal place of business in New York. Id. ¶¶ 10-11. Lincoln Partners Advisors LLC is a subsidiary of Lincoln International LLC.

SHIP's Investment with Beechwood

Since SHIP stopped writing any new insurance policy in 2003, its access to capital and its sources of income have been limited to premiums from preexisting policyholders and investment income. Id. ¶¶ 28-30. In this context, starting in late 2013, SHIP started discussing investment opportunities with

Mark Feuer, Scott Taylor, and David Levy of the "Beechwood enterprise."[1] Id. ¶¶ 31-33.

Meanwhile, beginning in 2012, the "Platinum enterprise" faced liquidity crises because of increasing redemption demands and a high concentration of its investment in illiquid assets. Id. ¶ 34. Therefore, certain Platinum and Beechwood individuals – including Mark Nordlicht, David Bodner, Murray Huberfeld, Feuer, and Taylor – established Beechwood Re Ltd. ("Beechwood Re"), a reinsurance company, to fraudulently induce insurance companies and institutional investors, such as SHIP, to hand over funds to Beechwood Re, which in turn diverted the funds to keep Platinum entities afloat and enrich the co-conspirators. Id. ¶¶ 35-36.

The key to the scheme's success was to keep the relationship between Beechwood and Platinum secret, as their affiliation would dissuade investors from investing with Beechwood. Id. ¶ 39. The co-conspirators misrepresented who owned and controlled Beechwood and created a complex structure to obscure Platinum's control of Beechwood. Id. ¶¶ 39-40. They also repeatedly misrepresented to SHIP, inter alia, that SHIP's money would be invested in high-quality, high-yield investments

---

[1] Familiarity with the relevant nonparties, as detailed in the Amended Complaint ¶¶ 12-25, is here assumed.

-3-

and that there would be "independent valuation and reporting" from Lincoln on "all valuations on a quarterly basis." Id. ¶¶ 44-50. These representations were false, as SHIP's money was used to prop up Platinum entities and as Lincoln was not truly independent, as described below. Id. ¶¶ 51-54.

On May 22, 2014, June 13, 2014, and January 15, 2015, SHIP entered into three investment management agreements ("IMAs") with Beechwood Bermuda International Ltd. ("BBIL"), Beechwood Re, and B Asset Manager LP ("BAM I"), respectively, pursuant to which SHIP invested a total sum of $270 million. Id. ¶¶ 60, 61, 69, 173. All three IMAs contained similar provisions. For instance, each IMA promised, on a quarterly basis, valuation reports from an independent third-party valuation company. Id. ¶¶ 57-58.

Each IMA contractually guaranteed to SHIP an annual investment return of 5.85% of the net asset value ("NAV") of the assets in the relevant account, and, in the event of a shortfall, the relevant Beechwood counterparty was required to make up the difference (with a slight modification for the IMA with BAM I). Id. ¶¶ 63, 74-76. On the other hand, the Beechwood counterparties could retain investment returns above the 5.85% return as a performance fee. Id. ¶¶ 63, 75.

Lincoln's Alleged Role in the Platinum-Beechwood Scheme

-4-

Lincoln served as a valuation firm for Beechwood from February 2014 to February 2015. Id. ¶¶ 88, 169. Lincoln accepted the engagement, in the hope of securing additional work from Platinum in the future by replacing Sterling Valuation Group (Platinum's then-main valuation firm) for valuation of all Platinum funds. Id. ¶ 86. On paper, Lincoln was engaged by Beechwood, but Lincoln knew that it was working for Platinum and that Platinum and Beechwood were closely related. Id. ¶¶ 88, 90-92.

Lincoln issued valuation reports based on what it knew to be false and misleading information in the following respects:

First, Lincoln knowingly relied on deficient information and documentation in issuing valuation reports, as discussed in more detail below. Id. ¶ 95.

Second, Lincoln included disclaimer language in its Negative Assurance Letters that it knew was false and misleading, to wit, language stating that Lincoln had "relied upon and assumed the accuracy and completeness of the financial information supplied to [Lincoln] and considered in [Lincoln's] analysis" of fair value, but that, based on Lincoln's analysis, "nothing came to [Lincoln's] attention that would lead [it] to believe that management's fair value estimates as shown are unreasonable." Id. ¶ 101.

Third, Lincoln knew that the information in its valuation reports was inaccurate. Lincoln assigned "fair market value" to Beechwood's investments in Platinum-related entities even though it knew that assigning fair market value to a non-arm's length transaction was improper. Id. ¶¶ 106, 115-16. In actuality, Lincoln knew that Beechwood and Platinum were affiliated entities and that many of Beechwood's investments, such as the Agera investments, were in Platinum-related entities. Id. ¶¶ 115, 117.

Fourth, Lincoln did not act independently. Lincoln valued the Platinum funds at whatever NAVs Beechwood told Lincoln to use; it ignored the self-dealing nature of those transactions in its valuations; and at Beechwood's request, it removed ratings, references to Platinum, and discussions of "speculative assets" from its valuations. Id. ¶¶ 120-21, 123-25. Furthermore, at Beechwood's request, Lincoln changed its valuation methodologies so that it would arrive at the valuation ranges that Beechwood desired, even when that meant disregarding industry-standard valuation models. Id. ¶¶ 126-36.

<u>Primary Fraud and Breach of Fiduciary Duty by Beechwood</u>

The Beechwood counterparties to the IMAs violated various provisions of the IMAs and promises that they had made to induce

SHIP to enter into the IMAs, and they did so with Lincoln's knowledge and facilitation:

First, Beechwood placed SHIP's money into investments that were highly speculative, inadequately secured, and not appropriately disclosed to SHIP, in violation of the relevant investment guidelines. Id. ¶ 174. In particular, Beechwood used SHIP's assets to engage in related-party transactions to prop up Platinum entities. Id. ¶ 176. Lincoln's deletion, at Beechwood's direction, of reference in its reports to Platinum-controlled investments and its omission regarding the related-party nature of these transactions facilitated Beechwood's scheme. Id. ¶ 178.

Second, by inflating asset values, Beechwood collected unearned performance fees from SHIP. Id. ¶ 180. Lincoln's "independent" reports provided an air of legitimacy to such gross overvaluation and resulting extraction of performance fees. Id. ¶¶ 180-83. Based on the valuations provided by Lincoln, Beechwood reported each investment made under the IMAs to Wilmington Trust, the trustee of the reinsurance trusts, and, in turn, Wilmington Trust would reflect that information on the statement for the applicable IMA account submitted to SHIP. Id. ¶¶ 144, 184. Also, Beechwood sent the Wilmington Trust statements to SHIP to justify Beechwood's unearned performance fees. Id. ¶ 146. Lincoln's substantial assistance in

overvaluation was crucial in Beechwood's taking millions of dollars in performance fees while avoiding Beechwood's obligations to true-up the IMA accounts. Id. ¶¶ 77, 171-72, 194-99, 201.

In sum, SHIP would not have continued to entrust its assets to Beechwood, increased the amount of investment under the IMAs, entered into the last IMA, or authorized Beechwood to withdraw performance fees, but for the false information Beechwood gave to SHIP – which included the fraudulent valuations by Lincoln. Id. ¶ 188.

Termination of Lincoln's Engagement

By December 2014, it was becoming difficult for Lincoln to ignore the glaring issues surrounding Beechwood's investment values, insufficient collateral, and countless self-dealing investments. Id. ¶ 148; see also id. ¶¶ 151-52. Lincoln internally discussed reverting to the standard valuation methodologies that they had abandoned and began internally re-reviewing the entire Beechwood portfolio. Id. ¶ 149-50, 153-54. On January 7, 2015, Lincoln internally estimated that a 5-10% write-down of the entire Beechwood investment portfolio was warranted, and, shortly after in its final Positive Assurance Valuation, Lincoln dropped the value of multiple investments (e.g., China Horizon, Salt Lake, SMRTV, and Implant Sciences

-8-

investments), which Lincoln had been approving at 100% fair value in multiple valuation reports over many months. Id. ¶ 156.

Eventually, on February 19, 2015, Lincoln terminated its relationship with Beechwood. Id. ¶¶ 161, 169. On the same day, Lincoln issued its final Negative Assurance Letter for SHIP's assets. Id. ¶ 169. Also, on February 5, 2015 and February 19, 2015, a Lincoln associate sent emails to the relevant internal members to "cleanse [all] files on the Beechwood valuations in accordance with our record retention policy" and to "delete any draft models or reports and just hang onto the final models and analyses," in order to cover up any evidence of Lincoln's wrongdoing. Id. ¶¶ 162, 169.

## Analysis

In order to survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When adjudicating a motion to dismiss, the Court "accept[s] all

---

[2] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Any claim rooted in fraud is subject to the heighted pleading standard of Rule 9(b). See Fed. R. Civ. P. 9(b).

### A. Aiding and Abetting Claims (Counts One and Two)

Count One alleges that Lincoln aided and abetted the Beechwood fraud. "To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014).

Count Two alleges that Lincoln aided and abetted the breach of fiduciary duty by Beechwood individuals and entities. "A claim for aiding and abetting a breach of fiduciary duty requires, inter alia, that the defendant knowingly induced or participated in the breach." Krys v. Butt, 486 F. App'x 153, 157 (2d Cir. 2012) (summary order).

Because "the same activity is alleged to constitute the primary violation underlying both claims" in Counts One and Two, the claim for aiding and abetting fraud overlaps substantially with the claim for aiding and abetting breach of fiduciary duty.

-10-

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007). For this reason, except where otherwise stated, these two claims are analyzed together.

The parties do not dispute that both the primary fraud and the breach of fiduciary duty by Beechwood individuals and entities are adequately pled. Indeed, the amended complaint alleges a detailed account of their fraud and breach of the fiduciary duty owed to SHIP, in the form of, among other things: misrepresenting the fair market value of the assets that Beechwood invested in Platinum-controlled funds and entities, and diverting unearned performance fees from SHIP's accounts based on inflated valuations. See Amended Complaint ¶¶ 180-201.

In addition, knowledge element of the aiding and abetting claims against Lincoln is adequately pled. The amended complaint alleges detailed facts giving rise to a strong inference that Lincoln had the actual knowledge that: (1) the information Beechwood provided to Lincoln was materially deficient, id. ¶¶ 95-113;[3] (2) Lincoln was assigning "fair market value" to

---

[3] For instance, Lincoln's internal emails show that it had seen "no support" for any of the five Platinum-guaranteed loans, including having "never [been] provided the details of the guarantees Beechwood says they have in Implant Sciences, LC Energy and Northstar." Yet, Lincoln rubber-stamped valuations for each of these loans at 100% fair value. Amended Complaint ¶ 111. As another example, although Lincoln had received only an

-11-

Beechwood's investments in Platinum-related entities (e.g., MYSYRL Capital LLC, The New Bradley House Ltd., Partners Credit Opportunities Fund LLC, Platinum Partners Value Arbitrate Fund LLC, as valued in the Negative Assurance Letter dated February 19, 2015), when it knew those investments were not at arm's length, id. ¶¶ 79-85, 106, 114-19; (3) its valuation process was not independent, id. ¶¶ 120-36; and (4) SHIP was relying on Lincoln's valuations, id. ¶¶ 137-38.

Lastly, the substantial assistance element (along with proximate causation[4]) is adequately pled as well. Lincoln allegedly provided defective valuations that it knew would be used by Beechwood and Wilmington Trust to create relevant statements and documentation for SHIP. Id. ¶¶ 49-50, 93-94. Specifically, on January 15, 2015, Lincoln issued a Quarterly Portfolio Review valuing SHIP's investments as of December 31,

---

income statement for New Bradley House at least until nearly nine months after it began valuing New Bradley House and it had known that "Beechwood underwrote the loans [relating to New Bradley House] without financial information," Lincoln valued it at 100% fair value in nine Negative Assurance Letters and Positive Assurance Valuations between March and November of 2014. Id. ¶ 112.

[4] The concept of proximate cause is already "embedded into the substantial assistance element." Silvercreek Management, Inc. v. Citigroup, Inc. et al., 346 F. Supp. 3d 473, 488 (S.D.N.Y. 2018). But even if it were a separate element, it is here adequately alleged.

-12-

2014, and, on February 19, 2015, it issued a Negative Assurance Letter valuing a handful of SHIP's investments as of January 30, 2015. Id. ¶¶ 101-02. Among many examples, Lincoln, as noted, valued the New Bradley House loan – a SHIP investment – at 100% fair market value in nine valuation reports issued between March and November 2014 and in two additional valuation reports in early 2015, even when this loan was not an arm's-length transaction and therefore incapable of receiving a fair market value. Id. ¶ 112.

Lincoln argues that proximate causation is not plausibly pled, based on the following two related assertions. First, only one performance fee withdrawal request – made on October 2, 2014 and covering the period ending on September 30, 2014 – was made before Lincoln's termination in February 2015, and thus all but that request cannot have caused SHIP's injury. Second, even that one performance fee request was not related to Lincoln's valuations at all, because, in Lincoln's view, its first valuation of SHIP's investments did not occur until early 2015. Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 43 ("Lincoln Mem."), at 9. While SHIP disputes both assertions, it suffices to note that the second assertion is contradicted by the allegation in the amended complaint that an internal Lincoln

-13-

email dated February 6, 2015 was sent "six months after [Lincoln] began providing valuation reports for Beechwood Re/BAM reviewing and approving countless investments of SHIP's assets valued at 100% fair value." Amended Complaint ¶ 113. Given the factual contradiction, Lincoln's argument fails on the face of the pleading.

Moreover, even if both assertions were true, proximate causation still exists, because SHIP's injury from Lincoln's conduct is not limited to payout of performance fees. For instance, the amended complaint plausibly alleges that the inflated NAVs enabled Beechwood to avoid their obligation to true up SHIP's accounts in the event that the actual return fell below the guaranteed rate. Id. ¶¶ 63, 76, 171, 192, 218. The amended complaint also adequately pleads that Lincoln's fraudulent valuations contributed to preventing SHIP from discovering the fraud and terminating the IMAs.[5] Id. ¶¶ 188, 193-

---

[5] SHIP allegedly received Lincoln's valuation marks in at least three ways: (1) in October 2014, Beechwood sent SHIP a spreadsheet with the prices of SHIP's assets (i.e., Agera Energy and Platinum Partners Value Arbitrage) as of September 30, 2014, which indicated Lincoln as the price source, Amended Complaint ¶ 138; (2) Beechwood sent Lincoln's valuation reports to Wilmington Trust, which in turn used the reports to send to SHIP "each month" a statement of the applicable IMA account, id. ¶¶ 144, 184; and (3) on July 1, 2014, Beechwood provided SHIP with a draft valuation on Agera Energy, LLC prepared by Lincoln, id. ¶ 143. Generally, it is simply implausible that Lincoln, having

201; see also In re Platinum-Beechwood Litig., No. 18-cv-6658 (JSR), 2019 WL 4934967, at *46 (S.D.N.Y. Oct. 7, 2019) (finding proximate causation in a similar context). Each of these allegations is sufficient to establish proximate causation.

For these reasons, Lincoln's motion to dismiss the aiding and abetting claims is denied.

### B. Civil Conspiracy (Count Three)

Under New York law, civil conspiracy is not an independent tort. Instead, "[a]ll that an allegation of conspiracy can accomplish is to connect nonactors, who otherwise might escape liability, with the acts of their co-conspirators." Burns Jackson Miller Summit & Spitzer v. Lindner, 452 N.Y.S.2d 80, 93-94 (2nd Dep't 1982), aff'd, 451 N.E.2d 459 (N.Y. 1983). Here, the civil conspiracy claim, just like Count One, seeks to hold Lincoln secondarily liable for the underlying tort – primary fraud[6] – committed by Beechwood and Platinum insiders, and the factual allegations of Count Three are essentially identical to those set forth in Count One. See Amended Complaint ¶¶ 226-28.

---

served as a valuation company for Beechwood's investments for a full year had no "reasonably foreseeable" impact on SHIP's injury. Silvercreek Management, Inc. v. Citigroup, Inc. et al., 346 F. Supp. 3d 473, 488 (S.D.N.Y. 2018).

[6] SHIP has withdrawn its claim for conspiracy to commit breach of fiduciary duty. SHIP Opp. 11 n.9.

That is, the conspiracy alleged in Count Three is, on any scenario, entirely duplicative of Count One. It therefore must be dismissed.[7] See Loreley Fin. (Jersey) No 3 Ltd. v. Wells Fargo Sec., LLC, No. 12-cv-3723 (RJS), 2016 WL 5719749, at *8 (S.D.N.Y. Sept. 29, 2016) ("In cases in which Plaintiffs' aiding and abetting claims overlap with their conspiracy claims, New York courts have allowed the aiding and abetting claims to proceed, but have dismissed as duplicative the conspiracy claims.").

### C. Contribution and Indemnity (Count Four)

Under New York law, a party cannot "indemnify itself against its own intentional torts." Barbagallo v. Marcum, No. 11-cv-1358 (JBW), 2012 WL 1664238, at *4 (E.D.N.Y. May 11,

---

[7] Each dismissal in this Memorandum Order is with prejudice, for the following reasons. First, for most of the claims, the dismissal cannot be avoided simply by better pleading. Second, SHIP has been on notice for many months - since the Court's Opinion and Order issued on December 6, 2018 disposing of the motion to dismiss the complaint in the SHIP action - as to how this Court analyzed these motions. Indeed, on and after December 6, 2018, the Court had issued no less than four Opinions and Orders disposing close to 30 motions to dismiss in the SHIP and Trott actions. SHIP, obviously, was a party to that process in the SHIP action; and most of the claims in the amended complaint are similar to those claims in the relevant complaints in the SHIP and Trott actions. Third, this immediate action was unduly delayed in large part due to SHIP; giving SHIP another chance to replead would be significantly prejudicial to Lincoln. See Kulkarni v. City Univ. of N.Y., No. 01-cv-10628 (DLC), 2003 WL 23319, at *5 (S.D.N.Y. Jan. 3, 2003).

2012); Austro v. Niagara Mohawk Power Corp., 487 N.E.2d 267, 267 (N.Y. 1985). However, a claim for contribution allows a tort defendant to seek apportionment of liability among joint tortfeasors equal to the relative fault of each tortfeasor. D'Ambrosio v. City of New York, 435 N.E.2d 366, 369 (N.Y. 1982); see also Dole v. Dow Chemical Company, 30 N.Y.2d 143, 143 (1972) (recognizing common law for contribution among all joint tortfeasors in New York).

The amended complaint alleges that, if SHIP is held liable to plaintiffs in Cyganowski v. Beechwood Re Ltd. et al., 18-cv-12018 (JSR) (S.D.N.Y.) (the "Cyganowski action"), B Asset Manager, L.P. et al. v. Senior Health Insurance Company of Pennsylvania, 19-cv-4487 (JSR) (S.D.N.Y.) (the "BAM I action"), and/or Principal Growth Strategies, LLC v. AGH Parent, LLC et al. 19-cv-1319 (CFC) (D. Del.) (the "AGH action"), it will be solely because of the conduct of Lincoln and/or other parties, and thus SHIP is entitled to indemnification by Lincoln and/or other parties. Amended Complaint ¶¶ 234-39.

The contribution and indemnity claim suffers, however, from the fact that SHIP fails to allege why Lincoln is jointly liable to the applicable plaintiffs in the Cyganowski, BAM I, and AGH actions. For instance, SHIP's contribution and indemnity claim to the extent it is based on the Receiver's unjust enrichment

claim against SHIP in the Cyganowski action must be dismissed, because, among other deficiencies, the amended complaint does not make any reference to the December 2015 and March 2016 fraudulent conveyance transactions in the Cyganowski action, let alone allege that Lincoln may be jointly liable to the Receiver for liabilities arising out of such transactions.[8] Similarly, as to the AGH action, the amended complaint does not set forth any reason as to why Lincoln is jointly liable to plaintiffs in the AGH action for SHIP's involvement in the Agera transactions in 2016. For these reasons, Count Four is dismissed.

### D. Unjust Enrichment / Constructive Trust (Count Five)

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking

---

[8] Given that the Court already dismissed various claims against SHIP in the Cyganowski action, the only relevant claims against SHIP in the Cyganowski action for the purpose of the instant contribution and indemnity claim are the fraudulent conveyance, unjust enrichment, and declaratory relief claims against SHIP. The Court also dismisses SHIP's contribution and indemnity claim to the extent it is based on the Receiver's fraudulent conveyance claims against SHIP for another, independent reason: under Article 10 of the New York Debtor and Creditor Law, "there is neither an express nor implied right of indemnification or contribution." Edward M. Fox & James Gadsden, Rights of Indemnification and Contribution Among Persons Liable for Fraudulent Conveyances, 23 Seton Hall L. Rev. 1600, 1605 (1993) (referencing N.Y. Debtor & Creditor Law § 270).

to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). Relief for unjust enrichment is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012).

The amended complaint alleges that Lincoln was unjustly enriched at SHIP's expenses, when it received compensation and payouts derived from the ill-gotten gains Beechwood obtained at SHIP's expense. Amended Complaint ¶¶ 241-42. However, "[t]he existence of a valid and enforceable written contract governing a particular subject matter," as is the case here, "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 193 (N.Y. 1987). Therefore, to the extent that Lincoln's compensation came from the performance fees that Beechwood collected through the IMAs, the unjust enrichment claim is dismissed.

It is true that a portion of the unjust enrichment claim that appears not to be governed by any valid and enforceable written contract concerns SHIP's $50 million investment in the June 2016 Agera transaction outside of the IMAs. Amended

Complaint ¶¶ 173, 235.[9] However, it is not plausible, nor possible, that the $50 million investment would have enriched Lincoln, given that Lincoln's engagement was terminated in February 2015. Id. ¶¶ 7, 169. Therefore, the unjust enrichment claim is dismissed in its entirety.

### Conclusion

For the foregoing reasons, the Court grants Lincoln's motion to dismiss, with prejudice, the claims for civil conspiracy, contribution and indemnity, and unjust enrichment, but denies the motion in all other respects.

The Clerk of the Court is directed to close the entry at docket number 42.

SO ORDERED.

Dated: New York, NY
~~November~~ 12/3/, 2019

JED S. RAKOFF, U.S.D.J.

---

[9] Paragraph 235 of the Amended Complaint incorporates by reference the complaint in the AGH action, which in turn discusses the Agera transaction in 2016. Even if the Court deems the complaint in the AGH action to be not incorporated by reference, there is no allegation in the amended complaint tying this $50 million investment to the period during which Lincoln received compensations from Beechwood.